UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LEON SHABOTT,
Plaintiff,
v.
MERCURY AIR GROUP, INC.,
Defendant.

CIVIL ACTION No.04-11575-JLT
Referred to Magistrate Judge RBC

**AFFIDAVIT OF DAVID C. AISENBERG**

1. I am a lawyer at the firm of Looney, Cohen, Reagan & Aisenberg LLP and am counsel to Mercury Air Group, Inc. ("Mercury"), the defendant in this action. I submit this affidavit in support of Mercury's Renewed Motion for Summary Judgment filed herewith.

2. I personally conducted the deposition of Leon Shabott, the plaintiff herein.

3. Attached are true and accurate copies of the pages of Mr. Shabott's deposition which are cited in Mercury's summary judgment documents.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, this 31st day of October 2005.

David C. Aisenberg

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by [illegible] on 10/31/05

Volume: 1
Pages: 1-[illegible]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11575-JLT

- - - - - - - - - - - - - - - - - -

LEON SHABOTT, :
Plaintiff, :
v. :
MERCURY AIR GROUP, INC., :
Defendant/Third-Party Plaintiff, :
v. :
AVIA [illegible], [illegible] DIVISION, :
Third-Party Defendants. :

- - - - - - - - - - - - - - - - - -

Deposition of LEON SHABOTT, a witness called by counsel for the Defendant/Third-Party Plaintiff, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Rosemary [illegible], a Registered Professional Reporter, CSR No. [illegible], and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Looney, Cohen, Reagan & Aisenberg, LLP, [illegible] Street, Boston, Massachusetts, on Thursday, June 2, 2005, commencing at [illegible] a.m.

APPEARANCES:

Plaintiff appearing Pro Se.

Representing the Defendant/Third-Party Plaintiff:
LOONEY, COHEN, REAGAN & AISENBERG, LLP
[illegible] State Street
Boston, MA [illegible]
(617) [illegible]
BY: DAVID S. AISENBERG, ESQ.

Representing the Third-Party Defendants:
[illegible]
[illegible]
[illegible]
[illegible]
BY: PATRICK B. [illegible], ESQUIRE

I N D E X

| WITNESS | PAGE NO. |
|---|---|
| LEON SHABOTT | |
| BY MR. AISENBERG | 4 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment | [illegible] |
| [illegible] | Plaintiff's Production of Documents | [illegible] |
| [illegible] | Plaintiff's Memorandum in Support of Opposition of Mercury's Motion for Summary Judgment | [illegible] |
| [illegible] | Affidavit of Michael [illegible] | [illegible] |
| [illegible] | Complaint | |
| [illegible] | Affidavit of Leon Shabott | [illegible] |

LEON SHABOTT, Deponent, having been duly sworn, deposes and states as follows:

EXAMINATION BY MR. AISENBERG:

Q Please state your name.
A Leon Shabott.
Q And where do you live, Mr. Shabott?
A Presently at 248 Elm Street in Mountpelier, Vermont.
Q Mr. Shabott, my name is David Aisenberg and I'm an attorney representing Mercury Air Group in a complaint brought by you against Mercury Air Group in the Federal Court in Massachusetts.
Do you understand that?
A Yes, I do.
Q Have you ever been deposed before?
A Once before, yes.
Q So you understand that I'm going to be asking you questions and the court reporter is going to be taking down the questions I ask as well as the responses that you give; do you understand that?
A Yes, I do.

January 7th. Do you see that in the upper right-hand corner of the letter?

A. January 7, 2005, yes.

Q. And is that consistent with your recollection as to when you filed this document in court?

A. You know, I filed so many things, I assume that's correct.

Q. Well, do you see the letter and it says, paragraph four, Plaintiff Leon Shabott's Opposition of Defendant's Motion for Summary Judgment in the letter?

A. I see No. 4, Plaintiff's Motion for, yes, I do.

Q. And that's the same document we're talking about on the first page of Exhibit 1?

A. Yes.

Q. So does that refresh your recollection as to when you filed this particular document?

A. I honestly, without sounding difficult, I don't remember, but I assume it's there. The date is there. Unless I had my own original copies, I couldn't testify for sure.

Q. Well, you sent a copy of this to me, did you not, with the clerk stamp on it?

A. I sent everything, a copy of everything, to

you.

Q. With the clerk's stamp on it?

A. Some of it, I don't think I sent the clerk stamp, but I know I sent you copies of everything.

Q. Anyhow, would you agree with me this is the pleading that you filed in court at some particular time called Plaintiff Lee Shabott's Opposition of Defendant's Motion for Summary Judgment, correct?

A. It looks like it, yes.

Q. And there are various exhibits attached to that document, do you see those?

A. Yes.

Q. Exhibit F, if you turn to that, it's a document with the words, Purchase Agreement, on the top?

A. Yes.

Q. What is Attachment F?

A. Attachment F is a purchase agreement.

Q. For what?

A. For the purchase of an aircraft.

Q. Any aircraft or one in particular relevant to this lawsuit?

A. No, the one in particular, Twin Bonanza, Serial No. 43 which is also known as N3583B.

Q. And looking at this document, does this

refresh your recollection as to when you purchased the airplane?

A. Yes.

Q. When did you purchase the airplane that's the subject of this lawsuit?

A. Okay, I can't remember when I showed up and said, Yes, I will buy it. I'm not sure if this was in March or April or May, but somewhere around there.

Q. When did you sign the purchase agreement?

A. Oh, it's dated here 4/4/98.

Q. Did you sign the document on that date?

A. I don't remember if I did or not, if it was changed, it probably was that day.

Q. Is that your signature --

A. Yes, it is.

Q. -- over the word, Buyer?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. And for how much did you purchase this airplane?

A. For $35,000.

Q. And how did you determine -- how was the purchase price determined?

A. I paid the owner exactly what he was asking for it.

Q. Did you have any negotiations with the owner?

A. Not a bit.

Q. Had you known the owner previously?

A. Yes.

Q. How did you know the owner?

A. I responded to his ad in an aircraft sale magazine and spent many hours in discussion with him about, not only the aircraft, but, you know, life events and commandery developed.

Q. Was there a purchase price in the advertisement?

A. Yes.

Q. And what was the purchase price in the advertisement?

A. $35,000.

Q. And do you still have a copy of the advertisement?

A. No, I do not.

Q. What else was contained in the ad?

A. I don't remember. I'm sorry, that's a long time ago.

Q. And where was the seller located?

A In northern California.

Q. And did you actually see the airplane before you purchased it?

A I agreed to purchase the aircraft before I saw it.

Q And what was that based on?

A I had been looking for this exact type of aircraft with this exact type of indoor -- with these particular motors and modifications for several years, and it was exactly what I wanted at a highly phenomenal price.

And I placed an option to purchase the aircraft over the phone.

Q Do you have any other documents in writing in connection with your purchase of this airplane other than this purchase agreement?

A. I might. I shuffled through so many aircraft paperwork stuff. I may.

Q But you don't know as you sit here today?

A I don't know. I can't testify to that. I'm sorry.

Q And was the purchase of the airplane completed by May 3rd, 1998?

A I don't remember. It was somewhere around

then.

Q Who's handwriting is that where it says --

A. That's mine.

Q. And the purpose of the handwriting where it says, May 3rd due to mutually agreed upon delay?

A. Why was that?

Q Yes.

A For some reason, I actually don't remember the exact events involved, but for some reason we agreed to postpone the final sale.

Q And where and how did you pick up the airplane?

A I picked it up where it was being stored in California.

Q How did you get to California?

A I flew on an airline.

Q Commercial airline?

A Yes.

Q. And did you fly the plane back to Massachusetts?

A Yes, I did.

Q. And how long after you picked the plane up -- strike that.

Do you have records of when you first

flew the plane to Massachusetts?

A Somewhere, yes, of course.

Q And have you produced those in this case?

A No. I have not, not that I remember. I may have. You can check discovery, if you'd like.

Q And so you were living in Massachusetts when you purchased this airplane?

A. That is correct, yes.

Q. And you hadn't yet transitioned at all yet to Vermont, is that correct?

A. That is correct.

Q How long after you purchased this airplane did you begin transitioning to Vermont?

A. I don't exactly recall.

Q And when you purchased this airplane did you have a place in mind where you were going to store it when you weren't using it?

A. Yes, I did.

Q And where was that?

A. That was at Mercury, your clients.

Q And did you enter into some agreement with Mercury as to storing the airplane?

A Yeah -- yes. I'm sorry.

Q Did you enter into more than one agreement

with Mercury as to storing the airplane?

A. Well, throughout this whole -- my relationship with Mercury, I entered into many different agreements, some of them might be construed as storage agreements.

Q Do you recall at some point that you delivered various documents to me in connection with this litigation for production?

A You mean the discovery?

Q Yes.

A The 188 pages?

Q Yes, yes.

A Yes. I do.

MR. AISENBERG: Why don't we mark this as Exhibit 2.

(Exhibit 2 marked for identification.)

BY MR. AISENBERG:

Q. Showing you what we've marked as Exhibit 2, are those the 188 pages that you produced for discovery in this litigation?

(Witness reviewing document)

A. It is. It is a stack of papers, some of which I remember. I'm not sure if it's -- all of the 188 pages are here or there's additional stuff in here.

Q Well, you recall that you numbered each of the

that something got lost in the shuffle but it's all been kept in the same place.

Q And describe for me what you did in determining what documents to produce in this litigation?

A. I took the whole file of airplane stuff that I had.

Q. What's in this airplane stuff file?

A The log books, the -- there were log books, the some old repair receipts, and the communication -- some of the communication between Mercury and myself and other people involved in the whole airplane issue, both before and after discovery of the damaged motors.

Virtually everything I could remember giving -- having at that time.

Q. And you stored that all in one place?

A There was actually one place and then there was a couple of other files I found in some cardboard boxes. As far as I know I've given you everything that I have.

Q Is there anything in this stack that you didn't provide to us?

A Yes.

Q What stuff did you not provide?

A. Maintenance manuals books about the Twin Bonanza aircraft itself, files on other aircraft I looked at through the years and had elected not to purchase.

Q. Anything else?

A. Not that I can recall.

Q. And why didn't you produce the maintenance manuals?

A I was trying to save on Xeroxing.

Q Are these maintenance manuals specific to this airplane? What are these maintenance manuals?

A. There's just the, you know, like if you had an owner's manual for a car. It's kind of the same thing.

Q Okay.

A But I did include for you the maintenance manuals, copies of the maintenance manuals that were specific to the problems involved because I can show you right here in an attempt to give total and full disclosure, Lycoming maintenance manuals, the manufacturer of the engine.

Q So these engines were manufactured by Lycoming?

A. Yes, that I'm sure of.

Q Any other documents you pulled from these stacks and decided not to produce?

A Not that I can recall, but there's a lot of stuff there, but I tried to not be -- I tried to make sure I gave full disclosure of anything pertinent to the case.

Q And how did you determine what was pertinent to the case, that's what I'm trying to understand?

A Okay, anything that had to do with the previous maintenance of the aircraft, anything specific to that particular aircraft, CH43 and N3835 B, Bravo, I tried to provide.

Q I'm sorry?

A N3583B, B meaning Bravo or part of the phonetic alphabet.

Q You say CH43, what is CH43?

A That is the serial number of the aircraft.

Q And what is N3583B?

A That's like the license plate or the registration number.

Q So basically you produced anything specific to this airplane?

A Correct.

Q. Okay. What else did you determine was pertinent for discovery?

A I also included the pages of the Lycoming repair manual that were provided to me by the engine evaluator.

Q Anything else?

A. That I provided you?

Q Right; that you deemed pertinent for discovery in this case?

(Witness reviewing document)

A As far as I can recall that's pretty much it. Oh, excuse me, there was also some papers from Mercury, but that's paperwork specific to the aircraft. So I guess that covers that.

Q Did you include all of the materials that had been exchanged between you and Mercury?

A No.

Q Why not and what was excluded?

A Because what is excluded is the written agreement between the management of Mercury and myself involving negotiations directly after the discovery that the motor had shattered parts inside it.

Q Why didn't you produce that document?

A I still haven't found it. I made a notation somewhere in here that it existed in all of these papers that I sent back and forth.

Q So other than that alleged written agreement is there anything else that you did not include which was exchanged between you and Mercury in connection with this aircraft?

A Not that I can recall, just a lot of stuff there, but a lot of stuff happened and not everything is in -- I don't have everything in one place, but everything I thought was pertinent, I gave you a copy of.

Q Just to clarify, you gave me a -- except for this one document, this one written agreement, alleged written agreement, you have now produced all of the written communications exchanged between Mercury and yourself in connection with this airplane; is that correct?

A No.

Q Okay. What else has not been produced?

A I don't know, but I know there was probably quite a bit -- there was probably other paper that I have not yet found it. I have moved several times since this -- since the discovery of the broken motors, and I have a lot of stuff, a lot cardboard boxes in a lot of different places, and I'm still searching through it as we speak today.

I'm sure there could be other things so I cannot testify to that. I'm sorry. I can assure you as I find anything, I will indeed get you a copy as soon as possible.

Q Okay. Let me just clarify. You produced all the documents you could find that would reflect any communications exchanged between Mercury and yourself in connection with this airplane?

A As I can recall, yes.

Q You either have or haven't? Have you found documents of written communications or records of communications with Mercury and yourself that you have not produced?

A To this day?

Q Yes.

A I don't think so, no.

Q Okay. And when I say, Written communications between Mercury and yourself, I also mean any notes you may have taken of communications you had with Mercury.

Did you produce all of those that you could find?

A As far as I can recall, I tried to be as diligent as possible.

Q Have you also produced all of the documents in

connection with your communications with third parties that you could find in connection with this airplane?

A As far as I know, yes.

Q So you produced all records of any communications, say, with Aviation Engines; is that correct, that you could find?

A Yes, I believe so. I tried my best. This is really important to disclose all of this stuff.

Q And have you produced all records of any written communications with any so-called experts about this plane and the problems you have been experiencing?

A I think so. If I had them, I tried to give them to you. Understand this has transpired over many, many years now, and there's just been a lot of moves, and a lot of things got, you know -- are scattered about, but I'm pretty sure I have, yes.

Q Other than this alleged written agreement that you haven't yet found, are there any other documents of which you're aware that you could not find which would support your claims?

A There might be.

Q What would those documents be?

A More notes between -- there might be more than one written agreement between Mercury and myself that I

have not yet been able to find.

Q. Any other documents that you haven't been able to find that would support your claims in this litigation?

A There may be additional communication between Aviation Engines and myself, but I don't think so.

Q Well, any that you're aware of as you sit here today?

A No, none.

Q So the only thing, the only document you're aware of as you sit here today that you haven't produced that might support your claims are these alleged written agreements between yourself and Mercury; is that correct?

A Your question was done with such finality; as I can recall, yes.

Q And you say you're continuing to search, what are you doing to continue your search?

A I have -- I open up cardboard boxes of both files and I go through each file folder and each piece of paper individually looking for anything pertinent to the aircraft, my communication with Mercury or this case.

Q And where are these boxes that you keep

A. Yes I do
Q Why did you decide to move to Vermont?
A Numerous different factors. I discovered that 20,000 cars that drove up and down my street. My ex-wife was very concerned about the Millennium bug, Y2K catastrophe living in a major metropolitan area. There were concerns about just living in, you know, an urban environment versus a rural environment, business potential of being farther north and being easier access to different markets; a lot of different factors.
Q. How long had you lived in Massachusetts on Common Street?
A A while; a few years, I think.
Q Were you living there when you started All Slate & Tile?
A No.
Q But were you living in Massachusetts when you started All Slate & Tile?
A I didn't start -- I took it over from an ex-employee.
Q In 1993?
A. I think so, yeah. '92, '93.
Q And were you living in Massachusetts when you took it over from the former employee?

A No, I was living in California.
Q And did you move to Massachusetts?
A Mm hmm.
Q Yes?
A Yeah, he contacted me. He was diagnosed with preskin cancer and had to get out of the sun and he was an ex-employee who I had taught the business to. And he had -- he wanted to get out of the business, and I was living in California at the time.
And after transitional trips back and forth between the West Coast and East Coast, I took over his business.
Q. But at the time you took it over were you living in Massachusetts? Did you ever run Allstate & Tile from outside of Massachusetts prior to the time you moved to Vermont?
A. No.
Q. Why don't we start with Exhibit 2, and we'll go over some of the documents that you provided. If could you get the stack in front of you?
A Yes
Q Tell me what each of these documents are and why you produced them? So as I read them, look at the documents pages one through three seem to go together;

is that right?
A That's right.
Q And what are those documents?
A This is from Aviation Engines. These have the people that Mercury Air and I agreed that we would send the motor to for evaluation.
Q Now, is the motor still with Aviation Engines?
A Yes, it is.
Q So some time on or about December of 2004 you called Aviation Engines?
A. Yes, I did.
Q And what did you say and what did they say during that conversation?
A Well, I asked Pam -- that's the woman's name. I can't remember the guy's name. I asked her -- all I know it's Pam. It says so right on there; to give me a current price list for the repair of the motor.
Q. And this is what Aviation Engines produced?
A. Yes.
Q And so Aviation Engines was able to tell you they still has the motor?
A Yes
Q Did they tell you anything else about the motor?

A. Well, some things like it's in a box here, and we would love to get it back together for you. And they were very -- Pam was very careful to say this is very much a base price and it could be considerably more.
Q. Did they discuss with you at all the storage of the engine and the fact it had been six years since they last heard from anyone?
A. They were happy to hear from me. I talked to them on and off through the years.
Q And why did talk to them off and on through the years?
A Just to make sure my engine was okay.
Q And so their price for repair of the engines was approximately how much?
A I don't know. Let me look.
(Witness reviewing document)
A Current as of today, I don't see where it says the total.
Q Have you ever done anything to total these numbers?
A. Yeah -- well actually I remember there being a total on here. It says Rough estimate only, 4,000 more for the nose case, which isn't counted. I remember quoting a total in one of my documents.

