FILED
IN CLERKS OFFICE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

2006 NOV 14  A 9: 02

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| LEON SHABOTT | ) |
| | ) |
| *Plaintiff* | ) Civil Action No. |
| | ) |
| v. | ) 04-11575-JLT |
| | ) |
| MERCURY AIR GROUP, INC. | ) |
| | ) 13 November 2006 |
| *Defendant* | ) |
| | ) |
| AVCO CORPORATION, | ) |
| LYCOMING DIVISION | ) |
| | ) |
| *Third Party Defendant* | ) |

## AFFIDAVIT OF LEON SHABOTT

I Leon Shabott do hereby swear and depose as follows –

1.    I am a United States citizen and I am over the age of eighteen.

2.    Prior to July of 1998 I had a thriving business installing and maintaining slate and copper roofs. I did difficult steeplejack and high rigging of tall structures. I owned a home at 98 Common Street in Watertown , MA. I owned several late model vehicles. My children were in private schools; I had savings and brokerage accounts. I was prosperous and thriving.

3.    As my company's reputation grew I was asked if I would do very profitable work in Nantucket, Martha's Vineyard, greater New England, New York, and beyond, outside of greater Boston. Because of the scarcity of people doing the kind of high-level roofing work I did in these areas, I was afforded the opportunity to expand my business into these areas.

**Shabott V. Mercury Air Group, Inc. 13 November, 2006 Affidavit of Leon Shabott**
**Pursuant to Rule 60(b) for Relief from Judgment**

4.    In order to expand my work area efficiently I decided I needed to acquire an aircraft, I have been flying since the 1980's and once before in my career I owned and flew a single engine Beechcraft airplane for business.

5.    The aircraft I chose for the current mission was a twin engine Beechcraft BE-50 Twin Bonanza, an airplane I had aspired to fly since I was a child. I had been watching the market for years. The BE-50 is large and capable of carrying crew, supplies and equipment. It was originally designed for military use, to fly into and out of short fields with up to 6 men and heavy loads, it was used by the U.S. Military till after the Vietnam War. The specific aircraft I chose to buy was a specially modified model (Sweringen conversion) owned by a meticulous man for ~20 years, although he was a certified FAA aircraft mechanic, he used a professional aircraft facility for most all the maintenance. The plane was always hangered and was in near mint condition. I was able to buy it for a fraction of its market value, by diligently watching the market, experience, some calculated risk and luck.

6.    My family life did have its challenges. My wife of twelve years had developed mental illness and the older of my two sons had a learning disability. My oldest son was in a private school in Lexington, Massachusetts. My wife had become paranoid about the upcoming ramifications of the Y-2-K Millennium Bug and my older sons needs were not being met at the Lexington school.

7.    In the spring of 1998, for both personal and business reasons I was compelled to relocate to a rural area. I chose Chelsea, Vermont to live. It had a small private school that was located in the town center only one mile from a 140 acre parcel of land for sale with a small cabin. Two airports were situated close to Chelsea.

9.      Chelsea is situated in the very center of Vermont, the area was home to a many large roofing companies giving me a large experienced labor pool of potential employees who would be willing to travel and work for considerably less wages than the Boston area labor pool I was using. One of the difficulties in my business was the lack of affordable, loyal, experienced labor. The 140-acre property I purchased had a small cabin that was basically uninhabitable, without electricity, running water or sanitation.

10.     On July 13th 1998 I drove up in the early morning from Watertown, Massachusetts, to Chelsea Vermont and signed an agreement to buy a small house in the center of Chelsea right next to my son's new school. I put a $2000.00 deposit on the house. My family and I were to live in it while I built my shop and phase 1 of a new home.  The construction project required an 1800 ft road to be built, blasting and the extensive excavation of a hillside. see attachment #1 (check), #2, & #3 (phone records (7/13/98)

11.     To effectuate this on July 14th I inspected and put a deposit on a large, heavy bulldozer, which I found through a dealer of used equipment. The bulldozer was located at a construction sight in Middletown, MA. The next day, July 15th, 1998 I completed the purchase of the Bulldozer at the dealer's office in South Boston, I paid them  $9500.00 by check. The Bulldozer weighs over 25,000 pounds and needed a heavy hauling specialist to be moved, the dealer arranged this for $550.00, it was to be transported the next day.     see attachment #4 (receipt) and  #5 (check)

