UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LEON SHABOTT,               )
                           )
        Plaintiff,          )
                           )
v.                         )
                           )CIVIL ACTION No.04-11575-JLT
MERCURY AIR GROUP, INC.,   )Referred to Magistrate Judge RBC
                           )
        Defendant.          )
                           )

**AFFIDAVIT OF DAVID AISENBERG IN SUPPORT OF DEFENDANT MERCURY
AIR GROUP, INC.'S OPPOSITION TO PLAINTIFF'S MOTION PURSUANT
TO RULE 60(b)**

I, David C. Aisenberg, on oath, depose and state:

        I am a lawyer at the firm of Looney, Cohen, Reagan &
Aisenberg LLP and am counsel to Mercury Air Group, Inc.
("Mercury"), the defendant in this action. I submit this
affidavit in support of Mercury's Opposition to Plaintiff's
Motion Pursuant To Rule 60(b) for Relief from the Court's
Award of Summary Judgment to the Defendants ("Mercury's
Opposition"). It is based on my personal knowledge.

        These facts are in addition to those provided by
Mercury in support of its renewed motion for summary
judgment. None of them can be disputed.

**I.  Discovery Orders of the Court**

        1.   On November 3, 2004, the Court (Tauro, J.) issued
its Rule 26 Discovery Order. The Rule 26 Discovery Order
required the plaintiff Leon Shabott ("Shabott"), among other
things, to provide to Mercury "a copy of, or a description
by category and location of, all documents, data

1

compilations, and tangible things in the possession, custody, or control of the party that are relevant to the disputed facts alleged with particularity in the pleadings."

2.    A central issue of dispute in this case has always been the date when Shabott "test flew his airplane" after he gave it to Mercury to make repairs.  In the Complaint, Shabott alleges that this date was July 16, 1998; Mercury submitted evidence that the date was "on or before" July 13, 1998.

3.    On December 7, 2004, the Court held a Rule 16 Conference.  At the Rule 16 Conference, Shabott admitted that he had not complied with his Rule 26 obligations.

4.    By Order dated December 9, 2004, the Court ordered that the "Plaintiff has thirty (30) days to comply with the Rule 26 Discovery Order."  The Court also stayed all further discovery "until the hearing scheduled for February 14, 2005."

5.    On January 5, 2005, Shabott produced 188 pages of documents as his Rule 26 Disclosure.  This was intended to include all documents which support the allegation in the Complaint as to when Shabott "test flew his airplane" as required by Rule 26.  Shabott never produced any evidence to refute the allegation of Mercury that the "test flight" occurred on or before July 13, 1998.

6.    On February 14, 2005, the Court (Tauro, J.) entered a further Order with respect to discovery, including the allowance of some limited depositions proposed by the parties.  The Court further set a new discovery deadline of August 31, 2005.

7.    None of the deponents proposed by the plaintiff and identified in the Court's February 14, 2005 Order works for Mercury.  Nevertheless, the plaintiff never attempted to subpoena any of the witnesses on his list.  There is no correspondence either between the parties where the plaintiff requested that any of the named deponents be made available for deposition.  No requests by Shabott to make witnesses available were denied.

8.    On May 27, 2005, the Court (Tauro, J.) issued a further Rule 26 Discovery Order and a Notice of Scheduling Conference.  The scheduling conference was set for July 5, 2005.

9.    On July 5, 2006, the Court (Tauro, J.) issued an Order requiring that the parties schedule the deposition of the "expert" to take place prior to August 31, 2005.  The Court also scheduled a further conference on September 6, 2005.

10.    The deposition of the "expert" took place as Ordered, as did the deposition of the plaintiff.  No other depositions were ever scheduled.

11.   At the next Court conference, which was
rescheduled to September 13, 2005, the Court (Tauro, J.)
stayed any further discovery and Ordered Mercury to file a
Motion for Summary Judgment by October 31, 2005.

12.   On October 31, 2005, Mercury filed its Motion for
Summary Judgment.

13.   The plaintiff opposed the motion with all known
evidence.

14.   Based on the evidence, the Court (Tauro, J.)
granted summary judgment in favor of Mercury.  In the
Memorandum, the Court expressly found that "although Shabott
appears to dispute that July 13, 1998 is the date on which
Mercury Air returned the airplane to him, he has provided no
evidence to the contrary."

## II.   Shabott's Failure to Meet his Discovery Obligations

15.   Shabott was deposed on three separate days.  On
each day, Shabott was asked whether he had any additional
documents or evidence to provide.  His response was always
the same:

He compiled one stack of documents from the files he
could locate; he was unable to locate certain documents; he
had moved several times and his boxes were in many different
places; he knew of the locations, including his ex-wife's
home; he expressly identified the only additional documents
which he could not produce as three alleged agreements

**4**

between Mercury and him; he agreed to undertake the task of finding the additional documents if they existed; he was expressly asked about any documents to refute the evidence of Mercury that the plane had been returned to Shabott on or before July 13, 1998, and Shabott repeatedly replied that he could not produce such documents. See Deposition testimony attached hereto.

16. Shabott has produced nothing to demonstrate that he ever undertook to get any documents from his ex-wife, even though he knew she may have had documents. No subpoena was ever served upon the ex-wife.

17. Shabott has produced nothing to demonstrate that he ever attempted to obtain copies of his old checks from the banks on which they were drawn, and nothing prevented him from doing that. No subpoena was ever served upon the bank.

18. Shabott has produced nothing to demonstrate that he ever attempted to obtain copies of his telephone records, and nothing prevented him from doing that. No subpoena was ever served upon the telephone company.

19. Shabott has produced nothing to demonstrate that he ever attempted to obtain copies of his credit card records, and nothing prevented him from doing that. No subpoena was ever served upon the credit card company.

### III.  The "Newly Discovered" Evidence Produced by Shabott Does Not Prove that The Airplane Was returned on any Day Other than One "On or Before" July 13, 1998

20.  Shabott now offers telephone bills, credit card bills and checks as his "newly discovered" proof. At all times, Shabott had the ability to obtain these documents. Indeed, he now claims that the records he now relies upon were given to him by one of his children. Shabott never alleges that he asked his children for these records during the discovery phase of the litigation.  Shabott, at all times knew of these records and where they were located, yet he never made an effort to get them.

