UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEON SHABOTT | ) |
| *Plaintiff* | ) Civil Action No. |
| v. | ) 04-11575-JLT |
| MERCURY AIR GROUP, INC. | ) |
| *Defendant* | ) 16 February 2007 |
| AVCO CORPORATION, LYCOMING DIVISION | ) |
| *Third Party Defendant* | ) |

FILED
CLERKS OFFICE
2007 FEB 21  P 4:4[?]
DISTRICT COURT
DISTRICT OF MASS.

## AFFIDAVIT OF LEON SHABOTT

I Leon Shabott do hereby swear and depose as follows –

1. I am a United States citizen and I am over the age of eighteen.

2. I am a pilot and am rated to fly twin engine aircraft. I have ~500 hours of flight time. Aviation is a big deal to me. I flew my first plane when I was 13 years old. I enlisted in the Civil Air Patrol at 14 years old. I am an experienced skydiver with over 500 freefalls.

3. FAA rules governing the production, engineering and maintenance of aircraft airframes, engines and electronics results in a quality of aviation motors where they almost never fail or experience and significant mechanical in-flight failure. Every year an aircraft must be meticulously inspected, this is known as an annual inspection. Each type of aircraft engine is given a specific rating on how many hours it should be operated before it must be tore down by FAA certified mechanics and rebuilt to FAA specifications. This FAA rating is called a Time Before Overhaul ("TBO").
The engines Time Before Overhaul ("TBO") is about 1200 hours of run time. At the time of purchase the Airplane's engines had about 650 hours on them. As a pilot and aviation

Case 1:04-cv-11575-JLT    Document 92    Filed 02/21/2007    Page 2 of 9

Shabott V. Mercury Air Group, Inc. 16 February, 2007 Affidavit of Leon Shabott                                    2
Pursuant to Second Opposition to Defendants Renewed Motion for Summary Judgment

professional I have full confidence that the engines on the Airplane at the time of purchase would last to the next overhaul. The engines were fully maintained before I flew the aircraft from California to the East Coast. I had an engine oil analysis performed on the motors it always showed the engines had no excessive wear. Cylinder replacement on the front outside position of a twin engine plane is not uncommon. The #2 cylinder on the left engine is the one Mercury replaced incorrectly that caused the engines destruction.

4. As a licensed pilot I am required by the FAA to maintain a set of records that documents the maintenance history of the Airplane and my flight time in it. These records are referred to as "log books."

5. The FAA requires that only certified FAA mechanics can work on an aircraft and it engines. Logbook entries must be made by any FAA certified mechanic who works on the Aircraft. These regulations cause an aircraft owner to become reliant on FAA certified mechanic's to keep an aircraft airworthy.

6. This aircraft was in pristine condition when I purchased it. This plane had very low operating hours and had been meticulously maintained by a FAA certified mechanic. I checked the log books and extensively interviewed the Victor Cushing, the FAA certified mechanic who had maintained the airplane for years.

7. In June 1998 I entered into a verbal agreement ("Verbal Contract") with Mercury Air to inspect engines and do other mechanical and electrical repair work on the Airplane consistent with FAA rules. I arrived and handed them all my log books as is required by FAA regulations.

8. On 16 July 1998, I was requested by Mercury Air Group Inc. (Mercury) to test fly my BE-50 Beechcraft Twin Bonanza aircraft (Airplane). I was told I had to pay for all work performed to date. I paid $4186.21 for the work done to date with my MBNA Platinum Plus- Aircraft and Pilot Association credit card credit card. I have personal recollection that the date of test flight was 16 July 1998. I have the credit card statements to prove the date of the test flight was 16 July

Case 1:04-cv-11575-JLT    Document 92    Filed 02/21/2007    Page 3 of 9

Shabott V. Mercury Air Group, Inc. 16 February, 2007 Affidavit of Leon Shabott                                             3
Pursuant to Second Opposition to Defendants Renewed Motion for Summary Judgment

1998 and I have additional evidence to prove that I was not in the state of Massachusetts to be able to fly the aircraft on 13 July 1998, as has been fictitiously claimed by Mercury.

9. Before the "test flight" on 16 July 1998, I radioed to the tower that I needed clearance for a test flight pattern. During the test flight the *right* motor developed the slightest bit of roughness and the Exhaust Gas Temperature (EGT) gage to the *left* motor was not working properly. Due to what I perceived to be a broken gage, I was required to end the flight, by FAA regulations. I requested clearance to land without declaring an emergency. If I thought there was any possibility of damage to the engine(s) I would have been obligated to declare an in-flight emergency.