Q Do you remember -- you would agree with me though these first three pages all have your No. 1, 2, and 3 in the upper left?
A Yes.
Q And are unrelated to the fourth page in this stack, is that correct?
A That's correct.
Q And you believe there's another page which provides a total for the cost of this engine repair as of December of '04, is that correct?
A I'm not sure.
Q What's your best recollection as to the cost to repair the engine as of December of '04 from Aviation Engines?
A I think it was $30,000.
Q Was that for one engine or both?
A One.
Q Anything else to your conversation between you and Aviation Engines in connection with getting this quote?
A I told them that I had -- that I was hoping that we could get it fixed soon, that I had waited long enough and I had initiated the lawsuit and I needed the current estimate.

Q Have you had any discussions with them since December of '04 or your receipt of this quote?
A I may have called them up one other time, but I don't think so.
Q Have they called you?
A I don't think so.
Q Okay. If you could turn to your numbered page four?
A Hold on one second. Okay; page four.
Q I think page four through page 10 appear to be Mercury Air Center documents, is that correct?
A That's correct.
Q And were these all the documents you could find in connection with your delivery of the airplane to Mercury in the June, July 1998 time frame?
A I don't know if they're all of them, but it's what I have.
Q They were all that you could find, is that correct?
A Right.
Q Now some of these records from Mercury, pages four through 10, have prices associated with them, do you see those?
A Yeah.

Q Did you ever pay Mercury for the work that's reflected in these documents?
A Yes, I did.
Q Do you have copies of your checks?
A No, I could, but I don't know where they are.
Q Did you pay by check or some other way?
A I don't remember.
Q What was your typical practice at that time?
A To pay by either check or charge card.
Q Do you have any charge card records?
A Somewhere.
Q Well, let's start with page No. 4.
A Okay.
Q What was that for?
(Witness reviewing document)
A That is for right tack not working. The tachometer appears there was a problem with -- there's two motors and so there's two tachometers which tell you the revolutions per minute of the motor as its spinning prehouse case or before the propeller.
And it seems they charged me $156 to replace one of the plugs to it.
Q Now can you explain why there are different dates on document four than there is on document six?

A No.
Q Is that yes or no?
A That's a no, I don't know why.
Q Did you bring the plane into Mercury more than once in July of 1998?
A I don't remember. The airplane spent a lot of time in their hangar. They fueled the aircraft. We sat around and talked. I mean they were -- there was a lot of camaraderie. They were basically friends.
Q Who were friends?
A The guys in the hangar.
Q With you or --
A With me, yeah. You know, we shared stories and talked and stuff. So I spent a lot of time talking to them as they did different things.
Q Now when you picked up the airplane from Mercury, did they give you a copy of the documents such as document No. 4 and document No. 6?
A I don't remember.
Q How did you get documents four and six or how did you get any of the documents 4 through 10?
A These were in the stack.
Q So at some point they had given these to you?
A Yes.

Q. And did they give them to you when you came to pick up the plane?
A. I don't know. It was a long time ago and, you know, I showed up. And I remember I was there a lot, you know, back and forth during repair of the aircraft.
Q. And what was the procedure for paying before you took delivery of the plane? Would you pay for these before they gave you the plane back?
A. I remember they insisted I pay them before I took the aircraft, yes. That was always their thing, they always wanted their money.
Q. And would you have copies of your check registers or credit card receipts from 1998?
A. Maybe in some boxes.
Q. Have you done anything to look for those?
A. Mm-hmm.
Q. And you haven't found them yet?
A. No, they could actually be in my ex-wife's possession, too. So I actually don't have copies of them.
Q. You would agree with me, though, those would help you determine when the plane was returned to you, wouldn't they?
A. Yeah -- well, maybe.

Q. You would agree with me that you paid for it before they gave you the plane back, correct?
A. As I recall, yes.
Q. So if you had a record when you paid --
A. Right.
Q. -- you would know you had the plane?
A. Before that moment, yeah.
Q. Well, you had the plane immediately after that moment, correct?
A. Right.
Q. The next document is document No. 11. What is that document; a letter to Leon Shabott dated December 6, 2004?
A. Right. This is a letter faxed to me by a person named Mr. Gregg Cadieux.
Q. Could you spell his last name?
A. No -- Oh, yes, I can; C-A-D-I-E-U-X is what is on top of the fax.
Q. And what was said?
A. I explained to him I initiated a lawsuit and I would like some substantiation from him as to the estimate of what my plane was worth.
Q. And who is Greg Cadieux?
A. He's a twin Bonanza expert.

Q. And why do you describe him as a twin Bonanza expert?
A. He had been involved in twin Bonanzas since he was a small child. His father owned one and he has -- he runs the Twin Bonanza Support Group and owns several twins Bonanzas and has purchased and sold a lot of them. He maintains a large inventory of parts and is considered an expert in this particular type of aircraft.
Q. By whom?
A. By me.
Q. Okay. And is he more qualified than you to evaluate the worth of the twin Bonanza plane in this particular litigation?
A. Probably not.
Q. So you're just as qualified, at least as qualified, as he is to evaluate --
A. Yes, I think so. I've been watching the price of these for a couple of decades now.
Q. And why did you consult with him?
A. Because I was looking for a second opinion to support my substantiation that the aircraft was worth more than $75,000 which was a disputed figure.
Q. How did you come to call on Mr. Cadieux?

A. I've known Gregg since my first -- when I started to search for twin Bonanzas and became available. As soon as I discovered who he was, I started talking to him about the aircraft.
Q. When was that?
A. Mid-'90's, I think.
Q. So before you purchased your plane in this particular case?
A. Yeah.
Q. And have you maintained a relationship with him continuously since then?
A. Yes.
Q. And before he wrote this letter, what did you say to him?
A. I called him up and I told him that I had initiated a litigation or a lawsuit and that there was some dispute because of the amount of money I had paid for the aircraft versus what it was worth, and I would like from him a statement stating what he thought the aircraft was worth to provide to the courts.
Q. Now, had he done anything before he wrote this letter to examine the condition of your plane at the time you purchased it?
A. Yes, he's seen my plane.

the aircraft, but I would not call myself ignorant.
Q I'm not saying that you are ignorant. I'm asking for your expertise in this particular case.
You did not rely on your expertise in this case other than for the value of the airplane?
A Correct.
Q Now, I see here on page 14, and just to -- strike that.
Just to clarify, when you refer to page numbers, you're referring to your page numbers; is that correct?
A. That's correct, my written ones in the upper left hand corner.
Q So if we turn to page 14 of your handwritten pages, there's a Post-It Fax Note on that page, do you see that?
A Yes, I do.
Q And that's dated July 20, 1998?
A. 7/20/98.
Q Is that when you received this document from Mr. Cushing?
A I believe so, yes.
Q And why is it that you were talking to Mr. Cushing on July 20, 1998?

A That was after the discovery that there's something wrong with my aircraft. I spoke with Victor who I believe to be an expert in twin Bonanzas and mentioned to him the fact that I was having a problem with the aircraft.
And he faxed me over for my own information this copy of the Lycoming Overhaul Manual which he had in his possession at the time.
Q Did you have any more detail discussion with him as to what may have caused your engine to fail in this particular case?
A. Yes, during that time I had numerous conversations with Victor.
Q Before or after you received pages 14 through 25?
A I can't remember that. It was a long time ago, sir, I'm sorry.
Q Did you know when you asked Mr. Cushing for pages 14 through 25 that your engine failed as a result of mixing old and new parts?
A I don't remember.
Q. Did you know what caused your engine to fail at the time you requested pages 14 through 25 from Mr. Cushing?

A I don't remember. I'm sorry. I can elaborate, if you'd like.
Q Sure.
A I was told that the hydraulic lifters, the exact hydraulic lifters they replaced had shattered.
Q Who told you that?
A Mercury Air.
Q So Mercury Air was the first one to tell you that the hydraulic lifters had shattered?
A Right, and although there was, for quite some time, a question as to why that transpired, naturally I would suspect that the same parts that they had just replaced had broken and that perhaps there was some connection between the fact that the very parts they had replaced had broken inside my motors while in flight.
Q When did you first know that Mercury had mixed old and new parts in the hydraulic lifters?
A. To my recollection it was upon receiving the report from Aviation Engines.
Q And the report you got from Aviation Engines, is that the same or different than Attachment A to Exhibit 1?
(Witness reviewing document)
A. This is the report -- I would like to clarify

I didn't get this from Aviation Engine.
Q From whom did you get that report?
A. Mercury.
Q Even though it's addressed to Leon Shabott?
A. Yes.
Q Do you see the date on it, 8/12/98?
A Yes.
Q. Does that refresh your recollection that you received this report on or after that date?
A. Yes. I'm sure it was after, but...
Q. Upon receiving this report sometime after August 12, 1998 after receiving Attachment A --
A Yeah.
Q. -- that's the first time you knew that the mixing of old and new parts had potentially caused your engine to fail?
A Yes, that's correct.
Q So you didn't know that then when you had this conversation with Mr. Cushing on July 20, 1998?
A. That's correct.
Q. So when you received this from Mr. Cushing on July 20, 1998, pages 14 through 25 --
A Yes.
Q -- what were you looking at, at this

A Yes, I do

Q Have you seen that document before?

A One that looks like it, yeah

Q. And this particular document on page three has something called a certificate of service?

(Witness reviewing document)

A Okay

Q. And it's signed by me as the attorney for Mercury Air?

A Yes

Q Do you have any reason to believe why you didn't receive that document in this case on or about December 9, 2004?

A. I remember receiving a document just like this one

Q And attached to that document are various typewritten and handwritten pages?

A Yes

Q. Have you reviewed those at any time in this litigation?

A Yes I have; I actually read them

Q Are those documents -- those attachments reflect various conversations Mr. Wasson had with a variety of people would you agree with that?

A. Yes.

Q Some of those conversations were with you; is that correct?

A Yes

Q And are those the conversations to which you're referring when you say that --

A. No

Q -- Mr Wasson --

A. No, I'm not There was numerous other conversations with Mike both on the phone and in person that are not included in here

Q. And in those conversations when are they in relation to the conversations that are reflected in the attachments to Exhibit 4, when in time?

A During that same time period or after

Q Do you have any records that you could --

A No I don't

Q -- look at to better determine when those conversations are?

A. I'm afraid not, David

Q Do you have any documents that could refute any of the statements made by Mr Wasson in the attachments in Exhibit 4?

A Maybe in my piles of papers that I explained

to you before

Q But you haven't yet produced those is that correct?

A That is correct

Q So there are no documents you produced to date that would refute any of the statements made by Mr Wasson and the attachments to Exhibit 4?

A. Maybe some of my affidavit would

Q Okay Other than your affidavit any documents that you've produced in this case?

A I'm not comfortable answering that. It's very possible that there is, but for me to sit here line item by line item and sift through all of my discovery and all of my testimony, I can't possibly say that conclusively

Q Okay Well I mean to exclude your testimony because your testimony is not a document that was recently created, correct?

A Mm-hmm

Q You would agree with me?

A Okay

Q Okay. Do you have any contemporaneous documents by Contemporaneous, I mean in the June, July, August, 1998 time frame, that would refute any of

the statements by Mr Wasson contained in the attachments in Exhibit 4?

A I can't conclusively say I do not I haven't gone through fully my discovery line items by line items.

Q And by Discovery, you mean Exhibit 2 in this case, correct?

A Exhibit 2 or in my possession at this time that are obtainable

Q And by Obtainable and in your possession at this time, you mean these boxes of documents that you haven't yet fully gone through that you think you're likely to go through them by the end of June of this month?

A Yes or stuff that could actually be in my ex-wife's possession that I may or may not be able to access

Q Are you aware of any documents in Exhibit 2 that would refute any of the statements made by Mr Wasson and the attachments to Exhibit 4?

A I can't say

Q Well, why don't you go through the documents in Exhibit 2 and find any documents which you believe refute any of the statements by Mr Wasson and the

attachment of Exhibit 4?

A At this point I'm not comfortable doing that.

Q Why not?

A Because I'm not -- I feel under pressure, you know, and I'm not -- I don't feel comfortable saying that. Figuring that out at this time it would take me several items, line item through every line to sifting through every piece of paper to conclusively say that, sir.

Q Why don't we go back to Exhibit 2, just exactly the categories of what the documents are; okay? Are you okay with that?

A Sure.

Q So if we start on page 25 that could take you through few page 29 as the next group, correct?

A Let's find out. Yes.

Q None of the information contained in those documents would refute any of the statements to Mr. Wasson --

A No.

Q -- and the attachments to Exhibit 4, correct?

A Yes.

Q So let's go to page 30, that's another document?

A Okay.

Q Nothing contained in that document would refute any of the statements made by Mr. Wasson and the attachments to Exhibit 4, is that correct?

A Correct.

Q. Okay. The next group of documents -- Why don't we skip pages 31 and 32 for now, and 33, 34, 35, and 36.

37 and 38, why don't we look at those?

A Okay.

Q There's nothing in that document which would refute any of the statements made by Mr. Wasson and contained in the attachments, is there?

A. Thirty-seven, no.

Q You're looking at 36?

A. 37, no, I said.

Q 37 and 38. I'm looking at right now.

A Oh, I'm sorry, no.

Q Okay. What about anything contained in 43 through 49, is there anything in that document that could refute any of the statements made by Mr. Wasson in the attachments to Exhibit 4?

A 43 through 49, this is a technical thing from Lycoming. It could be, yeah, but I'm not familiar

enough with this.

Q. It could refute something he said in a communication to you?

A It might. I can't say conclusively. This is all technical stuff.

Q Okay, fine.

What about pages 50 through the end, is there anything in those documents that could refute any statements made by Mr. Wasson in the attachments to Exhibit 4?

(Witness reviewing document)

A I didn't see anything on pages 50 through 138, the ones I just went through that would.

Q And you flipped briefly through each of those pages, correct?

A Yeah.

Q Okay. And what are pages 26 through 29?

A Good question. 26 through 29, this is -- what is this? This is the annual inspection bill by Victor Cushing.

Q And was this given to you in connection with the discovery of the plane?

A It was given to me by Victor after I bought the airplane.

Q While you were in California or at some later time?

A No, he gave this to me while I was in California.

Q. To pick up the plane?

A. Yes.

Q And do you see where it says, Date printed --

A. Yes.

Q -- 5/1/98?

A Uh-huh.

Q. Does that refresh your recollection that you picked up the plane on or after May 1st, 1998?

A Yes.

Q And the next document, page 30, that's the purchase agreement. I believe we've already gone over that, is that correct?

A Uh-huh. Yes.

Q Page 31, what is that?

A Let me look.

(Witness reviewing document)

A I actually can't figure out what it is. It's a spec sheet on the airplane.

Q. On the airplane you actually purchased?

A Yes, page 43.

A I don't know. I didn't cross it out. I don't think so.

Q You didn't cross it out and you didn't write 35 000?

A I don't think that's my handwriting, no.

Q Is there anything in this document which could refute any of the statements by Mr. Wasson in the attachments to Exhibit 4?

A I don't think so, no.

Q Okay. Move on to the next page. This is page 32 of Exhibit 2?

A Right.

Q What is there?

A This is my handwriting and there is references here to names who, I don't know who they are.

Q So you don't know when --

A Aviation Engines. I know that name, and the others I don't recall.

Q Okay. And do you see where on page 32 appears to have come out of some sort of folder with a binder clip?

A Uh-huh.

Q Yes?

A Yes.

Q Is that a binder that you maintained?

A Yes.

Q What was in this binder?

A Probably this one piece of paper.

Q That was it?

A Probably, because when I did my discovery, I sat there at Kinko's with the aviation file which was in a duffel bag and I kept every piece of paper as I recall.

Q And you have no idea as you sit here today when these notes were created or why they were created?

A I see Aviation Engines. I assume this was probably done after the discovery of the fact that the parts were broken in the aircraft, is the only thing I could guess because the aviation name is on there.

Q Can you narrow it down, the time frame?

A Sometime after -- I don't know for sure, but I can almost assure you I never heard of Aviation Engines until after my aircraft was broken.

Q So at some point between 1998 and today?

A Well, definitely in the 1998-ish time, summer, fall of 1998.

Q But other than that you don't know why?

A No -- well, there was a time when I was

searching pretty hard to try to come up with some conclusive reason as to why my aircraft was broken and how to get it repaired.

Q Is there anything in this document that refutes any of the statements made by Mr. Wasson in the attachments to Exhibit 4?

A I don't believe so, no.

(Short Recess)

Q If we could turn to page 33 of Exhibit 2, that's a document from Mercury Air Center, is it not?

A I don't know. It was in the stack I copied.

Q You see where it says Mercury Air Center at the top?

A Oh, okay. I do.

Q And see where it says W/O M266?

A Mm-hmm.

Q Do you know what that stands for?

A No. I assume it would stand for work order.

Q Okay. And so with that assumption in mind, if you take a look at page No. 6 of Exhibit 2?

A Yes.

Q You see in the upper right it says M 266?

A Yes.

Q Same letter numbers as contained on page 33

Q Yes. And then if you turn even to page seven of Exhibit 2, the parts requisition, and you see where it says WO number?

A Yes.

Q M 266?

A Yes.

Q And do you have any reason to believe the WO isn't the same as W/O?

A No.

Q So they're both Mercury Air documents; would you agree with me?

A Yes.

Q And they both have WO and they both have M 266?

A Mm-hmm. Yes.

Q So with that in mind you would agree with me that page 33 is a Mercury Air Center document referring to work order M 266?

A Yes.

Q And that was work order with respect to the repair of your airplane?

(Witness reviewing document)

A Yes.

Q. Now is there anything contained in that document that would refute any of the statements made by Mr. Wasson and the attachments to Exhibit 4?