12.     On the morning of July 16th 1998, I took delivery of the Bulldozer at my property in Chelsea, Vermont; I wrote a check for $550.00 to the company for having the Bulldozer moved from Massachusetts to Vermont.  See attachment #6 (check). During all that busy week my aircraft was not flying, it was having extensive maintenance done on it by Mercury Air and

the completion had been delayed. My aircraft and I were a constant fixture at the Mercury

maintenance hanger. The staff and I had become friendly, I often asked them for advise and for

special help, to look at and fix issues as I discovered that came up with my aircraft as I was

flying constantly, often with my entire family. The mercury staff and I had an ongoing program

to keep a close watch on the plane. Mercury performed oil analisis and regulare inspections, as

the plane was essential to my business and relocation endeavors.

13.     Some time in late June or early July Mercury's staff discovered that the #1

cylinder of the right engine (one of the six independent piston and cylinder assemabllys) had low

compression and needed to be replaced. The # 2.cylinder on the other motor was still flyable, but

I was advised by Mercury to replace it as well, if aircraft downtime in the near future was going

to cause me hardship. I followed their advice and agreed to let them take both my motors apart.

14.     The unexpected repairs came at a very critical time for my relocation efforts. I

had to drive excessively between Massachusetts and Vermont. The repairs originally were

estimated to take two weeks. After the cylinders were removed and sent to Teledyne Mattituck

Services, Inc. of Mattituck, Long Island and returned, the repairs were delayed because during

cylinder reinstallation process Mercury told me that they discovered the hydraulic lifters of both

cylinder assemblies of both engines also needed to also be replaced, this had to be done in

conjunction with the cylinder replacement. The completion of the repairs and the return of the

plane was delayed.

15.     The delay of completion of the repairs caused me to have to drive a lot to run my

business in Boston and act as a general contractor for my relocation efforts in Vermont. Mercury

told me they were having a problem finding the replacement Hydraulic lifters. The aircraft sat

Case 1:04-cv-11575-JLT    Document 71    Filed 11/14/2006    Page 5 of 18

Shabott V. Mercury Air Group, Inc. 13 November, 2006 Affidavit of Leon Shabott        5
Pursuant to Rule 60(b) for Relief from Judgment

idle while they waited for lifters. Mercury eventually found the lifters and purchased them through their supplier.

16.    On July 13th the plane was still not put back together, to my knowledge and belief, the replacement hydraulic lifter had not been installed. In the early morning of Monday, July13th, 1998 I drove to Vermont to meet with the realtor about consummating a purchase and sale agreement on a house for sale in the center on town. I left My home at 98 Common Street, Watertown , MA at about 6:00am I filled my truck at the rest stop on RT 128 in Lexington, Massachusetts at 6:36am and drove up North . see attachments #1 (check) #7 (receipt)

17.    While in route to Vermont, I talked on my cell phone during the time in travel to Chelsea. For the calls, as I was roaming outside greater Boston, I was charged for the calls on a separate part of my mobile phone bill, stating the area I was in when I made the calls, as well as the time the calls were made. See attachments #2 & #3 (phone records) I went to the local store in the center of Chelsea, VT for a tape measure that I needed for the house inspection.        See attachment #8 (receipt) I went up to a local sign company in Williamstown, VT, a neighboring town, to order some new signs to be made for my truck, stating my new business location.    See attachment #9 (receipt). I worked the rest of the day on my property in Chelsea and began my return trip in the late afternoon.