21.  Mercury did nothing to prevent the plaintiff from proving his allegations or from obtaining the records he deems necessary to defend this action.

22.  Mercury has never stated that the airplane was returned on July 13, 2006.  Instead, the evidence was that the date was "on or before" July 13, 1998.  This is consistent with the contemporaneous notes of Michael Wasson and also with the repair bills produced by Mercury.  The notes reflect that Mercury identified the problem on July 13, 1998 (not that Shabott flew the plane on that day), and the repair bills reflect that the initial repairs which led to the test flight were completed on July 6, 1998.

6

23.   Mercury never claimed that it required payment prior to allowing Shabott to take a "test flight."

24.   There is no basis to claim that any evidence was procured by fraud.

25.   The records now provided by Shabott do not prove that the inspection took place after July 13, 1998.  No issue was ever raised during discovery as to how Mercury posted its credit card payments.  There is no evidence that a payment posted by the credit card company on July 16, 1998 means that the payment was tendered on that day.  The telephone records, checks and receipts also do not prove that the "test flight" took place after July 13, 1998.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, this 28th day of November 2006.

/s/David C. Aisenberg
David C. Aisenberg

**OR.GINAL**

Volume:    I

Pages :    1-210

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11575-JLT

- - - - - - - - - - - - - - - - - - - - - - - -

LEON SHABOTT,                                           :

      Plaintiff,                                    :

  V.                                                   :

MERCURY AIR GROUP, INC.,                                :

      Defendant/Third-Party Plaintiff,   :

  V.                                                   :

AVCO CORPORATION, LYCOMING DIVISION,                    :

      Third-Party Defendants.                  :

- - - - - - - - - - - - - - - - - - - - - - - -

      Deposition of LEON SHABOTT, a witness called

by counsel for the Defendant/Third-Party Plaintiff,

taken pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before Rosemary

F. Grogan, a Registered Professional Reporter, CSR No.

112993, and Notary Public in and for the Commonwealth of

Massachusetts, at the Law offices of Looney, Cohen,

1    with Mercury as to storing the airplane?

2          A.    Well, throughout this whole -- my relationship

3    with Mercury, I entered into many different agreements;

4    some of them might be construed as storage agreements.

5          Q.    Do you recall at some point that you delivered

6    various documents to me in connection with this

7    litigation for production?

8          A.    You mean the discovery?

9          Q.    Yes.

10         A.    The 188 pages?

11         Q.    Yes, yes.

12         A.    Yes, I do.

13               MR. AISENBERG:    Why don't we mark this as

14         Exhibit 2.

15               (Exhibit 2 Marked for Identification)

16    BY MR. AISENBERG:

17         Q.    Showing you what we've marked as Exhibit 2,

18    are these the 188 pages that you produced for discovery

19    in this litigation?

20                    (Witness reviewing document)

21         A.    It is.    It is a stack of papers, some of which

22    I remember.    I'm not sure if it's -- all of the 188

23    pages are here or there's additional stuff in here.

24         Q.    Well, you recall that you numbered each of the

1    that something got lost in the shuffle, but it's all

2    been kept in the same place.

3        Q.    And describe for me what you did in

4    determining what documents to produce in this

5    litigation?

6        A.    I took the whole file of airplane stuff that I

7    had.

8        Q.    What's in this airplane stuff file?

9        A.    The log books, the -- there were log books,

10   the some old repair receipts, and the communication --

11   some of the communication between Mercury and myself and

12   other people involved in the whole airplane issue, both

13   before and after discovery of the damaged motors.

14              Virtually everything I could remember

15   giving -- having at that time.

16       Q.    And you stored that all in one place?

17       A.    There was actually one place, and then there

18   was a couple of other files I found in some cardboard

19   boxes.  As far as I know I've given you everything that

20   I have.

21       Q.    Is there anything in this stack that you

22   didn't provide to us?

23       A.    Yes.

24       Q.    What stuff did you not provide?

1          A.    Maintenance manuals, books about the Twin

2     Bonanza aircraft itself, files on other aircraft I

3     looked at through the years and had elected not to

4     purchase.

5          Q.    Anything else?

6          A.    Not that I can recall.

7          Q.    And why didn't you produce the maintenance

8     manuals?

9          A.    I was trying to save on Xeroxing.

10         Q.    Are these maintenance manuals specific to this

11    airplane?  What are these maintenance manuals?

12         A.    There's just the, you know, like if you had an

13    owner's manual for a car.  It's kind of the same thing.

14         Q.    Okay.

15         A.    But I did include for you the maintenance

16    manuals, copies of the maintenance manuals that were

17    specific to the problems involved because I can show you

18    right here in an attempt to give total and full

19    disclosure, Lycoming maintenance manuals, the

20    manufacturer of the engine.

21         Q.    So these engines were manufactured by

22    Lycoming?

23         A.    Yes, that I'm sure of.

24         Q.    Any other documents you pulled from these

1   stacks and decided not to produce?

2       A.   Not that I can recall, but there's a lot of

3   stuff there, but I tried to not be -- I tried to make

4   sure I gave full disclosure of anything pertinent to the

5   case.

6       Q.   And how did you determine what was pertinent

7   to the case; that's what I'm trying to understand?

8       A.   Okay; anything that had to do with the

9   previous maintenance of the aircraft, anything specific

10  to that particular aircraft, CH43 and N3835 B, Brava, I

11  tried to provide.

12      Q.   I'm sorry?

13      A.   N3583B, B meaning Brava or part of the

14  phonetic alphabet.

15      Q.   You say CH43; what is CH43?

16      A.   That is the serial number of the aircraft.

17      Q.   And what is N3583B?

18      A.   That's like the license plate or the

19  registration number.

20      Q.   So basically you produced anything specific to

21  this airplane?

22      A.   Correct.

23      Q.   Okay.  What else did you determine was

24  pertinent for discovery?