10. In my flying career I have experienced rough running engines, and broken gauges but never before have I experienced a catastrophic engine failure. I do not even know of any pilot who has had an in flight engine failure.

11. I landed the aircraft without incident, taxied back to the Mercury hanger. If I had thought there was anything wrong with the engine(s) I would have shut them down immediately upon landing and requested a tow back to the Mercury hanger. After taxiing back to Mercury's maintenance hanger I told Mercury's chief mechanic, William Young about the slight right engine roughness and the EGT gage reading zero, He reassured me the roughness was probably just a fouled plug. While I believed the gage was broke, my plane became un- airworthy by FAA regulations. *Bill Young kept running the left engine* to diagnose the broken EGT gauge.

12. I waited a half and hour or so, then I left Mercury, unknowing that anything was wrong with any of the work Mercury had done. On 17 July 1998, I went to the Mercury hanger, William Young was running the left engine when I arrived, the interment panel (dash board) was opened up and he told me he was still working on the broken gage problem. William Young told me I would not be able to do another test flight yet. I left Mercury without performing another test flight. On or about 20 July 1998 I was told by Mercury's employee Mike Wasson that shattered tappet bodies had been discovered in my aircrafts engine and bits of metal were strewn throughout the engine. This catastrophic engine failure was undetectable by me, during the test

Case 1:04-cv-11575-JLT    Document 92    Filed 02/21/2007    Page 4 of 9

Shabott V. Mercury Air Group, Inc. 16 February, 2007 Affidavit of Leon Shabott                                                         4
Pursuant to Second Opposition to Defendants Renewed Motion for Summary Judgment

flight, landing and taxi back to the maintenance hanger *and* by Mercury's certified aircraft mechanics. Mercury continued to start and run the motor for hours, after the test flight without knowing the engine was internally damaged. It is possible that Mercury's running of the engine shattered the tappet bodies and caused the bits of metal to become scattered throughout the engine. Once Mercury discovered the destruction on ~20 July 1998, Mercury did not admit responsibility for the damage.

13. While Mercury was doing the post test flight work I was reminded by Mike Wasson that Mercury's time was going to be billed to me, that the broken EGT gauge had nothing to do with the work they had just performed and I was being charged for the additional work.

14. Once I was told about the destruction of the engine(s) on 20 July 1998. I called many twin Bonanza experts: Victor Cushing of Mather Aviation, Dick Ward of the Twin Bonanza Society, Gregg Cadieux of Twin Bonanza Support, Mike Cam of Cam Aviation-- they all suspected improper installation or improper valve adjustment. Not one of these seasoned experts could imagine how a GO-480 F1A6 Lycoming engine could have such a failure without the cause being from Mercury's work. On the same day (20 July 1998) Victor Cushing sent me a fax showing the components involved in the cylinder / valve train assembly.

15. All of the work Mercury did to my plane was by Verbal Agreement. My aircraft and I were a constant fixture at the Mercury maintenance hanger. The staff and I had become friendly. I was reliant on the Mercury staff and had an ongoing program to keep a close watch on the plane including oil analysis and regular inspections. All the work to my aircraft by mercury was always with a "handshake", verbal agreement.

16. About 27 July1998 I met with John Wrega, William Young and Michael Wasson about my damaged aircraft. They (Mercury) wanted an independent Lycoming engine expert to dismantle and examine the left engine. We all made an agreement that Mercury would remove, crate and ship the engine to an expert, if the expert determined that the damage was no fault of Mercury's that it would be my responsibility to pay all costs, as well as the post test flight work they had done evaluating the EGT failure. For my part of the bargain, It was agreed that if it was

Case 1:04-cv-11575-JLT   Document 92   Filed 02/21/2007   Page 5 of 9

Shabott V. Mercury Air Group, Inc. 16 February, 2007 Affidavit of Leon Shabott                                            5
Pursuant to Second Opposition to Defendants Renewed Motion for Summary Judgment

determined that it was something Mercury had done wrong, Mercury would pay all costs to return it to flying condition and compensate me for the lost use of my aircraft. This was agreed to verbally and then written down as confirmation.