A. Including the handwritten stuff?

Q. Yes.

A. I don't think so.

Q. Okay, turn to the next document, page 34. Do you have that in front of you?

A. Yes, I do.

Q. When did you prepare and send that document?

A. Sometime after the engine -- the motor broke.

Q. Do you see where -- and what is Exhibit 34?

A. Exhibit 34 is a letter from me to John Wraga.

Q. And it refers to a company called Slate Work, Leon Shabott, Inc.?

A. Leon Shabott, Incorporated.

Q. Is Leon Shabott, Incorporated other than being a different name and different legal entity, does it do anything that your Massachusetts company didn't do?

A. No, I think that was -- I actually think I can't remember how the lawyers all ran that together at the time. I think Leon Shabott, Incorporated was my corporation.

Q. It's essentially the same as All Slate & Tile

Company, Inc. in terms of what it does and who it serviced?

A. As far as I can remember there was a lot of lawyers stuff as far as organizing my corporations. I don't really remember how it all went.

Q. Did Leon Shabott do anything that All Slate & Tile company didn't do?

A. I think so because I got insurance license and I was also speculating on maybe buying and selling airplanes. I can't remember if it was two corporations or one, but there could be a difference between the two. I don't remember. I could look for that.

Q. Leon Shabott, Inc. actually did more than All Slate & Tile Company did?

A. I don't think it did, but it may have been prepared to. Again, I don't recall how it all went.

Q. It was prepared to do more than All Slate & Tile Company did?

A. I don't remember how it was all set up. All that was all done, you know, in some signing papers and you know, getting like stamps and seals.

Q. You see where it says below Leon Shabott, Inc., it says, Renovation design conversation?

A. Uh-huh.

Q. Yes, you see that?

A. Yes.

Q. Is that all things that All Slate & Tile Company did?

A. Yes.

Q. And there's no other descriptive words for that, for the things the company did in that document, is there?

A. No.

Q. And what is this letter?

A. This is a letter to John Wraga.

Q. At Mercury Air?

A. Yes.

Q. And what's the purpose of this letter?

A. I'm asking -- I was asking him about getting my airplane flying again.

Q. And do you see where it says, Monday, March 20, 2000?

A. Yes.

Q. Is that the date on or which you -- on or about in which you sent this letter to Mr. Wraga?

A. I assume so. Honestly, there's some auto dates stuff on my computer and sometimes I do some cut and paste. I've actually been negligent of sending the

documents with the wrong dates.

So I assume it is, but I've actually been irresponsible and have sent documents with the wrong dates before.

Q. So the best case is you sent it on March 20th --

A. Or previous to that.

Q. If you were cut and pasting, how could you send it previously?

A. Okay. I guess not. That's a fair assumption.

Q. So the best date is you sent it on or about March 20, 2000, the worse case is you sent it on or after March 20th?

A. Yes.

Q. And it's a letter to Mr. Wraga about getting your plane flying again?

A. Yes.

Q. And what prompted you to send him this letter --

A. I can't recall.

Q. -- to Mr. Wraga?

A. I called up, I don't know, all the time asking him when he's going to fix it.

Q. And is that your signature on that page?

A. Yes, it is.

Q. And at this time, at the time you sent this letter, were you separated from your wife, ex-wife?

A. I can't remember; probably. I could look all that up for you. That's a pretty cloudy time and pretty bad time for me.

Q. When did this cloudy time begin?

A. Shortly after the airplane broke.

Q. Sometime in 1998?

A. Mm-hmm. Yes, I think so.

Q. So dates -- in order to get exact dates in 1998 and forward, you would need some sort of document to confirm when things happened, otherwise it's cloudy, would you agree with that?

A. I would agree with that. Well, in this particular case, yeah.

Q. And is there anything in page 34 which would refute any of the statements by Mr. Wasson in the attachments in Exhibit 4?

A. I don't see anything that would.

Q. Let's go to page 35. What is this document?

A. Thirty-five, this is a bill for storing my aircraft.

Q. Did you pay this bill?

A. Yes, as far as I know.

Q. And that was a monthly fee for storing your aircraft; is that correct?

A. Mm-hmm.

Q. So that would cover what period of time?

A. Either, I guess, the month before or the month after. As I see here, it says, Start date, 6/1/98, so I assume that is starting 6/1. So this was probably the month of the sixth month of the year.

Q. June?

A. June.

Q. Is there anything in on page 35 which would refute any of the statements by Mr. Wasson and the attachments to Exhibit 4?

A. I don't see any.

Q. Page 36, this is a letter from Mr. Wasson to you dated March 26, 1999; is that correct?

A. Yes, it is.

Q. And did you receive this document on or about March 26, 1999?

A. I remember receiving this document specifically, yes. I don't know if it was around that date, but yeah, I remember getting this and picking up the phone and calling him.

Q. That's my next question. How did you respond to your receipt of page 36?

A. I asked him what the expletive of this letter was.

Q. You asked him what?

A. I used an expletive.

Q. I'm sorry, what?

A. I used an expletive. Actually, I asked him what was going on in this letter.

Q. And how did you respond?

A. I called John. I didn't call Mike.

Q. You called John Wraga, you didn't speak to Mr. Wasson?

A. Correct.

Q. So you spoke to Mr. Wraga in response to receiving page 36?

A. I believe I spoke to John about it.

Q. And what did you say and what did Mr. Wraga say about this conversation?

A. I said, What's all this about?

Q. And what did Mr. Wraga say?

A. And he said, Well, we just wanted, you know, we just wanted to shake you up and find out what was going on.

Q. Have there been recent communications between you and Mercury Air immediately prior to your receiving this letter?

A. I had been contacting them regularly since then.

Q. Since when?

A. Since the motors broke, and I found this letter in dispute to the reality of my communications which is why I was fairly upset.

Q. And you see where it refers to 3600 in hangar rent?

A. Mm-hmm.

Q. Yes, you see that?

A. Uh-huh.

Q. Did you ever pay that amount?

A. I was never required to. I said, What's this? We agreed to store it for free. And he said, Yes, and he said, Yeah, I know.

Q. This agreement doesn't indicate they'll store it for free anywhere in writing?

A. I think it's part of the agreement I'm looking for.

Q. It's part of the written agreement that you can't find?

A Correct

Q It's not in writing in any document you produced is that correct?

A. No, it is not. I don't think it is.

Q Did you do anything with your aircraft after receiving page 34 of Exhibit 2?

A I had another meeting with John and Mike and actually, I can't remember. Bill wasn't there at the time.

Q Bill who?

A Bill -- William Young. Bill Young But there was someone else there I can't remember who that is now, another John I think, is his name.

Q Bill Young, Mike Wasson --

A No Bill Young wasn't there. I don't think but John was

Q John Wraga and then another John?

A. Yeah, I think so

Q And that was sometime shortly after you received page 36?

A Yes.

Q And I take it you didn't remove your aircraft within 15 days of receiving page 36, is that correct?

A It was some time after that that we made the deal to move it outside while we're waiting for the insurance company to fix it

Q And was that deal to move it outside, was that made at this meeting with Mr Wasson, Mr Wraga, and this other man, John?

A. Yes

Q And see the first sentence of this letter that says Since we haven't heard from you since December of last year, do you see that?

A Yes.

Q. Is that a true statement?

A No

Q So you believe you've spoken with people at Mercury between December of 1998 and March 26 of 1999?

A. Yes

Q And do you have any records to demonstrate that you spoke with someone at Mercury between December of 1998 and March 26 of 1999?

A. No

Q Do you have anything in writing that would refute any of the statements made on page 36 of Exhibit 2?

A I may, but I don't have it at my disposal right now

Q And you haven't yet produced it, is that correct?

A That is correct.

Q Is there anything on page 36 of Exhibit 2 that would refute any of the statements made by Mr Wasson and the attachments to Exhibit 4?

A I think most likely

Q What?

A Well let's see when this transcribes from. This goes to '98.

(Witness reviewing document)

A I guess it doesn't appear so, no Well there's '99 It might be You see here it's a little ambiguous because the typewritten stuff stops at 9/1/99 It's very hard to read the handwritten stuff that continues past '98 and goes onward into '99

Q But would you agree for me there's only three entries for 1999 contained on the attachments to Exhibit 4 correct?

A. Let me see.

(Witness reviewing document)

A No, I don't

Q You see more than three entries for 1999 on the attachments to Exhibit 4?

A. On my copy, sir, the typewritten notes stop at 9/1/1998

Q You would agree with me that's 1998?

A Correct.

Q I'm asking, are there more than three handwritten entries for 1999?

A. One, two three, no there's only three

Q Okay And do you see there's an entry, March 30 1999, the first entry for 1999?

A Yes.

Q And again, I'm reading from the handwritten portion of the attachments to Exhibit 4?

A Mm-hmm.

Q Second-to-last page, and it starts off, John Wraga Leon Sabott, and myself had meeting. Do you see that?

A. Yes

Q Does that refresh your recollection as to when you had the meeting after you received page 36 of Exhibit 2?

A No but the dates coincide I know what happened

Q As you sit here today can you say that Mr Wasson is wrong that the meeting occurred on

A. I would agree with that presumption.
Q. Okay. So the entry that you read about Per JW was on the preceding page to the page we're currently on?
A. That is correct, my apologies, yes.
Q. So now if you look at the second entry on this page with the three August 27, 1998 entries, and the one August 31, 1998 entry, right?
A. Yes.
Q. You see where Mr. Wasson, he calls Mr. Matthews at Lycoming?
A. Yes.
Q. I asked for a copy of letter to Leon, do you see that?
A. Yes.
Q. Do you have any reason to believe that the letter he's asking for is not page 39 of Exhibit 2, the Ohnmeiss memorandum?
MR. LANDERS: Objection. Go ahead.
A. No, I think that's the letter he's talking about. The ambiguity is that I think they already had a copy of it.
Q. But you don't know as you sit here today whether they actually had a copy of it, do you?

A. No, I don't. It was long ago, but I actually -- I think that Mercury handed this to me, but yeah, I don't know conclusively.
Q. Even if they handed it to you, you don't know when that happened?
A. That's true.
Q. You don't if it was before August 27, 1998 or after August 27, 1998; is that correct?
A. That's correct, yes.
Q. And again, as you sit here today, you can't say that Mercury had the Ohnmeiss memorandum, page 39 of Exhibit 2 on August 27, 1998?
A. No, I cannot.
Q. So once again, let me ask you, is there anything on page 39 of Exhibit 2 which would refute any of the statements made by Mr. Wasson in the attachments on Exhibit 4?
A. I don't think so.
Q. Okay. Page 40, I believe we already briefly discussed this letter to Pam Freeman, Attention Leon Shabott dated August 6, 1998, do you see that?
A. Yes, I do.
Q. Is there anything in that document which would refute any of the statements by Mr. Wasson in the

attachments to Exhibit 4?
(Witness reviewing document)
A. No.
Q. And now if you look at pages 41 and 42, we've also briefly discussed those in the past. And it's a two-page letter from Aviation Engines dated August 12, 1998, Attention, Leon Shabott.
Do you have that in front of you?
A. Yes, I do.
Q. Can you tell me why it says, Leon Shabott typed?
A. Where?
Q. At the top of the letter, see where it's typed L-E-O-N?
A. No, I don't -- oh, I see where it says Leon.
Q. Do you have any idea why it says that?
A. No.
Q. Oh, okay. And you don't know who typed that there on both page?
A. No, I don't.
Q. Is there anything in pages 41 and 42 which would refute any of the statements made by Mr. Wasson and the attachments to Exhibit 4.
(Witness reviewing document)

A. Well, yeah, there's some. It says here --
Q. Says where? You have to tell me so the court reporter can get it down on the record.
A. Second paragraph, page one.
Q. So page 41 of Exhibit 2?
A. Page 41 of Exhibit 2, last paragraph, it says, From all indications it does not (sic) appear that plunger assembly No. 78290 did bottom out from excessive -- I'm sorry, can I start again. On page 41, second paragraph -- last paragraph, it states, From all indications it does appear that plunger assembly, abbreviated, No. 78290 did bottom out from excessive pressure and seized. Consequently, this caused excessive clearance in valve train that allowed the push rods to make contact with the inner edge of the lifter bodies. This contact would cause breakage of a lifter body, as this appears to be the case in your engine.
It states that there, and then -- and that is dated 8/12. But again on 8/27 it says that the damage was not caused by anything that Mercury did.
Q. As you sit here today do you know when Mercury received pages 41 and 42 of Exhibit 2?
A. No, I don't.
Q. So as you sit here today can you say whether

they received it before August 27, 1998?
A. No.
Q. So I ask you once again, is there anything in Exhibits 41 and 42 that would refute any of the statements made by Mr. Wasson in the attachments made in Exhibit 4?
(Witness reviewing document)
A. I don't think so.
Q. Okay. Let's go on to the next group of documents which are pages 43 through 49 of Exhibit 2.
A. Say that again, I got absorbed in reading this.
Q. I'm moving on to the next page of Exhibit 2 which are pages 42 through 49.
A. I'm ready.
Q. What exactly are these?
A. I'm reading, let me look.
(Witness reading document)
A. This is a service bulletin or service instruction from Textron Lycoming.
Q. And I believe you received this from Aviation Engine, is that correct?
A. I don't know where I got this.
Q. Well, if you look at page 42 of Exhibit 2?

A. 42.
Q. Which is part of the letter from Don Freeman, Attention, Leon Shabott dated August 28, 1998, correct?
A. Yes.
Q. The second page of that letter?
A. Yes.
Q. And you see the second-to-last paragraph?
A. Yes, I do.
Q. The one that says, "To follow is Lycoming SI 1011 H" et cetera?
A. Yes.
Q. And would you agree with me that pages 43 through 47 appear to be Service Instruction No. 1011 H from Textron Lycoming, correct?
A. That's correct.
Q. And in addition to the second-to-last paragraph on page 42 refers to service instruction 1182 A?
A. Yes.
Q. And would you agree with me as well, pages 48 and 49 of Exhibit 2 appear to be Service Instruction No. 1182 A, correct?
A. Yes.
Q. And so now, does that help refresh your

recollection as to where you received pages 42 through 49?
A. Yes, from what I read here, it looks like it came in the same letter or fax.
Q. Or subsequently, right?
A. Yes.
Q. And you see on page 49 of Exhibit 2 there's some handwriting?
A. Yes.
Q. Is any of that yours?
A. No.
Q. Is there anything in pages 43 through 49 which refutes any of the statements made by Mr. Wasson in the attachments to Exhibit 4?
(Witness reviewing document)
A. I don't see any.
Q. Okay. You would agree with me at this point that we've gone through all of the documents in Exhibit 2, correct?
A. Yes.
Q. And those are all of the documents that you produced in this case to support your claims other than your written affidavits that you recently created, correct, or that you've created in connection with this

litigation, correct?
A. Yes.
Q. And so would you agree with me now that there is nothing contained in the documents that you produced that would refute any of the statements made by Mr. Wasson in the attachments to Exhibit 4?
A. I still cannot conclusively say yes to that.
Q. Well, we've just gone over the documents you produced?
A. I also said I'm not totally sure. I just don't feel comfortable saying absolutely, positively yes to that, I'm sorry.
Q. Well, is there anything you can add to your testimony other than what you've said already that would refute any of the statements made by Mr. Wasson in the attachments to Exhibit 4?
A. No.
Q. And just tell me, you've gone over them, if you could identify briefly in groups what pages 50 through 138 are in Exhibit 2?
A. Fifty, the first group of pages are --
Q. 50 through 75.
(Witness reviewing document)
A. Yes.

Q Are what?
A 50 through 75 are previous maintenance records for the aircraft in question.
Q. And by Previous Maintenance Records, you mean before you purchased the airplane?
A Yes
Q Okay --
A Well, hang on here. This one is here 4/26/94 Yeah, I think so
Q Okay. And you received those when you purchased the airplane from Mr. McCartney, correct?
A I may have gotten all copies from him as soon as I saw it, yeah, when I purchased it
Q Okay; great. Let's move on to starting with page 76
A Okay
Q I just want a quick summary of what these documents are?
A These are -- all right, these are all copies of all the log books. There's a lot of different log books required -- in order to legally fly and maintain an aircraft, you need a log book for each engine. You need a log book for each propeller, and you need a log book for the various frames itself. And these are exact

copies of all the pages of all the log books pertaining to my aircraft.
If you need or you would like, I could arrange a time for you to look at the originals.
Q. That might be fine. I'm going to ask you a question. I'm trying to figure out what page it is.
Okay. If you could turn to pages 186 and 187. I'm sorry, it can't be 186 and 187. It must be 136 and 137. I'm sorry. I can't read your writing. This is what they look like.
Well, 140 is clearly numbered, so it's in the back of that group, those two pages, okay?
A Right
Q What log book are those two pages from?
A These are from -- I don't know. I can look and see, aircraft log book current annuals. This is from the air frame log book.
Q So not the engine log book?
A. Correct
Q Which pages contained in Exhibit 2 are for the engine log book?
A. Now that this is all shuffled around it might take me a minute. The last pages are engine log book
Q Which page?

A Last page, 188, you can actually see I Xeroxed the cover engine log, and it's hard to read. And 187 is the first page of the right engine known as RH Position. And there's the subsequent pages of the engine log going in declining order
And at point there's an end to that. The end will probably be where Mercury did their work. Yeah, that's where Mercury did their work, page 167
Q That's the ends of the right engine log book?
A Right, yeah
And then on page 126 I may have shuffled mine but I may have not gotten these in order to begin with.
Q So let me just ask about 167
A Okay
Q So would you agree with me based on this entry on 162457 Mercury completed its work on July 6, 1996?
A I don't know if they did or not because I actually got the log from them a long time afterwards. I was actually really concerned about that because they had the logs in their possession for a long time.
They may have had filled them out you know long beforehand or long after. I don't know.
Q Do you know one way or the other?