18.    While in route back to Massachusetts I stopped to fill up my truck again in Contooco, NH at 5:41 PM and retuned to Massachusetts. See attachment #10 (receipt), #2 & #3 (phone records). On the morning of July 16th I was in Vermont again to take delivery of my new bulldozer. see attachment #6 (check), #2 & #3 (phone records)

19.    On the afternoon of July 16th 1998, I returned to Massachusetts from Vermont. On the way home to Watertown, MA, I went to Mercury Airs maintenance hanger and found

William Young, Mercury's chief mechanic just finishing the motor work to my plane. I was told

that the motors were ready for the first test flight, there was still other work to be done to the

plane, but I was told a test flight was needed at this point. see attachments #2 & #3 (phone

records)

     20.     Michael Wasson the maintenance operations manager told me that it was

Mercury's policy that the plane could not be test flown until all work to date was fully paid for. I

gave him my MBNA Platinum Plus credit card (issued by the aircraft owners and pilots

association) and he charged my card $4186.21 for the work done to date.     see Attachment

#11 &12 (Credit Card Receipt & year end statement)

     21.     I invited William Young (the mechanic and only other person legally allowed to

fly in the aircraft during a test flight), he declined saying it was against company policy, I

climbed up stairs of the plane and before pulling up the door, waved a good by and told the

crowd of Mercury staff that had gathered that I would "be right back", with the slight

nervousness that accompanies most every pilot before a "test flight". During the taxi, run up and

engine check everything looked fine. I announced to the tower that I was to embark on a test

flight and was cleared to climb to 3000'feet ASL (above sea level) an enter an orbital pattern

around the airfield. During the climb out and level off  everything appeared to be fine, after the

first orbit around the airfield the right motor developed the slightest bit of roughness and I

switched the Exhaust Gas Temperature (EGT) gage to the left motor and saw that one cylinder

was at zero degrees. In this airplane a single EGT gauge is shared by both motors, a switch

changes the EGT readings from one motor to the other. As a seasoned pilot, when even the

slightest thing appears to be wrong with my aircraft during a test flight, I decided to end the test

flight. I announced to the tower my test flight was over, they asked me if any thing was wrong

Case 1:04-cv-11575-JLT · Document 71 Filed 11/14/2006 Page 7 of 18

**Shabott V. Mercury Air Group, Inc. 13 November, 2006 Affidavit of Leon Shabott** 7
**Pursuant to Rule 60(b) for Relief from Judgment**

and if I wanted to declare an emergency, I told them no, explained "it was only an EGT gage reading zero".

22.     I landed without incident, taxied back to the Mercury hanger where the crowd who had been watching the flight was still waiting. See Complaint #6. I told William Young (Bill) about the right engine running a bit rough and the EGT gage reading zero, He reassured me the roughness was probably just a fouled plug or something. In my presence he opened the cowling of the left engine to diagnose the EGT, I waited a half and hour or so, to see if I needed to test fly the plane again, he told me he had not found the problem, he needed to still working on it and said I should leave. I left Mercury, unknowing that anything was with the work Mercury had done, I went out to eat at a restaurant in Lexington, Ma. (July 16th, 1998) see Attachment #13 (receipt)

23.     The next day Friday, July 17th 1998, I went out to the field to check on Mercury's progress with the plane, When I arrived William young was running the left engine, the interment panel (dash board) was opened up and he told me he was still working on the problem. William Young told me I would not be able to do another test flight yet. I left Mercury without performing another test flight.

24.     Upon information and belief, on Monday July 20th, 1998 I was called by Mercury (Mike Wasson) and was told that they had (finally) discovered the problem, the EGT gage was not reading zero due to a gage failure. They found that the #2 cylinder corresponding to that gauge had stopped creating heat, due to failure of the entire valve train; I now know the cause was that: The hydraulic lifters on the #2 cylinder of the left engine were hammered till they became frozen, the pushrods, became unseated from the rocker arms and the dislodged pushrods had been slamming around in the cylinder assembly and against the tappets, shattering the tappet

Case 1:04-cv-11575-JLT    Document 71    Filed 11/14/2006    Page 8 of 18

**Shabott V. Mercury Air Group, Inc. 13 November, 2006 Affidavit of Leon Shabott**          8
**Pursuant to Rule 60(b) for Relief from Judgment**

bodies and scattering bits of metal throughout the engine while the engine was running both in

flight and during the running time of mercury's attempt at diagnosis of the zero EGT gage.

24.    To Lycoming's credit (the engines designer and manufacturer). The motor ran so

well after such a catastrophic engine failure, it was undetectable by me, during the test flight, the

landing and taxiing back to the maintenance hanger. The engine ran so well that the failure and

damage was undetectable by Mercury's certified aircraft mechanics, they continued to start and

run the motor for hours, after the test flight without knowing the engine was internally damaged.