1          A.    I also included the pages of the Lycoming

2    repair manual that were provided to me by the engine

3    evaluator.

4          Q.    Anything else?

5          A.    That I provided you?

6          Q.    Right; that you deemed pertinent for discovery

7    in this case?

8                          (Witness reviewing document)

9          A.    As far as I can recall, that's pretty much it.

10   Oh, excuse me, there was also some papers from Mercury,

11   but that's paperwork specific to the aircraft.  So I

12   guess that covers that.

13         Q.    Did you include all of the materials that had

14   been exchanged between you and Mercury?

15         A.    No.

16         Q.    Why not and what was excluded?

17         A.    Because what is excluded is the written

18   agreement between the management of Mercury and myself

19   involving negotiations directly after the discovery that

20   the motor had shattered parts inside it.

21         Q.    Why didn't you produce that document?

22         A.    I still haven't found it.  I made a notation

23   somewhere in here that it existed in all of these papers

24   that I sent back and forth.

1       Q.   So other than that alleged written agreement,

2   is there anything else that you did not include which

3   was exchanged between you and Mercury in connection with

4   this aircraft?

5       A.   Not that I can recall; just a lot of stuff

6   there, but a lot of stuff happened and not everything is

7   in -- I don't have everything in one place, but

8   everything I thought was pertinent, I gave you a copy

9   of.

10      Q.   Just to clarify, you gave me all except for

11  this one document, this one written agreement, alleged

12  written agreement, you have now produced all of the

13  written communications exchanged between Mercury and

14  yourself in connection with this airplane; is that

15  correct?

16      A.   No.

17      Q.   Okay.  What else has not been produced?

18      A.   I don't know, but I know there was probably

19  quite a bit -- there was probably other paper that I

20  have not yet found it.  I have moved several times since

21  this -- since the discovery of the broken motors, and I

22  have a lot of stuff, a lot cardboard boxes in a lot of

23  different places, and I'm still searching through it as

24  we speak today.

42

1          I'm sure there could be other things so I

2    cannot testify to that, I'm sorry.  I can assure you as

3    I find anything, I will indeed get you a copy as soon as

4    possible.

5          Q.    Okay.  Let me just clarify.  You produced all

6    the documents you could find that would reflect any

7    communications exchanged between Mercury and yourself in

8    connection with this airplane?

9          A.    As I can recall, yes.

10         Q.    You either have or haven't?  Have you found

11   documents of written communications or records of

12   communications with Mercury and yourself that you have

13   not produced?

14         A.    To this day?

15         Q.    Yes.

16         A.    I don't think so, no.

17         Q.    Okay.  And when I say, Written communications

18   between Mercury and yourself, I also mean any notes you

19   may have taken of communications you had with Mercury.

20              Did you produce all of those that you

21   could find?

22         A.    As far as I can recall; I tried to be as

23   diligent as possible.

24         Q.    Have you also produced all of the documents in

43

1   connection with your communications with third parties

2   that you could find in connection with this airplane?

3       A.   As far as I know, yes.

4       Q.   So you produced all records of any

5   communications, say, with Aviation Engines; is that

6   correct, that you could find?

7       A.   Yes, I believe so.  I tried my best.  This is

8   really important to disclose all of this stuff.

9       Q.   And have you produced all records of any

10  written communications with any so-called experts about

11  this plane and the problems you have been experiencing?

12      A.   I think so.  If I had them, I tried to give

13  them to you.  Understand this has transpired over many,

14  many years now, and there's just been a lot of moves,

15  and a lot of things got, you know -- are scattered

16  about, but I'm pretty sure I have, yes.

17      Q.   Other than this alleged written agreement that

18  you haven't yet found, are there any other documents of

19  which you're aware that you could not find which would

20  support your claims?

21      A.   There might be.

22      Q.   What would those documents be?

23      A.   More notes between -- there might be more than

24  one written agreement between Mercury and myself that I

1   have not yet been able to find.

2        Q.   Any other documents that you haven't been able

3   to find that would support your claims in this

4   litigation?

5        A.   There may be additional communication between

6   Aviation Engines and myself, but I don't think so.

7        Q.   Well, any that you're aware of as you sit here

8   today?

9        A.   No, none.

10       Q.   So the only thing, the only document you're

11  aware of as you sit here today that you haven't produced

12  that might support your claims are these alleged written

13  agreements between yourself and Mercury; is that

14  correct?

15       A.   Your question was done with such finality; as

16  I can recall, yes.

17       Q.   And you say you're continuing to search, what

18  are you doing to continue your search?

19       A.   I have -- I open up cardboard boxes of both

20  files and I go through each file folder and each piece

21  of paper individually looking for anything pertinent to

22  the aircraft, my communication with Mercury or this

23  case.

24       Q.   And where are these boxes that you keep

1   referencing?

2       A.    Some of them are in my apartment in

3   Montpelier.  Some of them are at 4136 Center Pond.  Some

4   are in the storage area in West Burk, Vermont.  And some

5   of them are in a tractor trailer storage in Chelsea,

6   Vermont, and some of them are also in another home in

7   Newark, Vermont.

8       Q.    How many boxes of documents are we talking

9   about?

10      A.    50, 80.

11      Q.    And what effort have you made to be through

12  those 80 boxes?

13      A.    Considerable.

14      Q.    How many of the 80 have you gone through?

15      A.    More than half.

16      Q.    And when do you expect to complete your

17  search?

18      A.    Hopefully by the end of this month.  My

19  biggest problem is that some of those are in the storage

20  trailer in Chelsea which is hard to access.

21      Q.    Why is it hard to access?

22      A.    Because there's two storage trailers back to

23  back to each other and in order to move it forward to

24  open the doors, I need to get a tractor trailer truck.

1       Q.   Okay.  How many of these boxes are in that

2  particular trailer.

3       A.   I don't know.  There might be two.  There

4  might be 20.  I don't remember.

5       Q.   So other than that tractor trailer, you're

6  able to access all of the other boxes?