17. On 30 July1998 Mercury shipped the engine to Don Freeman of Aviation Engines in Centerville Alabama. The Engine was received on or about August 6th, 1998. On 12 August 1998 Aviation Engines faxed a report to Mercury Air, who they understood to be their customer. The report stated that "provided proper valve lash was obtained at cylinder installation"; "The problem was caused by an intermix of old and new style hydraulic lifter plungers". This was substantiated by a letter from an expert at Lycoming. August 12th, 1998 was the first time I was informed that there was an intermixing of old and new style parts in my engine. Once I received this news I called John Wrega who said "it was in the hands of Mercury's insurance company. August 12th, 1998 was the date that Mercury acknowledged that the damage was their fault.

18. Around March of 1999 I received a letter from Mercury stating they were charging me storage for my aircraft that was still in their maintenance hanger. I than had another meeting with Mercury, present was John Wrega, Michael Wasson and John Dupree. At this meeting Mercury told me they needed space in their hanger and told me they were going to put it outside. They acted like my aircraft was trespassing on their property. During this meeting, the discussions regarding how to offset the weight of the missing engine, seal the open lines and protect the open areas from weather damage were all talked about among us all, as well my concerns over a fuel migration problem that emptied one auxiliary tank into the main tank, as Mercury *never finished the original repairs*, which included changing the fuel selector valve. Twin Bonanzas are a large aircraft with a large rudder that is prone to wind damage if not kept locked. The rudder is kept locked by keeping the nose wheel turned hard to the Left side. Mercury assured me they would make sure it was maintained, by keeping the tie down ropes tight, maintaining air pressure and keeping the nose wheel pushed over to the left most position. Mercury also agreed to weekly hand prop the remaining right engine to keep it lubricated. Mercury agreed to keeping the aircraft safe outside the hanger. For their part of the bargain Mercury got space in their hanger and I agreed to still wait for their insurance company to pay to fix my aircraft and to not pursue litigation or other uncooperative recourse.

Case 1:04-cv-11575-JLT   Document 92   Filed 02/21/2007   Page 6 of 9

Shabott V. Mercury Air Group, Inc. 16 February, 2007 Affidavit of Leon Shabott 6
Pursuant to Second Opposition to Defendants Renewed Motion for Summary Judgment

19. Around June of 1999 I brought an Engine from a drug seized aircraft to Mercury. After some time and frequent calls Mercury told me they were refusing to install it, stating they did not want the liability. Sometime in the summer of 2000, I found another complete engine with complete logbooks, it was in good condition and had low hours. I delivered it to Mercury to get my plane flying again. Mercury did not install this engine eather.

20. On one of my visits to my aircraft in the summer of 2001. I discovered the aircraft in a state of neglect, the rudder had been damaged by the rudder lock not being maintained, the tires did not have sufficient air, and the right auxiliary fuel tank was empty. The mercury staff was very apologetic. I was told they would straiten the mess out.

21. In the fall of 2002 on one of my visits to Mercury I discovered that Mercury was no longer there! They had sold their operation to another company, Signature Air. I found John Wrega had opened his own Aviation consulting business across the parking lot from the old Mercury office Building, Michael Wasson and John Dupree where now working in the same maintenance hanger for new owners, Signature Air, my plane stood in the same spot. I had a conversation this all three ex Mercury employees, John Wrega assured me something could still be done about my plane, Michael Wasson and John Dupree expressed disappointment in how Mercury treated them, during and after the transfer of ownership. At that time Mike Wasson, a disgruntled ex employee, in my presence, went into a file cabinet in his office and gave me what he said was "the entire file on my airplane".

22. After filing suit in federal court, I complied with the courts orders and produced every document available to me at the time, ~200 pages. Mercury's discovery did not include the existing financial information about my many transactions with them, including the payment for $4186.21 for the repairs they did, prior to and on day of the test flight on July 16th, 1998. I continually asked Mercury's attorneys when and how the depositions would be conducted, they repetitively postponed them.

Shabott V. Mercury Air Group, Inc. 16 February, 2007 Affidavit of Leon Shabott                                    7
Pursuant to Second Opposition to Defendants Renewed Motion for Summary Judgment

23. During the litigation I called Michael Wasson and asked him to provide me with an Affidavit he responded that "Mercury had paid him for his testimony and he did not think he could do it, but I should ask John", (John Wrega) who Mike Wasson said was also given money by Mercury. I called Mr. Wrega and left a message to call me about the matter, he did not return my call.

24. I repetitively asked Mercury's attorney about depositions and documents they were to provider me as per the court orders. Mercury's attorney said he wanted for me to give my deposition first, which I ignorantly agreed to accommodate, Mercury's attorney never did produce any of documentation I requested.