A No
Q Do you have any concrete basis to dispute that they didn't on July 6, 1996 completed their work?
A To dispute that they did?
Q Yes
A No
Q So that's the right engine through page 167?
A Yes
Q And then what pages are for the left engine?
A The left engine starts at 163
Q Okay. And goes through what?
A. I don't know because these pages are --
Q 143?
A I have 126 here which is still part of the engine log book
Q. Are you sure that's a 126?
A Maybe that's a seven. Maybe that's 176. It appears the last entry for the left engine log is page 143.
Q. Right, okay. And again, page 143 is an entry for Mercury I gather, dated July 17, 1996?
A Yes it is
Q And you have no written document that Mercury completed its work is that correct?

A Not that I have available to me

Q So that's correct?

A Yes

Q And not that you produced in this case either, correct?

A Correct

MR. AISENBERG Why don't we take a little break

(Short Recess)

(Exhibit 5 - Marked for Identification)

BY MR AISENBERG

Q And so I have marked as Exhibit 5 a pleading entitled Complaint. Is that the complaint that you filed in this litigation?

A It looks like it, yes.

Q Do you have any reason to believe it's not?

A No

Q And that's your signature on the third page of Exhibit 5?

A Yes it is

Q Okay And I marked as Exhibit 6, a document entitled Affidavit of Leon Shabott?

A Yes

Q Is that an affidavit that you filed in this

litigation?

A. Yes, it is

Q And that document is not signed, correct?

A. No, it's not

Q But you believe that's the affidavit that you filed in this case?

A. Yeah, it looks like it

Q Do you have a habit of sending me copies without your signature as opposed to the ones you filed with the Court?

A I think most of mine I sent you signed. I think this one may have been -- my procedure is to do this work at the courthouse and to type it there And then to make multiple copies at the courthouse file them on the spot, and then mail them to you shortly after

Q And that's how you get a clerk's stamp on them when you send them to me?

A Yes And if I omitted sending you one with a signature and a clerk's stamp, it's my apologies. I can all by all means send you one if you request it

Q No, I'm just confirming that this is the affidavit that you filed in this case?

A Okay

Q Okay. So let's start with Exhibit 6 the affidavit?

A Yes

Q Now when you prepared this document you signed it under the pains and penalties of perjury is that correct?

A. That's correct

Q So if you look at paragraph one, it just indicates that you're the owner of the aircraft we've been talking about; is that correct?

A. That's correct.

Q. And paragraph two, you see where you indicate there you purchased the aircraft on April 4th, 1998 --

A Yes

Q. -- for $35,000?

A Yes

Q Is that true?

A. Yes

Q So does this now refresh your recollection you actually purchased the airplane on April 4th, 1998?

A I believe what happened is, I prepared this document many years after the actual purchase of the aircraft I used the purchase date on the seller's agreement in order to complete that date.

Q So you consider then the date on the purchase agreement to be the date of the purchase as it compared to the date when you actually took possession of the plane?

A. It seems like semantics, but yeah.

Q I'm just trying to understand. Earlier today we had a lengthy discussion about when you took possession of the plane.

Do you recall those discussions?

A. Yes I do

Q And you weren't sure of the date you took possession of the plane, right?

A. Yes, that's correct.

Q And so I'm comparing that testimony with what you have in this affidavit

A Okay

Q. It's not semantical to me.

A Okay.

Q. I'm just trying to understand, okay?

A Okay.

Q So I want to know what you meant in paragraph two when you say you purchased the aircraft on April 4th, 1998 as compared with your earlier testimony that you weren't sure when you took possession of the

A Right

Q And do you have any copies of records which would support that $5,000?

A That's back to the same question before, sir

Q Okay None that you've produced to date is that correct?

A Correct, that is correct

Q And then you say in paragraph two, and again we're talking about Exhibit 6, paragraph two After the annual inspection was done, the airplane's fair market value was around $90,000?

A Mm-hmm

Q Is that statement true?

A Yes

Q And is it your opinion that the fair market value since 1998 of this airplane, if it were flyable would have increased from 90,000 to $175,000?

A Yes

Q Based on what?

A Based on my opinion

Q Now when you picked up this airplane did you fully go over all of the prior repair records of the engine and the plane? Did you review them carefully?

A I reviewed them, yes

Q Did you do anything to determine whether parts had been properly replaced or not replaced and whether -- did you do anything to determine that?

A No.

Q So you didn't know at the time you purchased the plane whether parts that were not recommended were actually put into the plane is that correct?

A How could I?

Q Well, did you do anything to determine that?

A I read over the logs and looked over the airplane and I saw that it had been inspected annually repetitively for all those years, but there's got to be 30,000 parts in that airplane.

Q Did you have any expert inspect the engines of the airplane at that time before you completed the purchase?

A Victor.

Q Victor Cushing?

A Yes.

Q He actually inspected the engines?

A I spoke with him. He had been maintaining that aircraft for many years previous

Q Now you see in paragraph three it says In late June 1998, I flew the airplane to Mercury's

maintenance hangar for a routine inspection?

A Yes

Q Does that refresh your recollection as to whether you delivered the plane to Mercury for the first time?

A No, I had been storing the airplane for a long time

Q At Mercury?

A At Mercury When I stated I flew there, I was trying to state in my affidavit that I handed them a perfect flying aircraft.

Q Well you handed them an airplane you had just flown there is that correct?

A Right, I flew I landed, I taxied to their hangar, and handed them the keys

Q Okay And so that's late June of 1998 correct?

A Yes

Q Now if you look at Mr Wasson's affidavit which is Exhibit 4

A Okay

Q The first entry on the attachment is dated June 24 1998?

A Mm-hmm

Q Do you have any reason to believe that's not the date you dropped the plane off in late June of 1998?

A No I don't have any reason to dispute it. I'm not sure if it's the exact date

Q Do you have any documents to refute that date?

A Not that I have produced up to this time no

Q And you agree that up until -- and you agreed to let Mercury perform certain work on that aircraft at that time; is that correct?

A Yes

Q Now paragraph four, of your affidavit --

A Yes

Q -- you see where it says I am unsure as to the exact date Mercury returned the airplane to me?

A That is correct

Q Do you have any evidence to support what day Mercury returned the plane to you?

A No I do not as of yet

Q As you sit here today, do you have any basis to refute paragraph seven of Mr Wasson's affidavit which is Exhibit 4 which states that Mercury returned the airplane to Shabott on or before July 13 1998?

A As I sit here today no I do not

Q Now when Mercury returned the plane to you --

A Can we just back up? You said, Paragraph four. I don't see where it says that.

Oh, paragraph seven, okay.

Q. Is your answer the same you have no basis to refute that statement?

A I have no basis to refute it but I'm not sure it's true.

Q How did Mercury return the plane to you. Maybe that's not clear.

Did you come to Mercury and they gave you -- here are the keys to the plane? How did that occur?

A They called me up on the telephone someone did. I don't know if it was Bill or Mike or John, not John Wraga, but John.

Q John whomever?

A John Cushing, I can't remember. Someone there called up and said, Hey, your plane is ready. And it had been quite some time that the aircraft had been gone.

Q. What do you consider, some time?

A It was weeks.

Q. You dropped the plane off on June 24th?

A Right.

Q. And as best we know you got called around July 14th?

A. Somewhere around there.

Q So someone at Mercury called and said the plane is ready?

A Yes. And within some amount of time, I can't remember how long, I came down and got the aircraft. I came down to the Mercury Air hangar where the aircraft was parked out front.

Q Now you say within sometime, you can't say how much --

A No.

Q A minimum of a day or two?

A Honestly, I can't recall if it was hours or days.

Q And do you have any evidence to support whether it was hours or days?

A No.

Q And when you picked up the plane, how long after you picked up the plane was it that you flew the plane?

A. Immediately.

Q So the same day you came to Mercury, you flew the plane?

A Yes, but I had been back and forth to Mercury a lot during the maintenance process.

Q But at some point Mercury completed its work on the plane, correct?

A Obviously, yes.

Q And as best we can tell from the repair orders that you've attached to Exhibit 2, and I'm looking at pages four through nine --

A Mm-hmm.

Q -- it appears they may have completed their work as early as July 6; is that correct?

A Those are the dates on here but I don't think it was that soon.

Q That's also the date, is it not, on the engine logs and you showed me and we discussed those pages which were --

You don't remember what page that was, do you?

A. They're in the back. If you go all way to the last page and work your way backwards, I think you'll find it was in the 170-something.

MR. LANDERS: The ones he pulled out were in the 140-something.

A One of them is on 167.

Q And 143. If you look at July 28, it is the same date on the engine log books?

A Yes.

Q. And that's also the same date on the Mercury repair orders, is that correct?

A Yes.

Q. So you as you sit here do you have any reason to believe or any evidence to refute you were called on or about July 6, 1998 that the plane had been repaired?

A. I think it was later, but I don't have any evidence to refute it.

Q How much later?

A I don't know.

Q You can't say --

A I can't say.

Q -- whether it was hours or days?

A. Correct, or weeks, but yeah. I don't know. It's a long time ago.

Q Okay. So on the same day you came to Mercury to pick up the plane you flew the plane, is that correct?

A That's correct.

Q And again, you don't know how long after Mercury called you that that actually occurred; is that

correct?

A. That's correct.

Q. Now, do you see in Wasson's affidavit paragraph eight -- before I get to that

On the day that you picked up the plane and flew it is that the same day that you experienced a problem with the engine?

A. Yes.

Q. So you only flew it one time?

A. Yes.

Q. Where were you flying on that day?

A. I was orbiting Hanscom field.

MR. LANDERS: Orbiting?

THE WITNESS: Orbiting.

Q. For what purpose?

A. It was a test flight.

Q. You were just taking a test flight?

A. Correct.

Q. And how long was this test flight?

A. I don't recall exactly. It was somewhere -- probably takes 10 minutes, five minutes to run up the airplane, bring it out to the ramp to the threshold, take it off, climb up to 3,000 feet. It was probably a 15-minute test flight.

Q. And why did you decide to do the test flight?

A. Because I had just had extensive repair work done to both motors. And by law you must do a test flight without passengers before you are allowed to fly them, and that's to my recollection.

And having been an aircraft owner for quite some time that's what you do when you pick up an airplane that's been worked on. You fly it in a safe environment in which you have easy access back to a landing field.

Q. Had you made any arrangements as of this time to store the plane at all in Vermont?

A. One more time.

Q. Let me back up.

A. I'm a little confused here.

Q. You're in the process or starting -- the process of moving to Vermont --

A. Vermont, yes.

Q. -- at the time these repairs were being made; is that correct?

A. I think I was already in Vermont. I know I already owned a house.

Q. You already owned a house and you have records when you purchased the home?

A. I don't know. Yeah, I don't know where they are, but I can get them if you'd like.

Q. And this was the house in Chelsea?

A. Yeah.

Q. And you also had just signed a hangar agreement with Mercury to store your plane at Hanscom, correct, recently?

A. Yes, I guess so. There was a date on it, 6-something, I believe.

Q. Pages 37 and 38 --

A. Okay.

Q. -- that is the agreement.

And you were agreeing you were going to store your plane at Mercury, correct?

A. Correct.

Q. And you weren't going to store it anywhere else, correct?

A. Well, I also parked it at Knapp field in Vermont.

Q. That's what I'm asking you --

A. Okay.

Q. What's the place in Vermont called?

A. Knapp field.

Q. N A P P?

A. K-N-A-P-P.

Q. And where in Vermont is that?

A. That's located in Berlin, Vermont.

Q. So you had similar arrangements in Berlin, Vermont?

A. No, I did not. They just let me leave it there, fairly lose situation.

Q. Now this particular plane, had you stored it at all at Knapp, Vermont?

A. It spent time there, yeah.

Q. How much time?

A. I can't remember. I used to fly it there, land it there, leave my truck there and drive home.

Q. A lot?

A. What's a lot?

Q. You didn't have the plane for that long before you brought it to Mercury for this repair, you would agree with me on that, correct?

A. Fair amount of time.

Q. Okay. Let's back up because now we're getting a little cloudy here.

A. Okay.

Q. You signed the purchase agreement on April 4, 1998?

Q. Okay And that is?
A And that states there that the annual inspection done on May 1st, the HOB s meter was at 1227 (sic)
Q 1022.7?
A I'm sorry, yes 1022.7 And then if we go over to where Bill Young signed the log --
Q Which is on page what?
A. The page between 79 and 81
Q. So page 80 He says 1073.0?
A. Correct so that's 51 hours out of the seven
Q And that includes the flight from California to Massachusetts?
A Yes
Q Now this HOB's dated May 1, 1998 Would that reflect to you that you had not picked up the plane prior to May 1, 1998?
A Yes, it would
Q Now we narrowed it down and we know you picked it up on or after May 1998 And the only evidence we have of when you dropped it off at Mercury is Mr. Wasson's notation?
A So far
Q So in that time period between May 1 1998 and

June 24th, 1998 you flew the plane approximately 50 hours?
A According to what the HOB's meter indicates, yes
Q Do you have any reason to believe that the HOB s meter, what was written down, was incorrect?
A No
Q And how many times during that seven-week period was the plane stored, for lack of a better term, at Knapp airfield?
A I can't remember. You know, I'd park it there and I drive home
Q And why, if you were living in Vermont did you need a hangar agreement in Bedford, Massachusetts?
A. Because there s no -- let me explain how the aviation world works at Hanscom At Hanscom, to park a plane overnight, a twin engine aircraft is very expensive I can't remember how much it was something like $25 or $50 a night It was a significant amount of money. It was much more inexpensive to have a hangar agreement in lieu of just actually overnighting your aircraft, what's called, you know what's called on-the-ramp.
So if your basis of operation was to

commute in between Vermont and Boston, where I kept trucks in both places, it made sense to have 100 some odd dollars a month hangar agreement rather than pay a nightly storage charge
Q Did you ever consider just moving your business to Vermont, All State & Tile?
A I thought about it, of course, but this is where all my contacts were, my subcontractors I do a lot of subcontract work so, you know, business recommendations mostly and word of mouth, and I had been very established here
Q And as you sit here today you can't -- is it true that you can't recall the best net revenue year you had at All Slate & Tile?
A. No, but if you really need to, I can try to look all that stuff up and try to find that stuff.
Q What damages are you looking for in this lawsuit?
A David originally, all I wanted was my plane fixed
Q Well do you want anything different today?
A I might I'm not sure yet I'm actually somewhat flabbergasted at the amount of litigation that's gone on here I honestly believed that I would

file a complaint and Mercury Air would be decent and upstanding and finally admit to their obligation and actually repair my aircraft without any more rigmarole
I'm actually still surprised to be sitting here today, if you want the truth
Q. Okay Well, what other damages other than getting your plane fixed are you seeking in this lawsuit?
A. At this point none, and I'm not -- but I might change my mind on that
Q. And when are you going to make that determination?
A I can't say.
Q Now in your affidavit you say that you believe it was July 13; paragraph four?
A Mm-hmm
Q What's the basis for that statement?
A Let's see that was a year ago.
Q This was July 16?
A It was year ago, I wrote this
Q Mm-hmm
A. I remember I had sifted through sifted through -- I knew I was running out of time to file before the Statue of Limitations and I was under --

without having gotten any of this other stuff yet. See, at that point I still hadn't even had access to my aircraft folder. It was also stuffed in the box somewhere.

And so it was from my recollection. And I actually thought I was being pretty responsible that I didn't exactly know the date, but I knew it was right around that time.

Q. But you don't have any calendar or tell you or anything like that?

A. I do have stuff somewhere, if it still exists.

Q. But you haven't produced it?

A. Correct.

Q. And so in paragraph eight, Mr. Wasson states On July 13, 1998, Shabott -- and I'm talking about paragraph eight of Exhibit 4.

A. Mm-hmm.

Q. July 13, 1998, Shabott again returned the airplane to Mercury for further service.

A. I have no physical evidence to produce to you at this time.

Q. You said you knew you were running out of time based on the Statute of Limitations. How is it you knew what the Statue of Limitations were or that you were running out of time?

A. Well, through the years waiting and calling Mercury every now and then wondering if they had fixed it, and then going through all of my own personal upheaval. And I asked a number of my friends who were attorneys what my legal rights were in regard to this case.

And what I was told was that contractual obligation lasted for six years. And as I realized I was coming up upon the six-year mark, I actually went and opened the phonebook in the Boston area and kept on calling numerous attorneys, and not getting anywhere. I did believe the information I had six years. That's how I knew.

Q. And what is the contractual obligation you were trying to enforce?

A. That I asked them to fix my airplane and they -- what they did is, they put wrong parts in it and on the test flight these parts shattered. And then we made an agreement to repair the aircraft -- well, it's all written here.

Q. All written where?

A. In the complaint.

Q. In what document?

A. In the complaint.

Q. In the complaint we marked Exhibit 5?

A. Yes, it's all in Exhibit 5.

Q. We don't need to go through that; that's fine.

Now you indicate later on in paragraph four: Some time in late July of 1998 Mike Wasson phone me to tell me that the left engine's hydraulic lifters (the ones in the cylinder they had replaced) had shattered and that metal bits were scattered throughout the engine?

A. Correct, I remember that phone call.

Q. Now if you look at the attachments to Exhibit 4, in paragraph nine of Exhibit 4, Mr. Wasson indicates that on July 14th he notified you of this issue?

A. Right. I see that.

Q. Do you have any evidence to refute this statement by Mr. Wasson that he made a phone call on July 14th, 1998?

A. I have no physical evidence to produce at this time to either confirm or refute that statement.

Q. And do you recall telling Mr. Young at Mercury that you were going to shop around for another overhaul shop and would get back to Mercury?

A. No. I did not say that.

Q. You definitely did not say that?

A. No, I told him --

Q. You told Mr. Young?

A. Yeah, I talked to Bill, and I told him when I found out the motor was broken, since I was highly reliant upon the aircraft, I was going to shop for another motor, not a motor rebuilt shop.

Q. A rebuilt what?

A. Another motor, not a rebuilt shop. I was going to shop for another motor, an entire motor.

Q. And did you do that?

A. Yes.

Q. And what did you find out?

A. Well, I didn't find any motors immediately, no. It was in between the time that I was -- it was in between the time that I thought that the motor had broken for some undetermined reason that I was willing to try to replace the motor at my own expense not realizing what had transpired.