25.    Upon information and belief, on Monday July 20th, 1998, when Mercury notified

me that my engine was internally damaged.  I immediately returned to the maintenance hanger

and was shown the  damage to my aircrafts motor. Mercury staff was remorseful, but no staff

member admitted any wrongdoing and they were disturbingly closed lipped about the possible

cause of the damage. During this meeting, the Mercury staff members made **ao** offer to repair the

damage. (July, 20th 1998).

26.    The loss of the aircraft was shocking news to me. I had become reliant on air

travel to accomplish my formidable tasks of honoring my contractual obligations and doing the

work necessary for my family's relocation efforts. My immediate reaction was to get a

replacement engine in order to get my aircraft flying again.

27.    Upon hearing the news about the destroyed engine, and with Mercury unable or

refusing to make a determination as to the cause and repair the damage; I called Victor Cushing,

the owner of Mather aviation, who had maintained the aircraft for years while it was in the

possession of the previose owner and who was the last FAA certified mechanic to work on the

plane before Mercury began maintaining the aircraft for me. Victor Cushing could only say that

Case 1:04-cv-11575-JLT    Document 71    Filed 11/14/2006    Page 9 of 18

Shabott V. Mercury Air Group, Inc. 13 November, 2006 Affidavit of Leon Shabott          9
Pursuant to Rule 60(b) for Relief from Judgment

it had to have been something Mercury did during their work and speculated they did not adjust the valves correctly.

27.     After that conversation on Monday July 20[th,] 1998 Victor Cushing sent me a fax with the sections of the engine manual he felt relevant.    See attachment #14 (fax, 1st page). The week of the 20th of July 1998 I was in constant contact with Mercury who continued to not admit any wrong doing and claimed ignorance as to the cause of the damage. I was surprised that Mercury would not immediately repair my engine. I called many twin Bonanza experts: Dick Ward of the Twin Bonanza Sociaty, Gregg M. Cadieux of Twin Bonanza Support, Mike Cam of Cam Aviation who all suspected improper installation or improper valve adjustment. None of these seasoned experts could imagine how a GO-480 Lycoming engine, that had been running for 700+ hours since rebuild, could have such a failure without the cause being from the work that had just been done.

28.     Upon my best information and belief, on the week of July 27th, 1998 I attended a meeting in the Mercury FBO conference room with the manager John Wrega, the director of maintenance William Young and the service coordination Michael Wasson. In the meeting they admitted no wrongdoing but were willing do something to determine the cause of the engines damage. My first of foremost concern was to get my plane flying again, quickly. They agreed to allow an independent Lycoming engine expert to dismantle and examine the left engine. They were very concerned that if it was determined by the expert that the damage was not Mercury's fault that any and all costs including their labor to remove, crate and ship the engine would be my responsibility as well as the post test flight work they had done evaluating the EGT failure. For my part of the bargain, I agreed that if it was determined that it was something they had done

wrong, they would pay all costs to return the plane to flying condition and compensate me for the lost use of my aircraft.

29.    On July 30th 1998 Mercury shipped the engine to Don Freeman of Aviation Engines in Centerville Alabama. Mercury did not ship the logbook for the left engine, which was still in their possession. The Engine was received on or about August 6th, 1998. See Attachment #15 (Invoice)

30.    The Test Flight I underwent on July, 16th 1998 was required by Federal Law, I was not picking up my plane, Mercury had not "delivered or returned it to me, the test flight I took on July, 16th 1998 was requested by Mercury, the repairs were not completed and payment (to date)was only made to satisfy Mercury's required payment policy. See Attachment # 11 (credit card receipt) & #16 (FAR 91.407). The engine arrived at Aviation Engines, Inc. without the logbooks, as they were still in Mercury's possession. They requested the logbook, which they received. See Attachment #17 (letter)

31.    On August 12th, 1998 Aviation Engines faxed their report to Mercury Air, who they understood to be their customer. The report stated that "provided proper valve lash was obtained at cylinder installation"; "The problem was caused by an intermix of old and new style hydraulic lifter plungers". This was substantiated by a letter from an expert at Lycoming. See attachment #18 (report) # 19 (letter)

32.    On August 12th, 1998 was the first time I was informed that there was an intermixing of old and new style parts in my engine. Once I received this news I called John Wrega who said, "it was in the hands of his insurance company. "On August 12th, 1998 was the date that Mercury finally acknowledged that it was their fault and they would fix their mistake.