7       A.   Well, the ones in the storage area in West

8  Burk are pretty deep.  There's three storage units and

9  they're packed solid with cardboard boxes.  Some of them

10  are personal belongings, clothes, household items, and

11  some of those are files.

12       Q.   But you still expect to complete this entire

13  process by the end of the months?

14       A.   I am hoping.

15       Q.   Is there anything you can think of as you sit

16  here today that would prevent you from completing this

17  process by the end of this month?

18       A.   Yes.

19       Q.   What's that?

20       A.   Broken car like I had today, getting sick,

21  kids sick, all sorts of intangibles in my life.  Like

22  for instance, first I have to pay the storage guy

23  because right now I owe money and I'm locked out of

24  them.

47

1          Q.    Well, when can we realistically expect you

2    would have gone through all of your documents to find

3    any documents that are under your definition pertinent

4    to this litigation?

5          A.    I'm hoping by the end of this month, as I

6    said.

7          Q.    So will you agree to report back to us where

8    you are in that search by the end of this month?

9          A.    Most definitely, yes.

10         Q.    And you'll send myself and Mr. Landers a

11   letter as to whether you completed that search and if

12   not, when the search will be completed?

13         A.    If you would send me a letter of intent, I'll

14   know to send you one back.

15         Q.    I don't want to get into a big dispute with

16   you, but you filed this lawsuit.  I'm asking you for all

17   of the documents that would be required under Judge

18   Tauro's automatic disclosure requirements.

19         A.    Mm-hmm.

20         Q.    And I just want to know when you realistically

21   can inform us that you've completed that obligation

22   because you've already reported to the Court that you

23   completed the obligation?

24         A.    I've reported to the Court I've given them

1    everything that I had available.

2          Q.    I don't think it's my burden to send something

3    to you.

4          A.    May I have a piece of paper so I can write

5    myself a note then?

6          Q.    Sure.

7          A.    Thank you.  And may I have a pen?

8                MR. LANDERS:  Use mine.

9                THE WITNESS:  Thank you.

10                     (Short Recess)

11   BY MR. AISENBERG:

12         Q.    Do you share custody of any of your children?

13         A.    No, I do not.

14         Q.    So going back to All Slate & Tile Company,

15   this is where all this started, things started going

16   downhill after you started transitioning to Vermont?

17         A.    No, after the airplane broke.

18         Q.    After the airplane broke?

19         A.    Mm-hmm.

20         Q.    Had you already been transitioned to Vermont

21   after the airplane broke?

22         A.    Yes.

23         Q.    So sometime between May of 1998, approximately

24   May of 1998 when you took possession of this airplane?

66

1      Q.   Have you had any discussions with them since
2   December of '04 or your receipt of this quote?
3      A.   I may have called them up one other time, but
4   I don't think so.
5      Q.   Have they called you?
6      A.   I don't think so.
7      Q.   Okay.  If you could turn to your numbered page
8   four?
9      A.   Hold on one second.  Okay; page four.
10      Q.   I think page four through page 10 appear to be
11   Mercury Air Center documents; is that correct?
12      A.   That's correct.
13      Q.   And were these all the documents you could
14   find in connection with your delivery of the airplane to
15   Mercury in the June, July 1998 time frame?
16      A.   I don't know if they're all of them, but it's
17   what I have.
18      Q.   They were all that you could find; is that
19   correct?
20      A.   Right.
21      Q.   Now some of these records from Mercury, pages
22   four through 10, have prices associated with them; do
23   you see those?
24      A.   Yeah.

67

1      Q.    Did you ever pay Mercury for the work that's

2   reflected in those documents?

3      A.    Yes, I did.

4      Q.    Do you have copies of your checks?

5      A.    No, I could, but I don't know where they are.

6      Q.    Did you pay by check or some other way?

7      A.    I don't remember.

8      Q.    What was your typical practice at that time?

9      A.    To pay by either check or charge card.

10      Q.    Do you have any charge card records?

11      A.    Somewhere.

12      Q.    Well, let's start with page No. 4.

13      A.    Okay.

14      Q.    What was that for?

15                    (Witness reviewing document)

16      A.    That is for right tack not working.  The

17   tachometer appears there was a problem with -- there's

18   two motors and so there's two tachometers which tell you

19   the revolutions per minute of the motor as its spinning

20   prenose case or before the propeller.

21                    And it seems they charged me $188 to

22   replace one of the plugs to it.

23      Q.    Now can you explain why there are different

24   dates on document four than there is on document six?

68

1      A.   No.

2      Q.   Is that yes or no?

3      A.   That's a no; I don't know why.

4      Q.   Did you bring the plane into Mercury more than

5  once in July of 1998?

6      A.   I don't remember.  The airplane spent a lot of

7  time in their hangar.  They fueled the aircraft.  We sat

8  around and talked.  I mean they were -- there was a lot

9  of camaraderie.  They were basically friends.

10     Q.   Who were friends?

11     A.   The guys in the hangar.

12     Q.   With you or --

13     A.   With me, yeah.  You know, we shared stories

14  and talked and stuff.  So I spent a lot of time talking

15  to them as they did different things.

16     Q.   Now when you picked up the airplane from

17  Mercury, did they give you a copy of the documents such

18  as document No. 4 and document No. 6?

19     A.   I don't remember.

20     Q.   How did you get documents four and six or how

21  did you get any of the documents 4 through 10?

22     A.   These were in the stack.

23     Q.   So at some point they had given these to you?

24     A.   Yes.

Q.   And did they give them to you when you came to
pick up the plane?

A.   I don't know.  It was a long time ago and, you
know, I showed up.  And I remember I was there a lot,
you know, back and forth during repair of the aircraft.

Q.   And what was the procedure for paying before
you took delivery of the plane?  Would you pay for these
before they gave you the plane back?

A.   I remember they insisted I pay them before I
took the aircraft, yes.  That was always their thing;
they always wanted their money.