25. I was summoned to deposition 4 times, I was held in deposition for three sessions. Starting June 2nd, 2005 and ending July, 28th, 2005.

26. On July 5th, it was ordered by the court to depose Don Freeman the aviation expert, this deposition took place on August 5th, 2005. On August 4th Mercury and Lycoming had an engine expert of their own examine the disassembled engine and take notes and pictures, none of this notes or pictures have been disclosed to me the Plaintiff as required by law.

27. On September 13th, 2005 Mercury once again requested to file another summary judgment, The two key witnesses for my case Michael Wasson and John Wrega who I was told Mercury had hired as paid consultants, were never deposed.

28. I was always skeptical of the dates of the test flight and the authenticity of the handwritten notes of Michael Wasson, as they were not in the folder that Mike Wasson had given me in my visit to him after discovering Mercury had sold there operation, abandoned my plane and that he was now operations manager for Mercury's successor Signature Air. Mike Wasson freely offered the entire folder and said "This is everything left about your airplane". I felt at that time it was an offer of help and cooperation. He has said to me through the years that he truly felt bad about what had happened. I believe that, at the time, he was being genuine. Had there been handwritten notes that existed, which appear to be written on loose sheets of paper; I believe he would have given them to me at that time.

Shabott V. Mercury Air Group, Inc. 16 February, 2007 Affidavit of Leon Shabott                                    8
Pursuant to Second Opposition to Defendants Renewed Motion for Summary Judgment

29. I voiced the concern about the accuracy and authenticity of these notes to Mercury's attorney and stated it in my deposition. In a phone conversation I asked Mercury's attorney to see the original documents, he said he would see what he could do; Between the time I requested that he produce the original notes for my inspection and the filing of Mercury's two Motions for Summary Judgment, Mercury's Attorney never did produced the original notes.

30. As I was preparing this Affidavit, I saw in Mercury's discovery that the written agreement between Mercury and myself is only the last, signature page of what I recall to be a multiple page document, the missing page(s) contain the clause about Mercury agreeing to maintain the rudder lock and to weekly hand prop the remaining right engine to keep it lubricated.

31. I was mislead into waiting to depose my witnesses till Mercury could dismiss my case on a Statute of Limitation technicality. I repetitively verbally requested if Mercury could produce their banking records for my transactions with them in1998.

32. I was waiting for the time of deposition to ask for testimony and additional discovery from Mercury's ex employees, who had made all these promises and agreements with me regarding this case. They had become uncooperative and uncommunicative after Mercury paid them money, that Mercury had hired them to as consultants to "help with their defense".

33. At no time after the test flight on 16 July 1998 did Mercury look at the right engine to determine the cause and extent of damage. At no time after the Mercury's discovered the destruction of the left engine on 20 July 1998 did Mercury do anything to determined if the left engine EGT gauge is working correctly or is defective.

34. Once I was given my missing financial records, and was able to prove the date of the test flight was indeed 16 July 1998, I called Michael Wasson and asked him about how the conflict between the dates could have occurred. His notes conveniently state the test flight occurred one day *outside* the Statute of Limitations, My recollection and financial records prove it happened on 16 July 1998, two days *inside* the Statute of Limitations. When I confronted these facts to Michael Wasson he was at a loss for words. When I asked Michael Wasson about his notes, he

Case 1:04-cv-11575-JLT    Document 92    Filed 02/21/2007    Page 9 of 9

Shabott V. Mercury Air Group, Inc. 16 February, 2007 Affidavit of Leon Shabott
Pursuant to Second Opposition to Defendants Renewed Motion for Summary Judgment

9

seemed quite nervous. When I asked him where he had kept the notes all those years he stammered and said (~quote) *"I dun no, uh era maybe they were in a box somewhere or uh something."* Michael Wasson was unable to state a "chain of custody" for his handwritten notes when surprised with the question. The critical dates *on the first page* of the notes of Michael Wasson are untrue and could not possibly be correct.

35.   The last time I visited my plane at Signature Air in January of 2007 I was told by the manager Mr. Rick Blaze that it was of his opinion that my aircraft has accrued ~$7000.00 in storage charges since Mercury left town. The airplane and the spare motors sit exactly where Mercury left them in the summer of 2002. John Dupree, an ex Mercury employee is still working for Signature Air in the same hanger as when he worked on my aircraft in 1998.

Signed under the pains and penalties of perjury this Sixteenth Day of February In the year two thousand and seven

Leon Shabott, Plaintiff
4138 Center Pond Road
Newark, VT 05871
802-309-8707

*Pro Se*