Q. So your initial reaction had to have been some cause to break other than Mercury --

A. No, my initial reaction was, Oh, my God, it's broken. This has to get back in the air fast. We'll

sort it out later. Let's just get it back in the air.
Q. Do you recall having a conversation with anyone at Mercury that you were looking for a used engine to swap out?
A. Yeah, I do.
Q. So that's the conversation you're referring to?
A. Right.
Q. And you told them you would get back to them?
A. Uh huh, I'm sure.
Q. Yes?
A. Yes, I'm sure.
Q. And then what happened next?
A. In regards to what?
Q. Getting to the root of the problem.
A. Well, I don't really recall exactly what happened next, but at some point --
Q. Feel free to consult your affidavit.
A. Oh, okay, thank you.
(Witness reviewing document)
A. Well, at some point in the next few days, I had several meetings with the Mercury staff as per paragraph five.
Q. And it says there you entered into an

agreement to send the damaged motor to an independent expert?
A. That's correct.
Q. Did Mercury comply with its obligations with respect to that agreement?
A. Yes, they did.
Q. And the engine was sent to Aviation Engines?
A. Yes.
Q. Now, you also say in paragraph five, "We agreed that if Aviation Engines, Inc. determined the fault was caused by Mercury, they would pay to fix the motors, return the aircraft to flying condition, and make some type of goodwill compensation for the lost use of the aircraft."
Did I read that correctly?
A. Yes, word-for-word.
Q. Does that agreement refer to -- in that sentence is it anywhere in writing?
A. Yes.
Q. Where?
A. I don't know.
Q. So that's the written agreement you can not locate at this time?
A. Right, it was handwritten. I can't remember

if I wrote it or John wrote it, but we actually wrote it on this small Mercury Air pad about that big (indicating).
Q. As big as folding the paper in half?
A. Folding a piece of paper in half, and John and I both signed it.
Q. And were you given the original?
A. I can't remember.
Q. Were you given a copy?
A. I know I was given a copy. Whether it be the original or a copy, knowing John Wraga, I probably did not get the original.
Q. But you don't know one way or the other as you sit here today?
A. Correct.
Q. Was anyone else in the room with you when you and John wrote this agreement and signed it?
A. Bill Young was there -- not Bill Young, but Mike Wasson was there. And I believe that John
Q. John whomever?
A. Whomever was there, but I don't remember. But I know someone else was there besides Mike and Mr. Wraga.
Q. And the specific terms of this agreement were

that if Mercury was at fault, they would pay for it?
A. Yes, I considered the agreement to be binding arbitration by the opinion of Aviation Engines.
Q. What do you mean by binding arbitration?
A. Meaning the opinion of Aviation Engines would determine whether or not Mercury or myself would be responsible for the charges incurred to remove, ship, and repair and reinstall the motor. It seemed pretty straightforward to me at the time.
Q. And part of this agreement -- how long was this agreement?
A. One page.
Q. How many sentences?
A. I can't remember, sir.
Q. How many lines?
A. I still cannot remember exactly.
Q. And was part of this agreement as well that if the damage was determined by Aviation Engines to be unrelated to the work performed, that you would pay all costs?
A. Yes. I thought that that was being fair.
Q. And at that time what did you expect the cost of the engine repair to be?
A. I had no idea. I assumed it would be

expensive.

Q Several thousand dollars?

A Tens of thousands. Actually, no. I can't say. At that point, remember, we didn't know. We knew it had to be rebuilt. So, you know, it could mean 10,000; it could mean 30,000. It could have meant -- I don't know. I only had a vague idea at that point.

Q Certainly you thought it would be 10,000 or more for a new engine or rebuilt engine?

A Yeah, by the time it was shipped back and forth and installed everything, and all the Mercury bills to be associated with it to take an engine back out and put it in again, yes.

I mean they charged me $5,000 to change two cylinders, almost. What would it cost for the whole motor to have been taken out?

Q Did you have any other agreements with Mercury with respect to the repair of the airplane there?

A There was the other agreement at the meeting after they sent me this, you owe us umpteen thousand storage charges that you showed me.

Q And that had to do with the storage?

A It had to do with allowing them to store it outside.

Q Putting that agreement aside, do you have any other agreement with Mercury with respect to the repair of the engine other than what you've already told me?

A At this point, not that I can remember.

Q Are you aware of any other agreements?

A No.

Q And then at some time -- and now I'm skipping paragraph six and moving on to paragraph seven.

A Okay.

Q And you refer there to another agreement, and I take it this is the agreement as to the storage of the airplane?

A Correct.

Q Now this agreement in paragraph seven, is that in writing?

A Yes, it is.

Q And is it in a written document that's been produced?

A No, it is not.

Q What were the circumstances under which this agreement was entered into?

A I had a meeting with John and Mike and I believe one other person. I'm not sure who it was. It wasn't Bill, but it may have been the other John.

And at that point they asked me because they were waiting for their insurance company, if they could store the aircraft outside and not in their maintenance hangar. Shall I continue?

Q Sure.

A At that point we entered into another handwritten agreement, I believe penned by John Wraga but I don't remember. Stating that I was willing to leave the aircraft outside under a couple of conditions.

Q What were the options at that particular time in terms of where the plane would be stored?

A I was trying to be friendly and agreeable. I could have demanded that they keep it inside the hangar until this was all resolved, since at that point they had admitted fault.

Q Okay. What were the terms of this agreement?

A That they would, one, they would keep the rudder lock engaged, which is almost -- and the rudder lock on a BC50 twin Bonanza is almost exclusive to that particular aircraft.

Q So the exact terms were keep the rudder what?

A Keep the rudder lock engaged. I remember asking for that almost in that exact term.

Q Okay.

A And to keep the fuel tanks wet, and I agreed to even pay for the gas to do so.

Q Anything else?

A And to, on a regular basis, turn over the existing motor, to hand prop it. And of course, make sure the tie downs -- verbally we talked about making sure the tie downs were cinched and the tires were kept full of air, that kind of stuff.

Q So these other terms you knew were not in writing, correct?

A Correct.

Q So the only terms you remember were in writing were to keep the rudder lock engaged, to keep the fuel tanks wet, and to hand prop the existing motor?

A Correct.

Q And was this agreement longer or shorter than the other agreement that you can't find?

A As I recall, it was about the same.

Q And this, again, was an agreement that you signed?

A Yes, me and John.

Q So you and Mr. Wraga signed both of these agreements that we can't find?

A As I recall, yes.

Q And did you leave this meeting with Mercury with a copy or original of this agreement?

A Honestly, I'm pretty sure I did, but I don't remember.

Q But again, you can't find it?

A No, but I watched John put in his file both of these agreements. He's actually a pretty astucious guy.

Q Why is it that you wouldn't have these agreements in a box with all these other records with respect to this airplane?

A At the time I was estranged from my wife. She had a boyfriend who was living with my kids.

Q Is this in 1998?

A He was living with my kids in my house. I was down -- while they were up there gallivanting on the hill on our estate, I was down in some cruddy little apartment in Chelsea, Vermont amongst cardboard boxes and, you know, and sparring furniture.

Q We're talking 1998, aren't we, right now?

A Yeah.

Q So in 1998 around the same time this is all going on with this airplane, you and your wife are separated?

A Correct.

Q Okay --

A We weren't actually legal separated. She considered us pretty separated.

Q Well, she was having an affair with another man?

A Correct.

Q And you knew about it?

A Yes.

Q And this is all at this same summer of 1998?

A Yes, exactly. This all happened right after the airplane broke.

Q Unrelated to the airplane, I take it?

A The airplane -- the loss of the airplane precipitated all of this, quite honestly.

Q And how is that?

A Well, I have a special needs son. We had just moved to Vermont. She was in kind of sparring situation. I had all these contractual obligations down here. And I was commuting sometimes 10 hours a day suddenly because of the loss of the aircraft.

Q When did your wife first start having this affair?

A Shortly after the airplane broke.

Q So shortly after June 24, 1998?

A Yes, that's right.

Q Okay --

A And so understand that at that time my life was in turmoil. I come from -- I would go to a meeting at John's, and I go deal with all of my business stuff, and I finally make the drive back to Vermont.

And I'd throw my papers on a desk and they get shuffled into these huge piles of mess that are lying around. Everything amongst the other remnants of my life. And I don't know exactly where they are.

Q Well, but you've got a few documents here that pertain to this time period?

A No, actually almost all of these documents are in the aircraft folder. None of these seem to be after 1998.

Q Except you have the correspondence from Ohrnness, correct?

A I got that from your discovery.

Q Well, then, why didn't you just attach all the documents from your discovery in here?

A There's the stuff from the airplane folder and then I added the stuff from your discovery. I was able to use a lot of your discovery to make my discovery because I knew I had the same documents somewhere. And

then I may have copies of them as well, but like this one here I got afterwards. And these here I actually got from Mercury's folder. All these were given to me by Mike Wasson sometime -- I can't remember. (Indicating)

Q I don't believe Mercury produced these records, did we?

A Those, not those. Those actually came from Mike.

Q So the pages we're talking about right now we're talking about, I don't believe that Mercury found pages 4 through 10?

A No, there's a reason for that. Mike gave me those. I can't remember when, in like 2004, 2003, after Mercury Air moved out of Hanscom Field, and sold it to Signature Air. And one of the times I came by to visit my airplane talking to Mike and John and find out what, if anything, they were ever going to do about my aircraft, I discovered the Mercury Air sign was gone and Signature Air sign was there.

And I find out that Mike was actually working for Signature and not Mercury at the time. And I was -- I went and talked to Mike and I said, What the hell is going on here? And he said, Well, you know,

Mercury sold out and now I'm working for Signature.

I think that's what happened. But at some point I showed up and Mike gave me the Mercury file, and that's where I got these. And that was some time well after the whole -- the real low moments of my life and I happen to have that file and then I stuck the file in the aircraft folder.

Q Does that include this page 36?

A Let me look. I'm not sure I'll remember.

(Witness reviewing document)

A I think it did include it.

Q Page 37 and page 38?

A I don't think so. I think that 37 and 38 was in my aircraft folder, but I don't remember. I can't say conclusively, sir. I know that since I initiated this and I had to do a mandated discovery request, I have spent considerable time sifting through boxes and boxes and boxes in giving you this discovery that I've given you.

Q So as you sit here today you don't know what documents you had from 1998 and which ones you didn't?

A That's correct, but I tried to give you everything I had.

Q And you have no other explanation as to why

you don't have a copy of these records even though you had other records in your airplane folder?

A. As I was trying to explain before I got off on a tangent that those -- both of those agreements from the meetings that were attached to them were at a time when my life was in a great amount of displacement, you know. And you can imagine that after, you know, very, very hard, hard days work and driving umpteen hours up north, you throw some papers down on a desk and you fall asleep and they get shuffled into other papers, or maybe you can't, but that's what happened.

Q Why did you tell me earlier when I asked you about where these documents came from, Exhibit 2, you said they came from your airplane folder or box or from other boxes that you gave me, the various sources where these came from, not once did you mention that they came from Mercury either through our discovery that we provided to you or recently through Mike Wasson?

A Because when I had to make the discovery, I gathered everything that had the airplane on it that was necessary and that had anything to do with it. Again your discovery has also been shuffled in with my stuff and I gave you a copy of everything I thought would be pertinent.

MR. AISENBERG: I'm ready to stop now. We're going to suspend the deposition and reach a mutually agreeable date to continue it.

(Off Record Discussion)

THE COURT REPORTER: Mr. Landers, do you want a copy of the transcript?

MR. LANDERS: Yes.

THE COURT REPORTER: Do you also want a minitranscript and word indexing?

MR. LANDERS: Is it extra?

THE COURT REPORTER: Yes, it's $25.

MR. LANDERS: Okay. I'll order a mini, too.

[illegible]

C E R T I F I C A T I O N

[illegible]

Volume: II
Pages: [illegible]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11575 JLT

KEVIN SHABOTT, :
Plaintiff, :
v. :
MERCURY AIR GROUP, INC., :
Defendant/Third-Party Plaintiff, :
v. :
[illegible] :
Third-Party Defendants. :

[illegible] the Defendant/Third-Party Plaintiff, taken pursuant to the applicable [illegible] Massachusetts Rules of Civil Procedure, before [illegible], a Registered Professional Reporter, [illegible] and Notary Public in and for the Commonwealth of Massachusetts, at the law offices of [illegible],

[illegible] & Aisenberg, LLP, 109 State Street, Boston, Massachusetts, on Tuesday, July [illegible], commencing at [illegible] a.m.

APPEARANCES:

Plaintiff appearing Pro Se.

Representing the Defendant/Third-Party Plaintiff:
[illegible], BENJAMIN & AISENBERG, LLP
[illegible] State Street
Boston, MA [illegible]
[illegible]
By: DAVID C. AISENBERG, ESQUIRE

Representing the Third-Party Defendant:
[illegible]
[illegible]
Providence, RI [illegible]
[illegible]
By: PATRICK [illegible], ESQUIRE

I N D E X

WITNESS PAGE
KEVIN SHABOTT VOLUME II
BY MR. AISENBERG [illegible]

E X H I B I T S

None

KEVIN SHABOTT, [illegible], having been previously duly sworn, deposes and states as follows:

EXAMINATION BY MR. AISENBERG:

Q Mr. Shabott, you understand this is a continuing of your deposition which began on June 2, 2005 in the matter that you brought against Mercury Air in the Federal District Court of Massachusetts, Civil Action No. 04-11575?

A Yes, I do.

Q You have not had a chance to review your transcript from that deposition; is that correct?

A That is correct.

Q And we've agreed to extend the time for you to review that transcript through the end of July, do you understand that as well?

A Yes, I do.

Q And you're going to make arrangements with my office to come down here and sit in this conference room and review the transcript?

A Yes, I will, thank you.

Q And I just want to follow-up, first, on some

matters from the prior deposition. And the same rules apply to this deposition that applies to that, the instructions that we talked about in the beginning, you need to answer orally to any questions that I ask; and the court reporter will be taking down my questions and your answers.

Do you understand that?

A. I understand that.

Q. And if at any time you don't understand a question, you can tell me and I'll rephrase it so that you do understand it so the court reporter makes sure she's getting down my question and your answer which is responsive to that question.

Are you aware --

A. I am aware of that, yes.

Q. -- of that?

And if at any time you want to take a break, feel free to ask for a break. In addition, if Mr. Landers who represents the third-party defendant, Lycoming, objects, you can still respond to the question. He's just preserving his rights.

Do you understand that as well?

A. Yes. I am of that understanding.

Q. And once again, you've chosen to be here

without an attorney; is that correct?

A. That is correct.

Q. Have you moved yet to 4136 Center Pond Road in Newark, Vermont?

A. Yes, I have.

Q. And is that now your address?

A. Yes, it is.

Q. And that's your only address at this time?

A. Yes, it is.

Q. And you're renting that property; is that correct?

A. Yes.

Q. And have you done anything since the last deposition to complete your search for additional documents?

A. Yes, I have.

Q. And what have you done?

A. I have searched through endless file folders, boxes, reams of paper, and have not discovered the three documents that I'm still looking for.

Q. And what are the three documents?

A. One is a handwritten agreement that was drafted between John Wraga and myself with other staff of Mercury there.

Q. And what is the subject of that agreement?

A. That was an agreement to have the damaged motor shipped to a mutually agreed-upon party, Aviation Engines in Alabama.

Q. And the agreement also covers, in your view, what would occur based on the findings of Aviation Engines?

A. Yes, we made the agreement that if Aviation Engines determined that the damage to the motor was caused by some action of Mercury, Air, that they would pay for all the costs incurred as well as repair the motor and give some vague compensation, goodwill compensation, for the lost time of the aircraft.

Q. Is there anything else to that agreement as you sit here today?

A. Yes.

Q. What?

A. And if Aviation Engines determined that the damage to the motor was no fault of the recent repairs made by Mercury, that they -- that I would pay for the crating and shipping and inspection costs.

Q. And is that now your complete recollection of that agreement?

A. Yes.

Q. And again, this is a one page handwritten agreement which you have been unable to locate?

A. That's correct.

Q. And is there anything in that agreement that Mercury offered you to which you already didn't believe you were entitled?

A. Please rephrase that.

Q. Okay. In other words, you brought your plane to Mercury, and they made some repairs to the engine; is that correct?

A. Yes.

Q. And when you brought it to Mercury, you believed that Mercury should deliver back to you a fully repaired airplane; is that correct?

A. That is my understanding.

Q. And it's your understanding they did not deliver back to you a fully repaired airplane?

A. Yes.

Q. And does this agreement add anything to the obligations which Mercury already undertook when it agreed to repair your airplane?

A. Besides to repair the airplane and offer me some goodwill compensation for its lost use, no, not that I can recall.

Q What was your understanding as to the compensation of the loss use that was part of this agreement?

A It was fairly vague. I was under the understanding that my airplane would probably not be functioning for a month and I left it up in the air. I really can't say at this point from what I remember that to be.

Q So was that a vague term of the agreement?

A Yes. I thought that I was dealing amongst -- it was a setting where I thought reasonable men were sitting down trying to come to terms to solve a problem, and I thought that there would be some reasonable compensation given to me for the lost use of the aircraft.

Q Did you have any understanding at that time what that compensation would be?

A. No, I did not.

Q Did you have any discussion with Mercury about what that compensation would be?

A. No.

Q. And who offered that term?

A John Viraga.

Q And what were the words he used when he

offered that term?

A It was a long time ago. I don't remember.

Q So other than this vague notion about compensation for the lost use of the airplane, was there anything to this agreement that you didn't believe Mercury already owed you prior to entering in the agreement?

A I think you'll have to rephrase that. I'm not fully aware of what you're saying.

Q I'm just trying to understand. You dropped your plane off at Mercury --

A Yes.