33.     The loss of the aircraft caused me to have to commute constantly by automobile

back and forth to Vermont, the road project I was doing was delayed and I had to find and hire a

contactor to complete it (~$20,000.00)at great expense. My business in Boston suffered. Projects

did not get the proper supervision and my income shrank and bills grew. The financial losses

forced me to back out of the purchase agreement of the small house in the center of town in

Chelsea, Vermont. I had to begin renovations of the small uninhabitable cabin on the 140 acres

that I had acquired. I had use a local contractor for the renovation work at a cost of about

$30,000.00.

34.     School started in the beginning of September of 1998 and I was forced to house

my family in the still unfinished cabin. My younger son (then 6 years old) for the first time

developed asthma from the Spartan cabin under renovation while we were living in it, adding to

my stress and responsibilities.  My frequent inquires to Mercury brought the same answer, "still

waiting on insurance"

35.     Around March of 1999 I had another meeting with Mercury, present was John

Wrega, Michael Wasson and John Dupree the other mechanic who had worked on my plane. At

this meeting Mercury told me they needed space in their hanger and asked if they could store the

Plane outside on a tie down. I was trying to be agreeable and desperately needed my plane and

they told me they were still waiting on their insurance. The commuting had depleted both my

business and myself. I was over extended, my family life was having serious problems and my

marriage was on the rocks.

36.     During this meeting, the discussions regarding how to offset the weight of the

missing engine, seal the open lines and protect the open areas from weather damage were all

talked about among us all, as well my concerns over a fuel migration problem that emptied one

auxiliary tank into the main tank, as Mercury never finished the original repairs, which included changing the fuel selector valve which was causing the problem. I was also very concerned about the rudder lock; Twin Bonanzas are a large aircraft with a six-foot tall rudder that is prone to wind damage. The rudder is kept locked by keeping the nose wheel turned hard to the Left side. Mercury assured me they would make sure it was maintained, by pushing the nose wheel over to the left frequently. Mercury also agreed to weekly hand prop the remaining right engine to keep it lubricated. At this meeting Mercury strongly encouraged me to allow the outside storage and was very eager and willing to agree to my simple requests. Mercury assured me they would keep my aircraft safe while they stored it for me outside waiting for their insurance company. See Attachment #20 (partial agreement).

37.     Upon my best information and belief around June of 1999 I found an Engine from a drug seized aircraft, that I delivered to Mercury asking them to "while waiting for their insurance"if they would inspect and install in my plane, till they could get their insurance to fix my other engine. After some time and frequent calls,Mercury eventually refused to install it, stating they did not want the liability.

38.     Sometime in the summer of 2000, I found another complete engine with complete logbooks. It was in good condition and had low hours. I delivered it to Mercury to get my plane flying again, while they still waited on their insurance company. Mercury did not install this engine eather.

39.     At this time my wife and I had separated and my business was unprofitable, I was still commuting between Vermont and Boston by automobile. The demise of my marriage was taking a tremendous toll on me, she was having a blatant, open affair with a local, unemployed

man, I brought us to three marriage counselors one after the other, they all gave up, I was in

individual therapy and on medication.

    40.    I was divorced in August of 2001, My ex wife had become very difficult and took

almost all of my possessions, including financial records and through threat of leaving the

country with my children  (she is a German citizen) compelled me to pay her $2,300,00 per

month in support. On one of my visits to my aircraft in the summer of 2001 I discovered the

aircraft in a state of neglect, the rudder had been damaged by the rudder lock not being

maintained, the tires did not have sufficient air, and the right auxiliary fuel tank was empty. The

mercury staff was very apologetic. I was told they would straiten the mess out. See Attach #20.