Q.   And would you have copies of your check
registers or credit card receipts from 1998?

A.   Maybe in some boxes.

Q.   Have you done anything to look for those?

A.   Mm-hmm.

Q.   And you haven't found them yet?

A.   No, they could actually be in my ex-wife's
possession, too.  So I actually don't have copies of
them.

Q.   You would agree with me, though, those would
help you determine when the plane was returned to you,
wouldn't they?

A.   Yeah -- well, maybe.

1      A.    Yes.

2      Q.    Some of these conversations were with you; is

3  that correct?

4      A.    Yes.

5      Q.    And are those the conversations to which

6  you're referring when you say that --

7      A.    No.

8      Q.    -- Mr. Wasson --

9      A.    No, I'm not.  There was numerous other

10  conversations with Mike both on the phone and in person

11  that are not included in here.

12      Q.    And in those conversations when are they in

13  relation to the conversations that are reflected in the

14  attachments to Exhibit 4; when in time?

15      A.    During that same time period or after.

16      Q.    Do you have any records that you could --

17      A.    No, I don't.

18      Q.    -- look at to better determine when those

19  conversations are?

20      A.    I'm afraid not, David.

21      Q.    Do you have any documents that could refute

22  any of the statements made by Mr. Wasson in the

23  attachments in Exhibit 4?

24      A.    Maybe in my piles of papers that I explained

1    to you before.

2        Q.   But you haven't yet produced those; is that

3    correct?

4        A.   That is correct.

5        Q.   So there are no documents you produced to date

6    that would refute any of the statements made by

7    Mr. Wasson and the attachments to Exhibit 4?

8        A.   Maybe some of my affidavit would.

9        Q.   Okay.  Other than your affidavit, any

10   documents that you've produced in this case?

11       A.   I'm not comfortable answering that.  It's very

12   possible that there is, but for me to sit here line item

13   by line item and sift through all of my discovery and

14   all of my testimony, I can't possibly say that

15   conclusively.

16       Q.   Okay.  Well, I mean to exclude your testimony

17   because your testimony is not a document that was

18   recently created, correct?

19       A.   Mm-hmm.

20       Q.   You would agree with me?

21       A.   Okay.

22       Q.   Okay.  Do you have any contemporaneous

23   documents -- by Contemporaneous, I mean in the June,

24   July, August, 1998 time frame, that would refute any of

116

1    the statements by Mr. Wasson contained in the

2    attachments in Exhibit 4?

3        A.    I can't conclusively say I do not.  I haven't

4    gone through fully my discovery line items by line

5    items.

6        Q.    And by Discovery, you mean Exhibit 2 in this

7    case, correct?

8        A.    Exhibit 2 or in my possession at this time

9    that are obtainable.

10       Q.    And by Obtainable and in your possession at

11   this time, you mean these boxes of documents that you

12   haven't yet fully gone through that you think you're

13   likely to go through them by the end of June of this

14   month?

15       A.    Yes, or stuff that could actually be in my

16   ex-wife's possession that I may or may not be able to

17   access.

18       Q.    Are you aware of any documents in Exhibit 2

19   that would refute any of the statements made by

20   Mr. Wasson and the attachments to Exhibit 4?

21       A.    I can't say.

22       Q.    Well, why don't you go through the documents

23   in Exhibit 2 and find any documents which you believe

24   refute any of the statements by Mr. Wasson and the

```
 1   maintenance hangar for a routine inspection?
 2        A.   Yes.
 3        Q.   Does that refresh your recollection as to
 4   whether you delivered the plane to Mercury for the first
 5   time?
 6        A.   No, I had been storing the airplane for a long
 7   time.
 8        Q.   At Mercury?
 9        A.   At Mercury.  When I stated I flew there, I was
10   trying to state in my affidavit that I handed them a
11   perfect flying aircraft.
12        Q.   Well, you handed them an airplane you had just
13   flown there; is that correct?
14        A.   Right, I flew, I landed, I taxied to their
15   hangar, and handed them the keys.
16        Q.   Okay.  And so that's late June of 1998,
17   correct?
18        A.   Yes.
19        Q.   Now if you look at Mr. Wasson's affidavit
20   which is Exhibit 4.
21        A.   Okay.
22        Q.   The first entry on the attachment is dated
23   June 24, 1998?
24        A.   Mm-hmm.
```

1    Q.   Do you have any reason to believe that's not

2  the date you dropped the plane off in late June of 1998?

3    A.   No, I don't have any reason to dispute it.

4  I'm not sure if it's the exact date.

5    Q.   Do you have any documents to refute that date?

6    A.   Not that I have produced up to this time, no.

7    Q.   And you agree that up until -- and you agreed

8  to let Mercury perform certain work on that aircraft at

9  that time; is that correct?

10    A.   Yes.

11    Q.   Now paragraph four, of your affidavit --

12    A.   Yes.

13    Q.   -- you see where it says:  I am unsure as to

14  the exact date Mercury returned the airplane to me?

15    A.   That is correct.

16    Q.   Do you have any evidence to support what day

17  Mercury returned the plane to you?

18    A.   No, I do not, as of yet.

19    Q.   As you sit here today, do you have any basis

20  to refute paragraph seven of Mr. Wasson's affidavit

21  which is Exhibit 4 which states that Mercury returned

22  the airplane to Shabott on or before July 13, 1998?

23    A.   As I sit here today, no, I do not.

24    Q.   Now when Mercury returned the plane to you --

1  without having gotten any of this other stuff yet.  See,
2  at that point I still hadn't even had access to my
3  aircraft folder.  It was also stuffed in the box
4  somewhere.
5           And so it was from my recollection.  And
6  I actually thought I was being pretty responsible that I
7  didn't exactly know the date, but I knew it was right
8  around that time.
9      Q.  But you don't have any calendar or tell you or
10  anything like that?
11     A.  I do have stuff somewhere, if it still exists.
12     Q.  But you haven't produced it?
13     A.  Correct.
14     Q.  And so in paragraph eight, Mr. Wasson states:
15  On July 13, 1998, Shabott -- and I'm talking about
16  paragraph eight of Exhibit 4.
17     A.  Mm-hmm.
18     Q.  July 13, 1998, Shabott again returned the
19  airplane to Mercury for further service.
20     A.  I have no physical evidence to produce to you
21  at this time.
22     Q.  You said you knew you were running out of time
23  based on the Statute of Limitations.  How is it you knew
24  what the Statue of Limitations were or that you were

1    running out of time?