Q -- right?

And they agreed to make certain repairs?

A. They actually recommended the repairs, not agreed to it.

Q And they returned the plane, and in your view the repairs weren't properly made?

A Yes, that is correct.

Q And this agreement basically then simply confirms their obligation to make those repairs properly?

A Yes.

Q So other than this vague notion about

compensating you for the lost use of the plane, is there anything to this written agreement which in your view they didn't already owe you?

A I'm still having a hard time with the concept. I'm not trying to be evasive or belligerent.

Q You believe Mercury had an obligation to repair your airplane?

A Yes.

Q And you believe they didn't properly repair it, right?

A Correct.

Q And this agreement simply is a confirmation that they had an obligation to repair it properly, would you agree with that?

A. Not necessarily, quite honestly, because at the time they -- Mercury was saying they were under the belief or that nothing what they did was potentially not the cause of the damage.

Q Right. So if that determination is made then, it would be determined that Mercury properly took care of your airplane?

A. To that point, yes.

Q And if Mercury properly took care of your airplane, then they would have no further obligation?

A There's two other agreements.

Q. Right, we're just focusing on this one agreement.

With respect to this agreement, if Mercury properly took care of your airplane, up to that point this agreement added nothing to their obligations, is that correct?

A The agreement was vague and I was under some understanding there was other things that they did after I returned the airplane to them that I still had issues with them about which were only verbally discussed and not written in the agreement.

Q Okay. What were some of those issues?

A They spent a lot of time working on the exhaust gas temperature sensor, running the motor, heating it up, and then trying to discover why, even though it was running poorly, why the exhaust gas temperature sensor was showing zero on that one particular cylinder. And they actually, they racked up a lot of hours and took the airplane apart, the dashboard, and looked at wires and numerous other things, and in fact, the airplane is still apart.

Q Still what?

A It's still disassembled from their

investigation of that. And then after they spent all this time looking at the electronics of the sensors and the gauges, then they discovered that the reason there was no exhaust gas temperature being sensed is that there was no exhaust gas temperature at all because the cylinder didn't work because the valves didn't open and close because the hydraulic lifters had shattered.

Q Did the hydraulic lifters shatter before or after you took possession of the plane in mid-July --

A That's a good question

Q -- in 19 --

A I don't know the answer to that. I know that the two that they put in there were broken, they called me up and told me several days later were broken

Q That was after you brought it back to Mercury in mid-July of 1998?

A Yes, the same day they gave it to me

Q So the same day they gave you the plane and you returned the plane to them in mid July of 1998, you knew the hydraulic lifters had shattered?

A No, I didn't know for quite some time the hydraulic lifters shattered. I'm talking about this agreement. I simply handed them an airplane that was running rough after they did extensive work. One gauge

was not working at all which was the exhaust gas temperature gauge for one specific cylinder, and then it was several days later, you can read in my affidavit, they called me up and said the hydraulic lifters they had just replaced had shattered.

Q Okay. What I'm trying to understand with respect to this first agreement that you haven't been able to locate --

A Right

Q -- and we've talked about that --

A Mm-hmm.

Q -- and you gave me the terms of that, one of which was to pay for the repairs to put the plane in the condition to which you believe Mercury already had an obligation to deliver the plane to you; is that correct?

A In some ways, yes. It's not -- that wasn't -- my understanding the premise of the agreement was that potentially, you know, these honed polished experts had potentially made a very serious error and they were trying to satisfy a customer

Q So if Mercury was responsible for the problems, Mercury was going to pay for the problems that's your understanding of the agreement, correct?

A Yes, that's correct

Q And Mercury had an obligation to take care of the problems once you delivered the plane to Mercury, isn't that also correct? Originally, when you originally dropped the plane off to Mercury on June 24th, 1998, you expected that Mercury would return the plane to you in working order, correct?

A Yeah, I, at least, expected at that point they were doing a check up at that point, and I expected to get the same airplane I gave them which I flew there

Q So you flew in a working airplane?

A Yes

Q And you expected to be returned, a working airplane, is that correct?

A That was my understanding. I had done the same arrangements several times before, and that was always the case. I handed them a flying airplane, they returned a flying airplane

Q And this agreement about delivering the plane to Aviation Engines also required that if Mercury was responsible for not delivering you a flying airplane, it would make you whole by paying for the repairs to deliver you the flying airplane, right?

A Yeah, in a sense, yes

Q And the only other term besides that which was

part of this agreement was some vague notion of compensation for the lost use of the airplane?

A In this agreement, as far as I can remember, yes

Q So the two components of this agreement, just to capsulize this, are, one, to complete the obligation which Mercury already had if it was responsible for causing the plane not to be flyable?

A Well, you're kind of rearranging the words of the agreement as I recall it. I'm a little uncomfortable to just agreeing to that

What I'm saying is that when they discovered the motor had metal pieces scattered throughout the entire inside of the motor and that it would necessitate rebuilding the motor at tremendous expense and extremely long amount of downtime, that they agreed that if Aviation Engines determined almost in like binding arbitration, they were supposed to be the last word, we could expeditiously get the airplane -- get it back up in the air, which at that point was my first and foremost concern.

So the agreement stated if Aviation Engines thought that the hydraulic lifters they put in had shattered, were caused by some action of theirs,

they would fix it and expeditiously, that was the premise of the agreement.

Q. Let me just understand, irrespective whether you entered into this agreement, one-page written agreement which we can't find with Mercury?

A. Right.

Q. Irrespective of that, was it your expectation that Mercury would be responsible for any damage they may have caused to the plane?

A. Most definitely.

Q. This agreement didn't add any obligation to the agreement that -- or obligation that you thought Mercury already had, is that correct?

A. Yes -- well, I was under the impression that Mercury was going to fix my plane, yes.

Q. You were under that understanding when you dropped the plane off to Mercury on June 28, 1998 as well?

A. It's a little different. I don't think it was -- it was already working.

Q. You expected when you trusted Mercury with the airplane that they wouldn't do anything to break it, correct?

A. Yes.

Q. And then it was returned to you and you believe that Mercury had broken the airplane?

A. That's correct.

Q. And so if Mercury broke the airplane, it was your understanding that Mercury would pay for the repairs of the airplane?

A. Yes. I didn't even consider anything.

Q. But that was also your understanding when you dropped the plane off on June 28, 1998, if Mercury did anything to break the airplane at that point, Mercury would repair it?

A. Honestly, it never even occurred to me that they would.

Q. It didn't occur to you they would break it?

A. Right.

Q. It occurred to you they should return the plane to you in flyable condition?

A. Yeah. I expected to have to fly my plane back out in a very short period of time.

Q. And that's the agreement you had with Mercury when you dropped the plane off on June 24th, 1998, isn't it?

A. I don't remember the exact date, but yes, I asked them to check -- to give a check-up on the

airplane.

Q. And the only other term of this agreement was again -- strike that.

As I understand, there were two terms of this agreement, one was to step up to the plate if Mercury was responsible for breaking the plane, and the other was to compensate you for lost use of the plane, is that correct?

A. Step up to the plate meaning return a flying plane?

Q. Yes.

A. And admit to their -- yes, and that there would be some goodwill compensation, as I recall, as I remember.

Q. And again, this idea of compensation is somewhat vague in your mind?

A. Yes. It was not spelled out in any finite term.

Q. And you indicated that you had, in addition to this agreement that you entered into, you had some other problems that Mercury performed?

A. Well, they were actually being fairly sheepish at that point because it took them quite some time to discover that the two parts they had just installed

broke. And they were actually looking at a whole totally different part of the airplane. It's like if the motor was broken and they were looking in the trunk, that's the analogy.

Q. You indicated that Mercury spent some time working on the exhaust gas sensory?

A. Yes.

Q. And you had some other issues on work they did on the plane before they returned it to you?

A. No, that was after I gave it back to them.

Q. Okay. Did you have, when you took possession of the plane in mid-July 1998 --

A. Yes.

Q. -- did you have any issue with the work that Mercury did?

A. No, not at all. It was only after I returned the airplane to them that they were feeling very sheepish and a little embarrassed over the result of their work and also how they conducted their investigation to finally determine what was wrong with the airplane.

Q. So after you returned the plane to Mercury in mid-July 1998, they did some further investigation into the problem of the plane?

A Right

Q And you take some issue with their further investigation, is that what you're talking about?

A Yes, they were -- at that time there was -- they took several days to finally discover what was actually wrong. Instead of looking at the hard parts of the motor, they were focused on the electronics which they were then very quick to remind me they would be billing me for.

Q Did they bill you for that time?

A No, they did not.

Q Did you ever pay for the time they spent doing that after you returned the plane to them in mid-July of 1998?

A No, they never asked me to.

Q And so whatever issues you have in terms of Mercury's investigation after you returned the plane to them in mid-July of 1998, they never charged you for any of those --

A I never got a bill.

Q And you never paid for any work that they did --

A No.

Q -- after that date?

A No.

Q Okay. So that's one of the documents you're looking for?

A Mm-hmm.

Q What are the other two?

A The other document is an agreement that allows them to store the aircraft outside, that's what they requested while the investigation was going on, the aircraft was parked inside their maintenance hangar.

And I signed the agreement allowing them to park the aircraft outside under certain conditions.

Q And you also haven't been able to locate that document?

A That's correct.

Q And is there a third document you're also looking for?

A Yes, there is.

Q And what's that?

A That was another shorthand written document also written by John Wraga that said that no storage fees would be charged.

Q Okay. With respect to the third agreement, have you paid any storage fees since mid-July 1998 for this airplane?

A I don't know that for sure.

Q Well, do you have any records that would confirm one way or the other?

A No, I don't.

Q So as you sit here today, you can't say one way or the other whether you ever paid any storage fees since mid-July 1998 for this aircraft?

A Correct, yes.

Q So as you sit here today, do you have any reason to believe that Mercury violated that agreement or breached that agreement not to charge you for storage fees?

A No, I don't. I, actually, had a conversation with John Wraga not so long ago, in fact, right after I had filed suit. And at that time he told me that Mercury -- that not only has Mercury not charged me any money for storing the airplane, he reassured me of that, he also said it was not a big deal for Signature Air, and he assured me there was no storage charges being accrued while it sat there on the strip.

And that happened some time about one year ago. And I've called him a couple of times since and he's not returned my call.

Q And up to this point you're not aware you have

paid any storage fees, is that correct?

A That's correct.

Q At your last deposition I asked you what damages you were seeking, do you remember that?

A Yes, I do.

Q Do you know as you sit here today what damages you're seeking in this lawsuit?

A I sent you a settlement proposal, and as of, I don't know, last week, and I was at that time willing to settle this case for the sum in that settlement proposal. If this continues, I will probably be asking for additional damages over and above just the repair costs of the airplane.

Q Okay. I haven't seen the settlement proposal.

A Would you like to see a copy?

Q Sure.

THE WITNESS: Have you seen one?

MR. LANDERS: I think I have.

A It's almost the same amount as the last one. I added a little -- a disproportionately small amount of money for the grief that I incurred during this weird litigation.

(Witness proffering document)

A You may have that.

Q Thanks.

What are the elements of damage which you're seeking in this litigation?

A I'm still investigating that over and above just asking for that amount of money right now. I'm not sure.

Q How did you arrive at the figure in your settlement proposal?

A That was the estimate to repair the airplane plus a small stipend of money for which may not be enough to repair the airplane, quite honestly, plus a small stipend of money for all of this back and forth and writing papers and filing things, being here.

Q So you're essentially looking for your costs of litigation.

A I don't know even think that comes anywhere near the amount of -- to compensate for the litigation costs.

Q What do you consider litigation costs?

A My lost work time, travel expenses, telephone costs. And I mean, for instance, it will cost me, by the time this day is over, I will have spent a considerable amount of money just in fuel and childcare.

Q And do you intend to seek reimbursement for

all of those in this litigation?

A I'm still weighing what to do at this point, but my settlement proposal is -- I'm not sure how long I have before that is considered null and void, but I just don't know yet, or how much more I'm going to ask for if this thing really goes to trial.

Q As you sit here today --

A Yes.

Q -- what elements of damages are you seeking in this litigation?

A As I sit here today, I am seeking the money I believe I will -- the estimate given by Victor Cushing to repair my aircraft.

Q That was the approximately $155,000?

A Yes, plus a little bit more for the efforts and time and energy that I have spent so far in litigation.

Q And are there any other elements of damages as you sit here today that you are seeking in this litigation for damages?

A I'm debating seeking more, but I don't know yet if I will.

Q What other elements are you debating?

A I don't even know. I'm not -- this is out of

my scope of knowledge. I'm going to need the advice of people more knowledgeable in that arena than myself. I don't know.

Q At the time you filed this complaint, what elements of damages were you seeking?

A I asked you to -- I asked that my airplane be repaired, and that other compensation as deemed just by the Court.

Q As what?

A Deemed just is, I believe, the word I wrote. Would you like me to read it?

Q No, that's fine. I just didn't hear you.

A I think that's what I said. Don't hold me to it.

Q And other than that description, other compensation deemed just by the Court, you have no better sense what that would comprise?

A At this point, I'm sure there is quite a few things that might be considered deemed just by the Court, but again, I have to say I'm ignorant to what they might be.

Q So as you sit here today, the only elements you can be definite you are or may be seeking in this litigation are the repair of your airplane based on the

estimate of Victor Cushing, plus various out-of-pocket expenses associated with participating in this litigation, correct?

A Mm-hmm.

Q Yes?

A That is what comprises my settlement proposal that I've given you so far.

Q Right. I want to distinguish between your settlement proposal and the elements you are or you may be seeking for damages in this litigation to the extent they're separate.

A Without being at all pugnacious, I don't fully grasp the question.

Q You filed a lawsuit?

A Yes.

Q The defendants are entitled to know what elements of damages you're seeking in this litigation. I'm just trying to understand what elements you're seeking as you sit here today.

And the elements, as I understand them, is the cost to repair the plane as estimated by Victor Cushing?

A Mm-hmm.

Q Yes?

A Yes.

Q In addition, you're seeing various expenses; travel expenses, telephone costs, fuel, childcare associated with participating in this litigation; would you agree with that description of those elements?

A Yes, and I believe what I'm asking for is quite a reduced actual amount.

Q And when you say, You're asking for a reduced amount, you're basing that on your settlement proposal?

A Correct.

Q I'm just basing it on the elements you're seeking in the case.

A. Unfortunately, I'm not sure what other elements that, at this point, I am seeking. I'm actually having -- I'm investigating that now, and as soon as I find out I will let you know.

Q But as you sit here today, the only elements that you know of that you're seeking are the cost to repair the plane, I'll call that No. 1?

A Yes.

Q And No. 2, your various out-of-pocket costs with participating in this litigation. I'll call that No. 2, and No. 3, your lost work time?

Is there anything else?

A Yes, there is, but I don't know what they are.

Q Okay. And then four, we'll call it some unknown --

A Yes.

Q -- elements that you may or may not seek --

A Yes.

Q -- that you cannot identify as you sit here today?

A Yes. Because I'm not sure what I may or may not be righteously or legally entitled to.

Q And this lost work time, how would you go about calculating that?

A I don't even start to think about it right now.

Q Well, do you have any sense about how you would go about calculating that?

A No, but as soon as I do, I'll be sure to let you know.

Q So as you sit here today, you can't add anything to that other than you're seeking loss work time?

A Yeah -- yes. Once I have a better idea of what I may be righteously or legally entitled to, I will let you know.

Q And you have no idea as you sit here today how you would calculate your lost work time?

A No, because I don't know how it's done.

Q These out-of pocket costs, which I would characterize as No. 2, do you remember that?

A Yes, I do.

Q As you sit here today, what travel expenses have you incurred in this litigation?

A. I don't know. I don't exactly know right now. I don't have those -- I don't have any of the receipts with me.

Q Have you saved all of the receipts?

A Yes, I have.

Q. And then I would ask that you -- as I understand and I don't want to speak for Judge Tauro but as I understand his orders, if these are documents that you intend to rely on at the trial, they should be produced pursuant to your automatic disclosure obligations.

And if you need clarification, I can't speak for Judge Tauro, but I would suggest that you may want to seek clarification of that. But I would personally ask that all of the documents which support any of your damaged claims be produced.

Would you agree to undertaking that obligation?

A The figure that I gave you was a very vague estimate, so I am not -- in clarification, I am not stating that any of my travel expenses are based on definitive, finite incurred expenses, but were simply a vague guesstimation.

Q Do you have any records to support what these expenses are?

A. In a shoebox, yes.

Q Do you agree to produce the documents that support the expenses as to the extent you intend to rely on them as damages in this case?

A. To the vagueness of how I have come to the thought of adding for litigation costs or travel expenses, and the fact I have not put hard numbers on it, I have not listed or itemized anything. I have come up with what I thought was a highly reduced figure to what expenses were actually incurred to give you, for instance, in order to get down here, I had to buy a transmission and then install the transmission in order to get the truck that I drove here.