    41.    In the fall of 2002 on one of my visits to Mercury I discovered that mercury was

no longer there! They had sold their operation to another company, Signature Air. I found John

Wrega had opened his own Aviation consulting business across the parking lot from the old

Mercury office Building, Michael Wasson and John Dupree where now working in the same

maintenance hanger for  new owners, Signature Air, my plane stood in the same spot. I had a

conversation this all three ex Mercury employees, John Wrega assured me something could still

be done about my plane, Michael Wasson and John Dupree expressed disappointment in how

Mercury treated them, during and after the transfer of ownership. At that time Mike Wasson, a

disgruntled ex employee, In my presence, went into a file cabinet in his office and gave me what

he said was "the entire file on my airplane".

    42.    I then began to actively search for legal counsel to advise me about the situation.

My search was fruitless. I could not find an attorney to take this case on a contingency fee basis.

They all told me an aviation related case against a large company with a legal department and

deep pockets would be too formidable a task for them without a large retainer. (the minimum

requested retainer was $20,000.00). In the search for counsel, I was told about the six-year

statute of limitations. On July 14th 2004 with out any help from a lawyer, I filed suit in the First

Circuit District Court of Massachusetts. I was ignorant to court proceedings and foolishly though

my initiation of a suit would prompt Mercury to make good on their promises and fix my plane.

     43.    I complied with the courts orders and produced every document available to me at

the time, ~200 pages. Mercury's discovery did not include the existing financial information

about my many transactions with them, including the payment for $4186.21 for the repairs they

did, prior to and on day of the test flight on July 16th,1998. Nor did Mercury's discovery include

the complete Storage Agreement See Attachment #20, Complaint #10. Mercury's discovery did

not include the Agreement to pay for the repairs if the Engine Expert determined it was their

fault. See Complaint #8. I continually asked Mercury's attorneys when and how the depositions

would be conducted, they repetitively postponed them. I was trying to be reasonable and

cooperative.

     44.    On December 9th, 2004 Mercury filed a motion for summary judgment based in

part on a statute of limitations argument. The only evidence Mercury provided for their Motion

was an Affidavit by Michael Wasson and some handwritten records with a typed transcript. See

Affidavit Wasson. During my efforts to write my opposition to the summary judgment I called

Michael Wasson and asked him to provide me with an Affidavit as well, he responded that

"Mercury had hired him and John Wrega as consultants and he did not think he could do it, but I

should ask John", (John Wrega). I called Mr. Wrega and left a message to call me about the

matter, he did not return my call.

     45.    After the first summary judgment was dismissed, I asked again about the

depositions. Mercury's attorney said he wanted for me to give my deposition first, which I

ignorantly agreed to accommodate. I gave my deposition, which took three sessions starting June

2nd, 2005 and ending July 28th, 2005. On July 5th, it was ordered by the court to depose Don

Freeman the aviation expert. This deposition took place on August 5th, 2005. On August 11th

2005 I was asked by Mercury's attorney to assent to a postponement of an upcoming status

conference, which I agreed to.

46.     On September 13th, 2005 Mercury once again requested to file another summary

judgment, The two key witnesses for my case Michael Wasson and John Wrega who I was told

Mercury had hired as paid consultants, were never deposed.

47.     In the October of 2006 I had some boxes of personal belongings retuned to me

that were not accessible to me since before my divorce in 2001. Just recently I discovered papers

in some of the mislabeled cardboard boxes, among other things, I found shuffled receipts, bills

and bank statements for 1998. Among these I found the records and evidence to support the date

of the test flight to undisputedly be July 16th, 1998 As I stated in my original complaint and in

both of my oppositions to Mercury's two Motions for Summary Judgment. See Complaint #6.

These records irrefutably prove that July 16th, 1998 was the date I paid for the repairs that

damaged my aircraft immediately prior to the test flight. See Attachment #11 & #12 (credit card

statement)

48.     The records prove without doubt that there is no way I could have flown my plane

on July 13th, 1998, the date claimed by Mercury in the affidavit of Michael Wasson and the

supporting "contemporaneous records" See Affidavit Wasson. On July 13th, 1998 I was engaged

in business all day in Vermont. See attachments #1, #2, #3, #7, #8, #9 & #10. These newly

discovered records also show a pattern of activity and spending behavior of a man who had no

knowledge that his most needed method of transportation, for his family's well being and his

livelihood had been rendered useless. There is no way I would have paid over $10,000.00 in cash

for a Bulldozer if I knew I had to rebuild my airplane motor(s). See Attachments #1, #4, #5, and

#6.