2        A.    Well, through the years waiting and calling

3    Mercury every now and then wondering if they had fixed

4    it, and then going through all of my own personal

5    upheaval.  And I asked a number of my friends who were

6    attorneys what my legal rights were in regard to this

7    case.

8                And what I was told was that contractual

9    obligation lasted for six years.  And as I realized I

10   was coming up upon the six-year mark, I actually went

11   and opened the phonebook in the Boston area and kept on

12   calling numerous attorneys, and not getting anywhere.  I

13   did believe the information I had six years.  That's how

14   i know.

15       Q.    And what is the contractual obligation you

16   were trying to enforce?

17       A.    That I asked them to fix my airplane and

18   they -- what they did is, they put wrong parts in it and

19   on the test flight those parts shattered.  And then we

20   made an agreement to repair the aircraft -- well, it's

21   all written here.

22       Q.    All written where?

23       A.    In the complaint.

24       Q.    In what document?

```
 1          A.    In the complaint.

 2          Q.    In the complaint we marked Exhibit 5?

 3          A.    Yes, it's all in Exhibit 5.

 4          Q.    We don't need to go through that; that's fine.

 5                Now you indicate later on in paragraph

 6    four:  Some time in late July of 1998 Mike Wasson phone

 7    me to tell me that the left engine's hydraulic lifters

 8    (the ones in the cylinder they had replaced) had

 9    shattered and that metal bits were scattered throughout

10    the engine?

11          A.    Correct, I remember that phone call.

12          Q.    Now if you look at the attachments to

13    Exhibit 4 in paragraph nine of Exhibit 4, Mr. Wasson

14    indicates that on July 14th he notified you of this

15    issue?

16          A.    Right, I see that.

17          Q.    Do you have any evidence to refute this

18    statement by Mr. Wasson that he made a phone call on

19    July 14th, 1998?

20          A.    I have no physical evidence to produce at this

21    time to either confirm or refute that statement.

22          Q.    And do you recall telling Mr. Young at Mercury

23    that you were going to shop around for another overhaul

24    shop and would get back to Mercury?
```

1    Mercury sold out, and now I'm working for Signature.

2              I think that's what happened.  But at

3    some point I showed up and Mike gave me the Mercury

4    file, and that's where I got these.  And that was some

5    time well after the whole -- the real low moments of my

6    life, and I happen to have that file and then I stuck

7    the file in the aircraft folder.

8         Q.    Does that include this page 36?

9         A.    Let me look.  I'm not sure I'll remember.

10                    (Witness reviewing document)

11        A.    I think it did include it.

12        Q.    Page 37 and page 38?

13        A.    I don't think so.  I think that 37 and 38 was

14   in my aircraft folder, but I don't remember.  I can't

15   say conclusively, sir.  I know that since I initiated

16   this and I had to do a mandated discovery request, I

17   have spent considerable time sifting through boxes and

18   boxes and boxes in giving you this discovery that I've

19   given you.

20        Q.    So as you sit here today, you don't know what

21   documents you had from 1998 and which ones you didn't?

22        A.    That's correct, but I tried to give you

23   everything I had.

24        Q.    And you have no other explanation as to why

1    you don't have a copy of these records, even though you

2    had other records in your airplane folder?

3        A.   As I was trying to explain before I got off on

4    a tangent that those -- both of those agreements from

5    the meetings that were attached to them were at a time

6    when my life was in a great amount of displacement, you

7    know.  And you can imagine that after, you know, very,

8    very hard, hard days work and driving umpteen hours up

9    north, you throw some papers down on a desk and you fall

10   asleep and they get shuffled into other papers, or maybe

11   you can't, but that's what happened.

12       Q.   Why did you tell me earlier when I asked you

13   about where these documents came from, Exhibit 2, you

14   said they came from your airplane folder or box or from

15   other boxes that you gave me, the various sources where

16   these came from; not once did you mention that they came

17   from Mercury either through our discovery that we

18   provided to you or recently through Mike Wasson?

19       A.   Because when I had to make the discovery, I

20   gathered everything that had the airplane on it that was

21   necessary and that had anything to do with it.  Again,

22   your discovery has also been shuffled in with my stuff

23   and I gave you a copy of everything I thought would be

24   pertinent.

1   **ORIGINAL**                    Volume:   II
2                                   Pages :   211-297
3
4            UNITED STATES DISTRICT COURT
5            DISTRICT OF MASSACHUSETTS
6
7                      CIVIL ACTION NO. 04-11575-JLT
8   - - - - - - - - - - - - - - - - - - - - - - - -
9   LEON SHABOTT,                              :
10          Plaintiff,                         :
11     V.                                      :
12  MERCURY AIR GROUP, INC.,                   :
13          Defendant/Third-Party Plaintiff,   :
14     V.                                      :
15  AVCO CORPORATION, LYCOMING DIVISION,       :
16          Third-Party Defendants.            :
17  - - - - - - - - - - - - - - - - - - - - - - - -
18          Deposition of LEON SHABOTT, a witness called
19  by counsel for the Defendant/Third-Party Plaintiff,
20  taken pursuant to the applicable provisions of the
21  Massachusetts Rules of Civil Procedure, before Rosemary
22  F. Grogan, a Registered Professional Reporter, CSR No.
23  112993, and Notary Public in and for the Commonwealth of
24  Massachusetts, at the Law offices of Looney, Cohen,

1   Reagan & Aisenberg, LLP, 109 State Street, Boston,

2   Massachusetts, on Tuesday, July 5, 2005, commencing at

3   11:00 a.m.