I am not asking within the settlement for Mercury to pay for the transmission. So I'm not going

Q Do you have any reason to refute any of the information contained on page 143 of Exhibit 2?
A. No, I have no reason to refute it at this point.
Q And you have no documents to support anything that would challenge anything written on page 143, is that correct?
A Not that I know of.
Q If you would turn to page 167?
A I am at page 167.
Q. Okay. And that's also dated 7/5/98 with a HOBs reading of 1073, is that correct?
A That's correct.
Q And you have no reason to refute any of the information contained on that document, do you?
A No, I do not.
Q And you have no documents to challenge anything that's contained on page 167, is that correct?
A If I do, they've already been given to you.
Q But you're not aware of any specific document which would challenge the information on page 167?
A At this point.
Q And you would agree with me you have no records in your possession which would support the date

on which you picked up the plane from Mercury, is that correct?
A. That's correct.
Q And you also have no records in your possession to confirm the date on which Mercury called you to come pick up your plane in July of 1998, is that correct?
A Let us just clarify both statements. I have no records that I have available to me now that I have found that I have not produced to you already.
Q That would support either of those statements?
A Unless they're here.
Q Now in your affidavit which is Exhibit 6, in paragraph four, if you'll look at that.
A I'm afraid I don't have -- I don't see a yellow sticker with Exhibit 6. I have a 1, a 2, and 3 and 5, and I think back here was a 4, but I don't see a 6. Let me see if I can find it.
(Short Recess)
BY MS. ALBERICO:
Q Looking at Exhibit 6 which is your affidavit of Leon Shabott?
A Yes.
Q And do you see in paragraph four it says

towards the bottom, Sometime in late July of 1998 Mike Wasson phoned me?
A Yes, I see that.
Q Do you have any reason to refute the entry of Mr. Wasson that he told you that on July 14, 1998, as set forth in his affidavit, Exhibit 4?
A I have no reason to believe or to refute it, no, but I'm not sure it was that day.
Q And you have no documents to support that it wasn't, is that correct?
A None that I can put my hands on at this moment, no.
Q Now in paragraph five of this document, Exhibit 6, your affidavit --
A Yes.
Q -- you refer to this first agreement that we talked about, is that correct?
A Let me read it and I'll let you know.
(Witness reviewing document)
A That is correct.
Q And that's a summary of all the terms that were contained in the first agreement, is that correct?
A I'm not sure if it was all the terms. I'm not sure it was all the terms, but it's the summary of the

agreement.
Q Well, why would you have omitted some of the terms?
A I don't know when I typed this. I believed that what I was did was trying to convey my -- I don't know why I typed this. I was doing whatever I was doing at the time, so I can't say for sure.
Q So it's your testimony you weren't trying to think of all the terms of that agreement when you typed this?
A. No. I'm saying I can't say for sure that this -- that the agreement did not include additional terms that are set forth here. You're asking me to say something quite definitive and with finality, and I'm uncomfortable doing that.
Q And anywhere in that paragraph did you indicate that this agreement was in writing?
A. Do I indicate here it was in writing?
Q Yes.
A I don't know. I'd have to read it.
(Witness reviewing document)
A. I don't think I do.
Q Is there any reason why you didn't indicate it was in writing?

Exhibit -- the $134,000 plane in Exhibit 1, is that the price?

Q Yes

A Is not as desirable of AN aircraft as mine, in my opinion.

Q And that's all you can say?

A That's all I can say, as I recall it, yes.

Q If you look at Exhibit 3 --

A Yes

Q -- you would agree with me, wouldn't you, that if you look at the second paragraph, the introduction, that Shacoff contracted to have the engines repaired and the aircraft maintained by competent workmen and return usable? Do you see that sentence?

A Yes, I do.

Q And you would agree with ME that's the original contract on which you delivered the plane to Mercury on June 24, 1998, is that correct.

A I don't know the exact date I gave it to them.

Q Well, you have no reason to refute --

A Right, but still --

Q You'd agree with me sometime in June of 1998, you brought the plane to Mercury, is that correct?

A I think so, yeah. June or July. I can't

remember. I'd have to look it up.

Q And the subcontract at that time when you brought the plane to Mercury was to have the engines repaired and the aircraft maintained by competent workmen and returned useful?

A Yes, I asked them to fix it. I didn't ask them to fix it. I asked them to look at it and see what needed to be done.

Q And so you delivered the aircraft and you expected they would repair it and return it in a usable condition, correct?

A Yes, or tell me that there's nothing that needed to be repaired.

Q Fine. Anything else?

A No

Q When the plane was returned to you in mid-July of 1998, did Mercury do anything to prevent you from independently determining what the cause of the problem was?

A I don't remember how it all worked.

Q What?

A I don't remember how it all was or how it all went.

Q So you can't say for sure if Mercury did

anything to prevent you from determining what the cause was?

A No, they had the plane.

Q Well, you originally had the plane, correct? You flew the plane?

A Right.

Q And when you picked up the plane and flew it, it was in your possession, correct?

A Yeah. I climbed into the aircraft at Mercury's hangar, and I climb out of the aircraft at Mercury's hangar. So in between that time I was at the controls, I never left the airport or surrounding area of the airport.

I left Mercury's hangar and returned it to Mercury's hangar.

Q Did Mercury prevent you from fully examining the airplane prior to the time you returned it to Mercury after flying it?

A No, they did not.

Q I see in your complaint which is Exhibit 5 --

A Yes. I see the complaint.

Q -- paragraph five, you see that?

A Yes, I do.

Q Do you see where it says in January of 1998?

A Yes

Q Would you agree with me now it was in June of 1998 that you dropped your plane off at Mercury for the repairs?

A That's what I've written here, and to my -- I guess that's what I wrote a year ago.

Q And you have no reason to challenge that at this particular time?

A At this point I can't challenge that, no.

Q Do you know why you wrote June of 1998 in the complaint you filed in this matter?

A No. It could have been July or June. I actually don't know why I wrote it on that day.

Q All I'm asking you, do you know why you wrote June in the complaint which you filed in this matter?

A Because I believe at that time I believed that was the date -- that was the month I had it done.

Q What was the basis -- did you have any documents in front of you when you wrote the date in June of 1998?

A I had my airplane file, but I'm sure I did. But I don't remember why -- what caused me to believe it was a certain date or not. It was a year ago, and it was done at a library.

Q Did you have any pressure on you when you were writing this?
A Yes.
Q What sort of pressure?
A I had in my care, my 14 year-old son who was about to get shipped to Germany against my will, and this would be the last time I would see him for a year. I only had a short period of time to do this. I was under tremendous financial pressure and I had typed this in the library while they were about to close.
Q And why did you only have a short time to write this?
A Because I had to return to Lukas. I had to go back up north because my visitation time was over.
Q Well, why didn't you have more time to draft this complaint?
A That is the amount of time I had. I had come down here and that's what I did. And I was -- I remember being under tremendous time pressure. I remember them kicking me out of the library.
Q Is that the library out of the courthouse?
A No, the library in Waltham, Massachusetts on -- I can't remember the street.
Q And why did you type this at the library in

Waltham, Massachusetts?
A Because it was close to where I was staying and they had a word processor.
Q Did anyone assist you in drafting your complaint?
A Lukas was there at the time, he's 13 or 14.
Q Anyone else assist you in drafting the complaint?
A No.
Q And did you have your stack of documents with you?
A Yes, I did.
Q Now paragraph nine refers to an agreement to hangar the aircraft while it was investigating the cause of the damage to the motors.
Is that the same or different as the second agreement which you can't find or is that the third agreement which you indicated has not been breach yet?
A That's neither actually.
Q So that's a fourth agreement?
A It appears so.
Q So what is that agreement?
A Well, it was a -- that particular agreement

was, I believe -- I can't remember if it was John or Bill or John Wraga.
Q Bill Young?
A Bill Young, John Duprey or Mike Wasson, but someone said, and we'll keep it in the hangar.
Q Was there anything more to that agreement?
A Not that I remember. I just know I gave them my airplane and while they were looking at it, while they were spinning the motors, you know, trying to find -- spending all that time trying to find out why the EGT gauge didn't work, and after they finished that they wheeled it back into the hangar.
Q You mentioned a John Duprey?
A Yes.
Q Last time we were here you mentioned in your deposition, you mentioned a John and you said you can't remember his last name? Would that be John Duprey?
A Yes, my memory was jogged when I was reviewing my deposition documents today.
Q And what deposition documents are you talking about?
A May I?
Q Sure.
A I believe I was looking over a Court order

which is the order dated February 14th, 2005, and it says in here that the plaintiff may depose, and No. 5 is John Duprey.
Q May I see that?
A I actually didn't even know his last name until I read that, that I could recall. I believe you provided me with that name.
Q And did Mercury breach the agreement referred to in paragraph nine?
A Not that I know of.
Q So you're not seeking any damages for the agreement which is the subject of paragraph nine; is that correct?
A Not at this point.
Q And you're not aware of any breaches to the agreement which was referred to in paragraph nine, is that correct?
A No, I'm not.
Q Now, if we could turn to paragraph 10, that also refers to an agreement, do you see that?
A Yes.
Q Is that the second agreement to which you referred to that you can't find?
A That's correct.



Q. And that's again, the written agreement between you and John Wraga?
A. Yes.
Q. Now what happened in September of 2001 as referred to in paragraph 11?
A. I came over -- I went to Hanscom Air Force base or Hanscom Field, and at that point I discovered the rudder had been bent over. It was actually folded over.
Q. And why did you visit Mercury in September of 2001?
A. It was probably just another one of my promoting, what -- when are-you-going-to-do-this visit and I used to say, Hey, what are we going to do folks?
Q. And you say in paragraph 11, this was admitted to by the Mercury Air staff with apologies to the plaintiff?
A. Yes.
Q. To whom are you referring?
A. I can't remember. I don't know because the names on the uniforms change around a lot. But I was naturally fairly disturbed to find major air frame damage to my aircraft, and I said -- and then upon seeing the bent over rudder, I looked down and the

nose wheel was straight down and the rudder lock was not engaged. And I was like, oh, God.
Q. What actually was admitted by the Mercury Air staff?
A. Sorry, we should have kept that. They were just kind of body language and verbally apologetic.
Q. What were the exact words used by the Mercury employee?
A. I can't remember; it was a long time ago.
Q. So you can't remember the exact words and you can't remember who the Mercury employee was?
A. Correct, employees.
Q. Employees, it was more than one?
A. Yes.
Q. And was it more than an apology? I'm trying to understand what you mean by the word Admit?
A. I actually don't fully recall what they said. They were apologetic. They were sheepish. They felt ashamed. There was definitely a feeling of remorse and feeling of wrongdoing both in their mannerisms, their verbiage, their body language.
Q. Does that help you remember any more of what they said?
A. No.

Q. And can you remember any words, what they said?
A. We're really sorry. That was one of them, but I can't really remember.
Q. Other than We're really sorry, you can't remember anything else?
A. I don't even remember if they said We're really sorry. I remember more of the intent of the conversation than the actual words.
Q. And the intent of conversation was they were apologetic?
A. Yes, and remorseful and feeling like they had done something wrong, not locking the nose wheel.
Q. And again, you can't remember any words they had spoken on that day?
A. Yes, not under oath.
Q. What about not under oath?
A. None that I've already said.
Q. Now, as I recall, this second agreement, which you can't find, part of it was that you would pay for the fueling of the aircraft?
A. Yes.
Q. Did you ever do that?
A. I'm not sure if they ever did it.

Q. And how often when you made this agreement would you have expected the plane to be fueled?
A. What I had actually asked for was to just -- was for the -- to make sure the tanks remained wet and that once a week they would turn over the existing propeller and make sure the rudder lock was engaged and make sure the tires were pumped up and that the tie downs were somewhat tight; that was the agreement.
Q. And when did you make that agreement with Mercury?
A. One of the agreements along the way included that.
Q. And this is the one written between you and John Wraga?
A. Correct.
Q. That you can't find?
A. Correct.
Q. What was the production date of that agreement?
A. I don't know.
Q. What year?
A. I assume it was -- it would be still '98.
Q. So in 1998 --
A. Yeah, it would have to be '98, I assume.

told me they weren't going to fix it.

Q Putting the fixing aside, I'm talking about the second agreement you can't find the one about how the plane was going to be stored. Let's just focus on that agreement; okay?

A Okay.

Q And at some point you discovered Mercury was not complying with that agreement?

A Sort of. I discovered that the rudder was ripped off.

Q I'm trying to figure out with whom you spoke about that and what did you say and what did they say?

A I know that's the direct question you're asking. I can only give you the same answer I have before, which is, I do not remember.

Q Did you ever follow up with John Wraga about that?

A I talked to John on a regular basis both before and after, as I said before, and I'm sure that was discussed. However, I do not -- I cannot say for sure.

Q So you can't say for sure whether you actually spoke with John Wraga about Mercury's non-compliance with this second agreement that you can't find?

A It's been a long time, no. I cannot say for sure if I have or have not.

Q Now John Wraga is the one that signed this allegedly second agreement, is that correct?

A I actually believe he wrote it.

Q So you would agree with me he would be the person you should be speak about whether Mercury is complying with this agreement or not?

A It's hard to say because it's a concerted action there. I mean there's all these people, all of which I had a lot of face-to-face contact with through the years. I mean I knew the Mercury staff even before I bought the plane when I was renting there.

Q And you have no recollection as you sit here today when you first discovered that Mercury was not complying with its obligation under the second allegedly written agreement?

A That's correct. This is all a long time ago.

Q And you have no records of any conversations you may have had with anyone at Mercury or John Wraga about the non-compliance --

A I don't have any agreements that I can find.

Q And does paragraph 13 refresh your recollection as to the damages you were seeking when you

filed this complaint?

A Are we on Exhibit --

Q I'm on Exhibit 5, the complaint that you filed in this action.

(Off Record Discussion)

(Witness reviewing document)

A I see it here, yes.

Q Does that refresh your recollection as to the elements of damages you were seeking when you filed this complaint?

A That's part of what I was looking for.

Q Well, other than the aircraft be returned in a flyable condition with both motors overhauled, the damaged airframe repaired and the aircraft working properly and any storage charges accrued be paid, what other damages were you seeking when you filed the complaint?

A What I listed under 14, sir.

Q Such other relief this Court deemed just?

A Yes, when I had written this, I actually had no idea it would be either morally or righteously or legally possible to ask for additional damages over and above repairing the aircraft. I had no idea.

I did not seek a lawyer's help. I did

this totally on my own. And I honestly thought that by writing this document that that would snap Mercury into action and they would fix my plane.

Q And now as you sit here today, do you have any better understanding of the damages to which you may be entitled?

A No, I don't, but I'm starting to believe I should really look into it.

Q But you haven't done anything as of today to look into it?

A No.

Q And you would agree with me as well, where it says, Any storage charges accrued be paid, you haven't paid any storage charges, have you?

A No, I have not.

MR. AISENBERG: I think at this point we can break because I'm about to start a different document. I have more questions and Mr. Landers is going to have some questions, or someone from his office the next time, so we'll suspend now.

THE WITNESS: Okay.

Volume: III
Pages: 298-403
Exhibits: 7-11

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04 11575 JLT

LEON SHABOTT, Plaintiff

v.

MERCURY AIR GROUP, INC., Defendant/Third-Party Plaintiff,

v.

AVCO CORPORATION, LYCOMING DIVISION, Third-Party Defendant

CONTINUED DEPOSITION OF LEON SHABOTT, a witness by counsel for the Defendant/Third-Party Plaintiff, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Patricia M. McLaughlin, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Looney, Cohen, Reagan & Aisenberg, LLP, 109 State Street, Boston, Massachusetts, on Thursday, July 28, 2005, commencing at 12:45 p.m.

APPEARANCES:

Plaintiff appearing Pro Se.

Representing the Defendant/Third Party Plaintiff:

LOONEY, COHEN, REAGAN & AISENBERG, LLP
109 State Street
Boston, MA 02109
617.371.1050
BY DAVID C. AISENBERG, ESQUIRE

Representing the Third-Party Defendant:

HIGGINS, CAVANAUGH & COONEY
123 Dyer Street
Providence, RI 02903
401.272.3500
BY: PATRICK H. LANDERS, ESQUIRE

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LEON SHABOTT | | | | |
| BY MR. AISENBERG: | 301 | | 401 | |
| BY MR. LANDERS | | 391 | | |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 7 | Handwritten notes | 310 |
| 8 | Handwritten notes dated April 15, 2000 | 315 |
| 9 | Handwritten notes | 320 |
| 10 | Plaintiff, Leon Shabott's, Opposition of Defendant, Mercury Air, Inc., Motion for Summary Judgment | 330 |
| 11 | Plaintiff, Leon Shabott's, Response to the Defendant's, Mercury Air, Inc.'s, Statement of Undisputed Material Facts in Support of Motion for Summary Judgment | 335 |

STIPULATIONS

At the Law Offices of Looney, Cohen, Reagan & Aisenberg, LLP, on Thursday, July 28, 2005, commencing at 12:45 p.m.

It is stipulated and agreed by and between counsel for the respective parties that the reading and signing of the deposition by the witness are hereby not waived.

All objections, except as to the form of the question, and motions to strike are reserved until the time of trial.

LEON SHABOTT,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. AISENBERG:

Q Mr. Shabott, as you know this is a continuation of your deposition which began on June 2 of this year and continued on July 5 of this year, and we're then proceeding today, July 28th. You understand that we're still under the same instructions that we had previously?

told them the numbers. I called those folks in Dracut. I told them the numbers, and they said, yes, we have one. I went down there. I matched them exactly. I brought both of these fittings back to Mike.

Q When did you do that?

A Sometime during the repairs where they changed out the cylinders.

Q What do you mean, the repairs where they changed out the cylinders?

A I think so. It was one of the repairs that they did. I'm not sure if it was when they were doing the motor repairs. At some point when they were fixing the aircraft, I did give them that stainle[illegible] [illegible]eel fitting.

[illegible] Are you talking ab[illegible] [illegible] the aircraft. [illegible] you talk[illegible] [illegible] sometime [illegible] [illegible] [illegible]on Engine[illegible] [illegible] [illegible] [illegible] took the aircraft [illegible] down to [illegible] [illegible] time?

Oh, yes.

Q So this thing is dated April 18 of [illegible] it

appears.

A Yes.

Q Are you aware of continuing discussions with Mercury at that time about any of the issues that are referred to on Exhibit 8?

A No.

Q In addition, this testimony about getting this part for Mr. Wasson, it's your testimony that that occurred before the engines were sent to Aviation Engines; is that correct?

A Yes. I'm pretty sure the airplane was still flying. There was numerous times that Mercury did work on the airplane.

Q So that was sometime in the seven weeks between the time that you purchased the plane and you dropped it off at Mercury for these particular repairs?

A Um-hum.

Q Yes?

A It was sometime.

Q You just have to answer with a word.