49.     The discovery and review of these records caused me to refresh my memory of

the events of the week of July 13th, 1998 and be able to without hesitation state them to be true,

under oath, which I take very seriously. I am skeptical of the authenticity of the handwritten

notes of Michael Wasson, as they were not in the folder that Mike Wasson had given me in my

visit to him after discovering Mercury had sold there operation, abandoned my plane and that he

was now operations manager for Mercury's successor Signature Air. MikeWasson freely offered

the entire folder and said "This is everything left about your airplane". I felt at that time it was an

offer of help and cooperation. He has said to me through the years that he truly felt bad about

what had happened. I believe that, at the time, he was being genuine. Had there been

handwritten notes that existed, which appear to be written on loose sheets of paper; I believe he

would have given them to me at that time.

50.     I voiced the concern about the accuracy and authenticity of these notes to

Mercury's attorney and stated it in my deposition. In a phone conversation I asked Mercury's

attorney to see the original documents, he would not commit to a yes or no, to my recollection he

said he would see what he could do; Between the time I requested that he produce the original

notes for my inspection and the filing of Mercury's two Motions for Summary Judgment,

Mercury's Attorney never did produced the original notes. As I was preparing this Affidavit, I

saw in Mercury's discovery that the written agreement between Mercury.and myself is only the

last, signature page of what I recall to be a multiple page document, the missing page(s) contain

the clause about Mercury agreeing to maintain the rudder lock and to weekly hand prop the

remaining right engine to keep it lubricated See Complaint #10 & Attachment # 17

51.     I reviewed Mercury's Quarterly reports, I found out that they have reported to

their shareholders their belief that they could to weasel out their contractual obligation to me by

using a statute of limitations argument as their primary defense. See attachment #21 (form 10-Q)

This case is my first and only as a party in a lawsuit, Pro Se or through an attorney except for

some disgruntled roofing contacts through the years, which did not amount to anything, I did not

ever even go to court over them.  I am not a criminal.  I was basically a stranger to a courtroom

except for family and traffic court and some brushes with the law in my spirited youth.

52.     I was forced to go forward with this case as a Pro Se litigant due to coming of the

statute of limitations. I had no choice but to seek justice on my own, without any legal

experiences as an adult besides divorce and family court issues. At the time I was without

financial resources to hire counsel, I made a virtuous attempt to find representation on a

contingency basis without success.  I was acting in good faith and expected Mercury' attorney

would comply with and cooperate with me to execute the courts orders. I was of the miss

understanding that a mutually acceptable date needed to be arranged by all parties in order to

engage in the depositions of my witnesses.

53.     I now believe that I was mislead into waiting to depose my witnesses till Mercury

could attempt and reattempt to dismiss my case on a technicality. I was naive as to the ability to

compel my witnesses into deposition. I repetitively verbally requested if Mercury could produce

their banking records for my transactions with them in 1998. I was waiting for the time of

deposition to ask for testimony and additional discovery from Mercury's ex employees, who had

made all these promises and agreements with me regarding this case. They had become

uncooperative and uncommunicative after Mercury had hired them to as consultants to "help

with their defense". In the sprit of professional conduct, I believed Mercury's attorney, an officer

of the court would be honorable and fair in his actions.

54.    Acting as a Pro Se litigant has been a learning experience for me. I am not the

same ignorant man who foolishly believed justice will somehow surely prevail to the wronged

party in this undisputable and meritorious case.  I have spent countless hours learning the rules of

the court and have formed a competent advisory team to assist me in dealing with the

complexities of the legal system. I now feel competent to take this case to trial and am with the

knowledge and advisory recourses to not allow deceptive practices or trickery to hider my

pursuit to see justice prevail, and get my airplane flying again.

Signed under the pains and penalties of perjury this Thirteenth Day of November

In the year two thousand and six.

Leon Shabott, Plaintiff
4138 Center Pond Road
Newark, VT 05871
802.723.5487

*Pro Se*