4

5

6

7

8

9   APPEARANCES:

10  Plaintiff appearing Pro Se.

11

12  Representing the Defendant/Third-Party Plaintiff:

13          LOONEY, COHEN, REAGAN & AISENBERG, LLP

14          109 State Street

15          Boston, MA  02109

16          (617)371-1050

17          BY:  DAVID C. AISENBERG, ESQUIRE

18

19  Representing the Third-Party Defendant:

20          HIGGINS, CAVANAUGH & COONEY

21          123 Dyer Street

22          Providence, RI  02903

23          (401)272-3500

24          BY:  PATRICK B. LANDERS, ESQUIRE

1    without an attorney; is that correct?

2        A.    That is correct.

3        Q.    Have you moved yet to 4136 Center Pond Road in

4    Newark, Vermont?

5        A.    Yes, I have.

6        Q.    And is that now your address?

7        A.    Yes, it is.

8        Q.    And that's your only address at this time?

9        A.    Yes, it is.

10       Q.    And you're renting that property; is that

11   correct?

12       A.    Yes.

13       Q.    And have you done anything since the last

14   deposition to complete your search for additional

15   documents?

16       A.    Yes, I have.

17       Q.    And what have you done?

18       A.    I have searched through endless file folders,

19   boxes, reams of paper, and have not discovered the three

20   documents that I'm still looking for.

21       Q.    And what are the three documents?

22       A.    One is a handwritten agreement that was

23   drafted between John Wraga and myself with other staff

24   of Mercury there.

1      A.   No.

2      Q.   Okay.  So that's one of the documents you're

3  looking for?

4      A.   Mm-hmm.

5      Q.   What are the other two?

6      A.   The other document is an agreement that allows

7  them to store the aircraft outside; that's what they

8  requested while the investigation was going on, the

9  aircraft was parked inside their maintenance hangar.

10             And I signed the agreement allowing them

11  to park the aircraft outside under certain conditions.

12      Q.   And you also haven't been able to locate that

13  document?

14      A.   That's correct.

15      Q.   And is there a third document you're also

16  looking for?

17      A.   Yes, there is.

18      Q.   And what's that?

19      A.   That was another shorthand written document,

20  also written by John Wraga that said that no storage

21  fees would be charged.

22      Q.   Okay.  With respect to the third agreement,

23  have you paid any storage fees since mid-July 1998 for

24  this airplane?

1      Q.   And you have no idea as you sit here today,

2  how you would calculate your lost work time?

3      A.   No, because I don't know how it's done.

4      Q.   These out-of-pocket costs, which I would

5  characterize as No. 3; do you remember that?

6      A.   Yes, I do.

7      Q.   As you sit here today, what travel expenses

8  have you incurred in this litigation?

9      A.   I don't know.  I don't exactly know right now.

10  I don't have those -- I don't have any of the receipts

11  with me.

12      Q.   Have you saved all of the receipts?

13      A.   Yes, I have.

14      Q.   And then I would ask that you -- as I

15  understand and I don't want to speak for Judge Tauro,

16  but as I understand his orders, if these are documents

17  that you intend to rely on at the trial, they should be

18  produced pursuant to your automatic disclosure

19  obligations.

20          And if you need clarification, I can't

21  speak for Judge Tauro, but I would suggest that you may

22  want to seek clarification of that.  But I would

23  personally ask that all of the documents which support

24  any of your damaged claims be produced.

```
 1                    Would you agree to undertaking that
 2   obligation?
 3        A.    The figure that I gave you was a very vague
 4   estimate, so I am not -- in clarification, I am not
 5   stating that any of my travel expenses are based on
 6   definitive, finite incurred expenses, but were simply a
 7   vague guesstimation.
 8        Q.    Do you have any records to support what these
 9   expenses are?
10        A.    In a shoebox, yes.
11        Q.    Do you agree to produce the documents that
12   support the expenses as to the extent you intend to rely
13   on them as damages in this case?
14        A.    To the vagueness of how I have come to the
15   thought of adding for litigation costs or travel
16   expenses, and the fact I have not put hard numbers on
17   it, I have not listed or itemized anything, I have come
18   up with what I thought was a highly reduced figure to
19   what expenses were actually incurred to give you, for
20   instance, in order to get down here, I had to buy a
21   transmission and then install the transmission in order
22   to get the truck that I drove here.
23                    I am not asking within the settlement for
24   Mercury to pay for the transmission.  So I'm not going
```

1   to produce that as a receipt.  I thought that it was

2   more than fair and within the discovery order or all

3   disclosures to simply say a certain amount of money

4   which is in far reduced to what I have actually

5   incurred.

6       Q.   Do you ever intend to list or itemize the

7   elements of your damages in this litigation?

8       A.   I don't know; hopefully I won't have to.

9       Q.   What documents do you have to support these

10  various costs associated with your participation in this

11  litigation?

12      A.   Because you are now making this question

13  defined, I can't really say I have any.  I have gas

14  receipts, but I'm not sure which gas receipts I could

15  possibly place with this exact trip or a previous one or

16  a phone call.

17      Q.   So if I understand you, you have no way of

18  saying among all these receipts you have which ones are

19  specific to your participation in this litigation; is

20  that correct?

21      A.   At this point, no.

22      Q.   Do you ever intend to make that determination?

23      A.   There may come a time where I do; I may, yes.

24      Q.   And when might that be?

1       A.    I can't say.

2       Q.    Okay.  Up to that point, though, would you

3    agree with me that you haven't produced any documents

4    other than Victor Cushing's estimate to substantiate any

5    damages; is that correct?

6       A.    That is correct.

7       Q.    Since 1998 have you made any efforts to

8    replace this particular airplane?

9       A.    No.

10       Q.    And you indicated at your last deposition at

11    some point that you received some sort of psychological

12    counseling; do you recall that?

13       A.    Yes, I do.

14       Q.    Who was the person from whom you sought that

15    counseling; person or persons?

16       A.    Well, it was at the Wellness Clinic in Barry,

17    Vermont.

18       Q.    Do you remember the name of the individual or

19    individuals --

20       A.    No.

21       Q.    -- who provided that?

22       A.    No, one of them was June, was one of them.

23       Q.    And do you have a better address for the

24    Wellness Clinic?

1   flyable?