A I don't know the answer to that. I just know they were working on the engine; the oxygen leaked. I found them the part and gave it to

them to put it in.

Q After that, you flew the plane?

A I can't remember if it was [illegible] obviously I flew the plane, yes.

Q So you flew the plane after that. So that was sometime before the time when you brought it in for these final repairs?

A I'm not sure. It could have been during the final repairs. Then I would have flown [illegible] plane one more time after that.

Q But it was before Mercury re[illegible] [illegible]e [illegible] to you in July of 1998?

A Yes, I'm sure.

[illegible] [illegible]

BY MR. [illegible]

[illegible] [illegible] that we've marked as Exhibit 9. It appears to be some notes on a note pad that says, "From the desk of John [illegible] [illegible] [illegible] [illegible] numbered items [illegible] [illegible]

A Yes, I do.

Q Would you read those to yourself?

A Okay. I have.

Q Did you ever have a meeting with John [illegible]

where he told you to write a letter?

A I have had a lot of meetings with [illegible] I'm sure that I know I have had meetings with him. I can't remember if he told me to write letters or not.

Q Do you see where it says, "No. 3, [illegible] meeting, asked not to charge storage fees"?

A Yes.

Q Do you see that?

A Yes.

Q You did have a meeting with him where you asked him not to charge storage fees; is that correct?

A I had one meeting with him where he told me that he would not charge storage fees or more than one meeting [illegible] a lot of meetings he said there were to be no storage fees charged.

Q I think at your last deposition you testified that there was some agreement in writing. Is that correct?

A I can't remember.

Q But in any event, they didn't charge you the storage fees, or if they did, you never paid them; is that correct?

A I have never received any bill for storage fees that I can remember that I have gotten.

Q Do you see No. 4 where it says, "Brought in junk engines"?

A Yes.

Q Does that refresh your recollection as to anything?

A At one point I brought in two motors to assist them in getting my airplane flying.

Q Didn't I just ask you about 15 questions ago about whether you ever brought anything into them?

A You said parts while during the repair, I thought. My apologies. Sometime ... the motors were discovered damaged, I ... that I got from a salvage ...

... two motors?

... and then quite sometime ... another motor ... trying to get my ... again. At that point, I was ... helpful and cooperative as ... supplying them with as much as ...

Q ... about my prior questions though, other than these two motors --

A Yes.

Q ... you brought in any other parts, components, any ... materials to Mercury in connection with your airplane?

A Not that I can remember. I may have given them a tachometer plug, but I can't remember if I did or not.

Q But you do remember bringing two motors into them?

A Most definitely. They were very heavy.

Q When did you bring these two motors in?

A Sometime after the left motor was sent to Aviation Engines. One time, almost probably a year or two later, I brought in the other motor.

Q When did you bring the first motor in?

A Sometime shortly after the first motor was sent to Aviation Engines.

Q So sometime in 1998?

A I can't remember when, but sometime after.

Q About within the first six months?

A I couldn't tell you if it was six months, a

year, a year and a half, but sometime in short order afterwards in the span of the whole time of this endeavor.

Q And the second motor was brought in about a year after the first one?

A Sometime after that. I honestly don't remember.

Q What was the cost of the first motor?

A I can't remember now.

Q ... $10,000?

A Yes.

Q ... $5,000?

A ... it was $2,000 or so.

Q What was the cost of the second motor?

A I think it was somewhere around $10,000. I had to take it out of an airplane. It was ...

... the right ...

as well.

No, as I ... found motors for this ... brought ... them thinking somehow or another ... assist them in getting my aircraft back ...

Q When you brought the first motor to Mercury, with whom did you speak?

A I'm pretty sure I talked to Mike. ... could have been Bill or John Dupris.

Q So Mike Wasson, Bill Young or John Dupris?

A Yeah, I don't remember who was in the maintenance hangar at the time.

Q I'm just trying to put last names on Mike, Bill and John.

A Oh, I'm sorry.

Q Did I do it correctly?

A I believe so.

Q So when you brought the first motor in, you talked to either Wasson, Young or Dupris, what were your instructions?

A Here, maybe this will help.

Q What did they say to you?

A Okay, we'll see or something to that effect.

Q Was there ever any follow up on that

not doing anything with the second motor as well.

Q Did you ever send any letters to Mr. Wraga?

A I had so many phone calls and correspondence. I'm sure I did.

Q Do you have copies of them?

A If I haven't put it in the discovery, no. I don't or haven't found them yet.

Q Do you have any recollection that he asked you for letters and you didn't write them?

A No.

MR. [illegible]BERG: Can we mark this Exh[illegible]

[illegible]

[illegible]BERG

Q Showing you what we [illegible] as Exhibit 11, it's [illegible] says [illegible] Mercury Air [illegible]

[illegible]

A Yes, it looks like a copy of [illegible] that I wrote.

Q And you see in the second paragraph of that

state that, "All claims did not arise on or before July 13th, 1998." We talked about the agreement with respect to Air [illegible]

A Right, and then the agreement [illegible] aircraft?

Q [illegible] claims that did not arise [illegible] July 13th, 1998?

A [illegible] are the [illegible] that I can remember at this moment.

Q Is there anything that would refresh your recollection?

A No.

Q Do you need more time?

A I said no. I couldn't think of anything. I can read my Affidavit 1.

Q Read whatever you need to read.

A (Witness complies.)

Q Are you done?

A [illegible] a little bit here as to [illegible] After July 13th [illegible] agreed to remove the motor [illegible] to Aviation Engines. They agreed that if Aviation Engines determined that it was not our fault that the motor was

Exhibit 12 it refers to your affidavit?

A Yes.

Q Is that Exhibit 6?

A Yes, it is.

Q Do you see in Paragraph No. 1 -- the one with a 1 before it, it starts "Mercury Air, Inc.'s Motion for Summary Judgment".

Do you see that paragraph?

A Yes, I do.

Q It states at the end of that, "Chabott states that all claims did not arise on or before July 13th, 1998." Do you see that?

A That, yes, I do.

Q What's the basis for that statement?

A After the claims I have -- start again. When we sent the motor to Alabama, to Aviation Engines, it was my argument that that was an agreement between Mercury Air and myself that they did not honor.

Q So that agreement was after July 13th?

A Correct.

Q Does that sentence mean anything else?

A I don't see -- what do you mean?

Q I asked you what you meant by that, where you

damaged that they would pay for all costs to remove, crate, ship the motor, repair the motor, and reinstall it.

Q So that's the agreement that arose July 14th or later, correct?

A Correct.

Q Are there any other agreements that arose July 14th or later?

A I remember an agreement where they agreed to store my aircraft outside and make sure that the gas tanks were kept wet and that the rudder lock would remain engaged. I remember an agreement that no storage charges would be charged. I remember an agreement where they would compensate me for the lost use of the aircraft.

At this moment, as I sit here, those are the only agreements that I can recall.

Q And it's your recollection as well that all four of those agreements are in writing?

A There was numerous pieces of different [illegible] handwritten. I'm not sure [illegible] in writing.

Q [illegible] the other three agreements that arose July 14th or later, it is your best recollection that all of these are in writing?

A I'm not sure if the storage agreement was in writing. That was something that was reiterated to me repetitively.

Q With respect to the storage agreement, [illegible] your testimony is there has been no breach of that agreement, is that correct?

A No, I don't believe so.

Q I am correct?

A That I don't know of any, yes.

Q So the two agreements that you claim there is [illegible] that arose July 14th or later that are in writing are the agreement with respect to sending the engine to Aviation Engines and determining if there was fault or, if there was, who would [illegible] whom?

A [illegible]

Q And the agreement to care for the aircraft [illegible] keeping the tanks wet and the [illegible]?

A [illegible]

Q [illegible] would be the only two agreements that are in writing that arose July 14th or later, is that correct?

A As I can remember this [illegible], yes.

Q And the other two agreements that arose July 14th or later, you are not sure if they are in writing?

A [illegible]

Q And at least except for [illegible] storage charges, there has been no breach?

A Correct, I believe. The last time I talked to John Wraga, he once again when reassured me that even though Mercury had sold their operation to Signature Air and that my aircraft was in a Signature Air spot and that my motors were still in the Signature Air hangar, as well as my propeller and some other parts, that he assured me that he had a good relationship with Signature Air and that he assured me that no storage charges would be accrued by them either.

Q But you haven't been charged any storage charges, correct?

A Not that I know of, no.

Q Just to clarify, there are no other claims that you are aware of that arose July 14th or later?

A Not that I can [illegible] right now.

Q In Exhibit 11 in Paragraph 40, on the top of Page 3, you refer to something called an evaluation agreement?

A Page 3, you said?

Q Right. At the top in Paragraph 40 it refers to something called an evaluation agreement. Do you see that?

A Yes, I do.

Q And what is that?

A That is the agreement between myself and Mercury Air that we would send the damaged motor to Don Fineman at Aviation Engines in Centerville, Alabama.

Q We've talked exhaustively about this. That isn't an agreement that we have already talked about, is that correct?

A Yes, that's correct.

Q Now, when you prepared Exhibit 11, were there any other claims other than the four that you just mentioned that you were intending to keep in this lawsuit when you stated that all claims did not arise on or about July 13th 1998?

A There may be. I'm still debating as to whether or not I'm going to be asking for additional compensation.

Q Can you be any more concrete?

A No. You've asked me for a very concrete answer to something that I can only reply with ambiguity.

Q What do you mean by the word "claims"? I guess that's my confusion.

A When I wrote Paragraph 1 of Exhibit 11, I was simply trying to convince the Court that indeed that this was a triable case and that the six-year statute of limitations did not pertain to this case.

Q I'm just trying to understand. Are you saying that it did not pertain to this case because there was an agreement with respect to the engines being sent to Aviation Engines?

A Yes.

Q And you're saying it did not pertain to this

case because there was an agreement to care for the aircraft with respect to the gas tanks and the rudder lock?
A Yes
Q And the statute does not pertain to this case because there is an agreement with respect to storage charges on or after July 14th, 1998?
A I hadn't considered that when I type it.
Q But now you would add that?
A Yes
Q And you're saying that the statute of limitations would not bar your claims with respect to being compensated for the lost use of your aircraft; is that correct?
A Not really. Because, you see, I have very little legal knowledge or savvy, and when I wrote this, it was solely my intention to simply allow the Court not to have my case dismissed due to the statute of limitations. That was my only consideration when writing that paragraph.
Q Are there any other claims as you sit here today that you would argue are not barred by the statute of limitations?

A I can't say. We're playing to a game of legalese, where it's very hard for me under oath to say something that definitive.
Q Are you aware of any other claims as you sit here today that would not be barred by the statute of limitations?
A As of this moment, no.
MR. AISENBERG: Mark this as Exhibit 11.
(Document marked Exhibit No. 11.)
BY MR. AISENBERG:
Q I'm going to show you what we've marked as Exhibit 11. It's another pleading. This one says "Plaintiff, Leon Shabott, Response to the Defendant's, Mercury Air, Inc.'s, Statement of Undisputed Material Facts in Support of Motion for Summary Judgment". Do you recognize that document?
A Yes, I think this is a copy of one of the ones that I typed.
Q Is that your signature on this document?
A Yes, it is.
Q Now, if you look in paragraph 4 it says, "The exact date the aircraft was returned is in dispute."

A Correct. That's what I'm saying.
Q Do you have any facts other than those that you have testified to in these depositions to support that statement?
A Not that I know of.
Q You have no [illegible] that the aircraft was [illegible] that correct?
A Not that I know of.
Q And you have no basis to [illegible] the statements in Mr. Wass[illegible] affidavit as to the date he claims that the aircraft was returned; is that correct?
A Not at this moment.
Q Paragraph 5, it says, "The exact date the aircraft was flown [illegible]." Do you see that?
A Yes, I do.
Q Do you have any [illegible] to support that statement?
A No, I don't.
Q But it is your testimony that the aircraft was flown on the same day that you actually physically picked it up from Mercury; is that

correct?
A I really cannot remember how that all transpired. It was a long time ago.
Q But you have no other evidence to support whether it was the same day or a different day, is that correct?
A No, I don't at this moment.
Q And the same with respect to the [illegible] sentence in paragraph [illegible] would you [illegible] the same, just talking about the sentence that says, "The exact date the aircraft was flown is in dispute"?
A No, I can't give you any [illegible] at this moment that the affidavit of Mike Wass[illegible] is not correct.
Q Paragraph 8, it says, "On July 14th, Shabott filed his complaint against Mercury, for breach of multiple contracts made after July 14th, 1998." Did I read that correctly?
A Yes, you did.
Q Would those multiple contracts be the [illegible] contracts that we just talked about?
A Yes.
Q And [illegible]

sit here today?

A I can't really say as I'm not sure exactly what my claims will eventually be if this goes to trial.

Q You can't think of any others as you sit here today; is that right?

A Correct.

Q If you can go back to these four contracts that we know of, the first contract, I'll call it the Aviation Engines contract.

A Okay.

Q You will understand that's the one --

A Yes, I will.

Q When was that contract breached by Mercury?

A In my opinion, they still continue to breach it today.

Q [illegible] the breach originally occur?

A [illegible] say when [illegible] [illegible] they had placed [illegible] to my motor [illegible] damage or that Mercury had misadjusted the engine so that the tappet clearances were great, hammering the hydraulic lifters with the push rods. I would say that from that

moment forward, that when Mercury did not simply agree to repair my aircraft engine and reinstall it and hand me back a flying machine as I trusted them with, that they breached that contract.

Q So in other words, when Mercury received Pages 41 and 42 of Exhibit No. 2, is that when the breach occurred?

A Maybe. That's probably one of the breaches. I can't really say.

Q We're just focusing on this one contract.

A As I said, I can't really say definitively. The breach could very well have occurred when they agreed to ship the motor, knowing very well that they weren't going to fix it if they found out it was their fault. I don't know. I don't know what they were thinking. What page are we on?

Q 41 and 42. Do you want to change your answer at all?

A No, I'm fine with that.

Q What are the damages that flow from that breach?

A I don't understand.

Q What damages are you seeking as a result of that alleged breach by Mercury that you just testified about?

A I can't say at this point. I don't know what condition the motor is in or what condition the aircraft is truly in, so I can't definitively answer that.

Q Have you done anything to evaluate the condition that the aircraft is currently in?

A No, except for observing it myself and then describing the conditions that I found to competent individuals.

Q When is the last time you observed the aircraft?

A I don't remember exactly. It was a couple of [illegible]

Q [illegible]

A Nicole Dubinsky.

Q [illegible] else?

A For a partial time some of the staff at

Signature Air.

Q Any staff in particular?

A Not that I -- no, I don't recall the name.

Q Did you have any conversations with the staff at Signature Air, the ones who were with you at this particular visit?

A I'm sure I did.

Q What do you remember of the conversations?

A Not much. Just a lot of the people at Signature were quite curious as to what the story was on this aircraft that's been sitting there ever since they've been there. Some people have actually heard just through shoptalk about the incident involving why the airplane is there.

Q And all this was discussed with you during this particular visit?

A Briefly, yes.

Q Anything else discussed with the people from Signature during this particular visit?

A I can't remember. I may have been there a couple of times or maybe even more when Signature owned it.

Q Is this Nicole person a pilot also?

A No, she's not. In fact, she's actually never flown an aircraft in her life.

Q Let's go to the second agreement which was the agreement to care for the aircraft. When was that agreement breached?

A It's hard to tell. I'm not sure.

Q When is the earliest date that you know of that that agreement was breached?

A Sometime along the way. I can't really say.

Q When was that agreement entered into?

A Sometime after the motors were discovered damaged.

Q Can you be any more specific?

A No, I'm afraid I can't.

Q We've already discussed that the no storage charge agreement hasn't been breached yet.

A As far as I know.

Q And the agreement to compensate you for the loss of use of your aircraft, when was that breached?

A I can't answer that.

Q In fact, you don't know when that agreement was entered into either; is that correct?

A No, that's not what I'm saying. What I'm

saying is I can't really say when it was fixed. Because they have never fixed it so ... if they haven't been able to fix it, they can't compensate me for the loss of use.

Q When did you enter into that agreement?

A Shortly after the motor was discovered broken.

Q Sometime in 1998?

A I assume so. Understand when this first was discovered, they were very remorseful people. They exhibited to me full intention to make my plane fly and give it back to me.

Q Would you agree with me that on the last time you flew this plane, which was immediately prior to your delivery of the airplane to Mercury -- would you agree with me on that?

A No, the last time I flew this aircraft was sometime after they gave it back to me.

Q They gave it back to you?

A And I flew it.

Q And there was some sort of engine problem?

A And I gave it back to them.

Q And that was the last time you flew it?

A Correct.

Q When you flew it on that occasion, you recognized there was some sort of problem with the engine, correct?

A Yes. And I was even told by some younger person at the Mercury staff that they actually -- since there was a crowd of people watching the airplane take off, that they heard something with the motor, that the motor sounded funny to them.

Q Describe to me exactly what you observed with respect to the problems with the engine during that flight.

A It was a long time ago. The main thing that I recall is while in flight I discovered that the exhaust gas temperature gauge for one of the cylinders went to zero.

Q Anything else?

A I'm sure, but I can't really remember as I speak here today.

Q And that represented to you a serious problem with the engine?

A It represented something that during a short flight the whole [illegible] alarming, yes.

Q And you [illegible] experienced that [illegible] brought to the attention of Mercury [illegible] is that correct?

A In, no.

Q So was it your conclusion at that particular time that it must have had something to do with the repairs?

A No, my initial reaction was simply one of caution. I was in an aircraft that had a critical function component indicator not working, and at that point, my entire focus was simply on bringing the aircraft simply to the ground as any responsible pilot would.

Q As as you sit here today, is it your opinion that the problems that arose during that flight arose from the repairs that Mercury made to the plane?

A Yes, I do.

Q Can you think of any questions that I have asked that you haven't been able to answer fully and accurately during this deposition?

A Can I think of any questions that you have asked that I have not been able to fully and accurately answer?