2        A.   No, it's possible that it would be, but that's

3   not -- I can't say for sure without trying to be vague

4   or elusive; I just can't say.

5        Q.   You don't know as you sit here if all these

6   things were done in the Cushing estimate, you would be

7   made whole?

8        A.   Correct.

9        Q.   But you have no other documents as you sit

10  here today to support what additional costs there would

11  be to make you whole; is that correct?

12       A.   That is correct.

13       Q.   If you turn to page 14 of Exhibit 2; it's an

14  overhaul manual from Lycoming?

15       A.   Yes.

16       Q.   Do you have that document in front of you?

17       A.   Yes, I do.

18       Q.   And why were you talking to Mr. Cushing on

19  July 20, 1998?

20       A.   Well, I'm not sure I was talking to him on

21  July 20 of 1998, but some time around then.

22       Q.   It would have been on or before?

23       A.   On or before, yes.  I called him up after I

24  was told that the hydraulic lifters in my motor were

1          Q.    Do you have any reason to refute any of the

2    information contained on page 143 of Exhibit 2?

3          A.    No, I have no reason to refute it at this

4    point.

5          Q.    And you have no documents to support anything

6    that would challenge anything written on page 143; is

7    that correct?

8          A.    Not that I know of.

9          Q.    If you would turn to page 167?

10         A.    I am at page 167.

11         Q.    Okay.   And that's also dated 7/6/98 with a

12   HCS's reading of 1073; is that correct?

13         A.    That's correct.

14         Q.    And you have no reason to refute any of the

15   information contained on that document, do you?

16         A.    No, I do not.

17         Q.    And you have no documents to challenge

18   anything that's contained on page 167; is that correct?

19         A.    If I do, they've already been given to you.

20         Q.    But you're not aware of any specific document

21   which would challenge the information on page 167?

22         A.    At this point.

23         Q.    And you would agree with me you have no

24   records in your possession which would support the date

1  on which you picked up the plane from Mercury; is that

2  correct?

3      A.    That's correct.

4      Q.    And you also have no records in your

5  possession to confirm the date on which Mercury called

6  you to come pick up your plane in July of 1998; is that

7  correct?

8      A.    Let us just clarify both statements.  I have

9  no records that I have available to me now that I have

10  found that I have not produced to you already.

11     Q.    That would support either of those statements?

12     A.    Unless they're here.

13     Q.    Now in your affidavit which is Exhibit 6, in

14  paragraph four, if you'll look at that.

15     A.    I'm afraid I don't have -- I don't see a

16  yellow sticker with Exhibit 6.  I have a 1, a 2, and 3

17  and 5, and I think back here was a 4, but I don't see a

18  6.  Let me see if I can find it.

19                    (Short Recess)

20  BY MR. AISENBERG:

21     Q.    Looking at Exhibit 6 which is your affidavit

22  of Leon Shabott?

23     A.    Yes.

24     Q.    And do you see in paragraph four it says

265

1    towards the bottom, Sometime in late July of 1998 Mike

2    Wasson phoned me?

3         A.    Yes, I see that.

4         Q.    Do you have any reason to refute the entry of

5    Mr. Wasson that he told you that on July 14, 1998, as

6    set forth in his affidavit, Exhibit 4?

7         A.    I have no reason to believe or to refute it,

8    no, but I'm not sure it was that day.

9         Q.    And you have no documents to support that it

10   wasn't; is that correct?

11        A.    None that I can put my hands on at this

12   moment, no.

13        Q.    Now in paragraph five of this document

14   Exhibit 6, your affidavit --

15        A.    Yes.

16        Q.    -- you refer to this first agreement that we

17   talked about; is that correct?

18        A.    Let me read it and I'll let you know.

19                    (Witness reviewing document)

20        A.    That is correct.

21        Q.    And that's a summary of all the terms that

22   were contained in the first agreement; is that correct?

23        A.    I'm not sure if it was all the terms.  I'm not

24   sure it was all the terms, but it's the summary of the

```
                                        Volume:   III
                                        Pages: 298-403
                                        Exhibits:   7-11

            UNITED STATES DISTRICT COURT

            DISTRICT OF MASSACHUSETTS

                        CIVIL ACTION NO. 04-11575-JLT
  - - - - - - - - - - - - - - - - - - -
LEON SHABOTT,                              :
                    Plaintiff             :
        V.                                :
MERCURY AIR GROUP, INC.,                  :
                    Defendant/Third-Party :
                    Plaintiff,            :
        V.                                :
AVCO CORPORATION, LYCOMING DIVISION,      :
                    Third-Party Defendant :
  - - - - - - - - - - - - - - - - - - -
```

            CONTINUED DEPOSITION OF LEON SHABOTT, a

        witness by counsel for the Defendant/Third-Party

        Plaintiff, taken pursuant to the applicable

        provisions of the Massachusetts Rules of

        Civil Procedure, before Patricia M.

        McLaughlin, a Certified Shorthand Reporter and

        Notary Public in and for the Commonwealth of

        Massachusetts, at the Looney, Cohen, Reagan &

        Aisenberg, LLP, 109 State Street, Boston,

        Massachusetts, on Thursday, July 28, 2005,

        commencing at 12:45 p.m.

507

```
 1        A    Yes, I do.

 2        Q    Since your last deposition, have you done

 3             anything to update your submissions or search

 4             for documents?

 5        A    I've continued my search for documents

 6             unfruitfully.

 7        Q    Prior to the beginning of your deposition, we

 8             agreed to extend the time by which you could

 9             read the transcript from the prior two days

10             of the deposition up to date of the court

11             conference on December 6th; is that correct?

12        A    Yes.

13        Q    In that agreement, we will also include the

14             third transcript.  If we have it here prior

15             to your visit here, pending arrangements you

16             make with my office, would also agree to

17             review that transcript prior to the court

18             conference?

19        A    Yes, I will.

20        Q    If you would turn to Page 31 of Exhibit 2,

21             which is your disclosure, you may or may not

22             need that as a reference, but my question to

23             you is:  What are the specific specifications

24             of your airplane which in your testimony make
```